THE ESTATE OF KRISTINA ANN FIEBRINK,
By Special Administrator Nathaniel Cade, Jr.; THE
ESTATE OF ANGELICA M. FIEBRINK; JOSE D.
MARTINEZ JR.; and ROBERT MARTINEZ;

      Plaintiffs,

  v.

ARMOR CORRECTIONAL HEALTH
SERVICES, INC.; DR. KAREN RONQUILLO-
HORTON; BROOKE SHAIKH APNP;
VERONICA WALLACE LPN; BRITENY R.
KIRK, LPN; EVA CAGE, LPN; BRANDON
DECKER APNP; MILWAUKEE COUNTY;
DAVID A. CLARKE JR.; RICHARD R.
SCHMIDT; NANCY L. EVANS; KEVIN
NYKLEWICZ; LATISHA AIKENS; BRIAN
PIASECKI; JENNIFER MATTHEWS;
LATRAIL COLE; LATOYA RENFRO; JOHN
DOES 1-10; JOHN DOES 11-20; EVANSTON
INSURANCE COMPANY; WISCONSIN
HEALTH CARE LIABILITY INSURANCE
PLAN; and WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

      Defendants.

Case No. 18-CV-832

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS KAREN RONQUILLO-HORTON AND WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN'S MOTION FOR SUMMARY JUDGMENT

---

On August 24, 2016, at approximately 11:30am, Kristina Fiebrink ("Ms. Fiebrink") was arrested by the Milwaukee Police Department for a probation violation and for resisting an officer. She was booked into the Milwaukee County Jail ("MCJ") later that day.

Both during and after the booking process, Ms. Fiebrink underwent various medical screenings including an intake screening performed by Mai Bruno ("Ms. Bruno"), a nurse employed by Armor Correctional Health Services, Inc. ("Armor"). During the screening process,

1

Ms. Fiebrink revealed that she had ingested heroin earlier on August 24th. Based on this information, Ms. Bruno performed a CIWA (Clinical Institute Withdrawal Assessment) check to determine whether, or to what extent, Ms. Fiebrink was experiencing withdrawal symptoms. Ms. Fiebrink's score was "0" indicating an absence of withdrawal symptoms at that time. Upon completing the CIWA evaluation, Ms. Bruno contacted Brandon Decker, ARNP ("Mr. Decker") for medical orders. Mr. Decker's medical orders required CIWA checks twice a day for five days. His medical orders did not include initiating taper medications.

Armor's records document that over the course of the next three days, nursing staff attempted detoxification checks on three occasions and that Ms. Fiebrink refused treatment on all three occasions.

On the morning of August 28, 2016, Ms. Fiebrink was found unresponsive in her cell. She was later pronounced dead. An autopsy performed revealed that she died of atherosclerotic cardiovascular disease.

Karen Ronquillo-Horton, M.D. ("Dr. Horton") was employed by Armor as the Medical Director at the MCJ. Dr. Horton's primary responsibility was to oversee health services at the MCJ. During the period between August 24, 2016 and August 28, 2016, Dr. Horton did not participate directly in Ms. Fiebrink's medical care, was not asked to consult with Mr. Decker about his proposed treatment plan for Ms. Fiebrink, was not asked to review Ms. Fiebrink's medical chart during that time and did not even know that Ms. Fiebrink was a detainee at the MCJ.

No reasonable jury could reach the conclusion that Dr. Horton violated Ms. Fiebrink's constitutional rights as Dr. Horton was not directly involved in Ms. Fiebrink's care and treatment. In addition, no reasonable jury could find that that Dr. Horton's conduct with regard to

Ms. Fiebrink was negligent or a cause of Ms. Fiebrink's death. Accordingly, the defendant, Dr. Karen Ronquillo-Horton, seeks summary judgment dismissing all of the plaintiffs' claims against her.

## PROCEDURAL HISTORY

The plaintiffs filed their lawsuit on May 31, 2018. (ECF No. 1). Dr. Horton filed a timely Answer on and moved for judgment on the pleadings. (ECF Nos. 41 and 42). Subsequently, the plaintiffs filed an Amended Complaint on October 16, 2018. (ECF No. 57). Dr. Horton filed a timely Answer and has moved for judgment on the pleadings with regard to the first three counts of the plaintiffs' Amended Complaint. (ECF Nos. 86 and 87). That motion is pending.

## FACTUAL BACKGROUND

On August 24, 2016 at 11:32am, Ms. Fiebrink was arrested by the Milwaukee Police Department on a probation violation and for resisting an officer (PFOF ¶ 1.) Ms. Fiebrink had a lengthy history of heroin abuse and had previously been a detainee at the MCJ (PFOF ¶ 2). On August 24, 2016 at 3:42pm, a receiving screen was performed by Officer Christopher R. Allen. (PFOF ¶ 3). The Medical Receiving Screen form documented no signs of intoxication, anxiety or a nervous condition. (PFOF ¶ 4.) Prior to being booked into the Milwaukee County Jail, Ms. Fiebrink underwent a pre-booking screening in which she identified that she had recently ingested heroin. (PFOF ¶ 5.)

Mai Bruno is a Registered Nurse employed by Armor. Ms. Bruno's assignment on August 25, 2016 was to conduct intake screenings in the booking area of the MCJ on August 25, 2016. (PFOF ¶ 6.) Ms. Bruno conducted an intake screening of Ms. Fiebrink on August 25, 2016 which consisted of a Mental Health screening and a Health Screening. (PFOF ¶ 7.) On the Mental Health Screening form, Ms. Fiebrink responded "yes" when asked whether she had a

3

problem with drugs or alcohol. (PFOF ¶ 8.) Ms. Fiebrink also informed Ms. Bruno that she used heroin on a daily basis. (PFOF ¶ 9.) Ms. Fiebrink displayed no evidence of sweating, anxiety, tearing, or any other symptom of opiate withdrawal during the health intake screening. (PFOF ¶ 10.) Under "State of Consciousness" on the health intake form, Ms. Bruno documented that Ms. Fiebrink appeared "alert and oriented" and did not check the box for "intoxicated or drug-impaired". (PFOF ¶ 11.) Question 18 of the health intake form asks about opiate use. (PFOF ¶ 12.) In response to Question 18, Ms. Fiebrink responded that she "snorts heroin, uses various amounts X a few years" and that she last used on August 24, 2016. (PFOF ¶ 13.) Question 18j of the health intake form asks the patient whether they have had problems withdrawing from drugs. (PFOF ¶ 14.) Ms. Fiebrink responded that she has experienced "Nausea/vomiting/diarrhea". (PFOF ¶ 15.) The Health Intake form requires the intake nurse to initiate a CIWA/COWS Withdrawal Screening Flowsheet (PT-018) if the response to question 18J is in the affirmative. (PFOF ¶ 16.) Based on information provided by Ms. Fiebrink in the Health Intake form, Ms. Bruno initiated a CIWA (Clinical Institute Withdrawal Assessment) screening on August 25, 2016 at 12:05am. (PFOF ¶ 17.) The CIWA screening documented no nausea, no vomiting, no tremors, no anxiety, no agitation, no sweating, no tactile disturbances, no auditory disturbances, no visual disturbances, no headaches or fullness in the head, no runny nose, normal pupil size, no issues with orientation, no bone or joint aches, no yawning, no gooseflesh skin. (PFOF ¶ 18.)

Brandon Decker, ARNP was on the on-call nurse practitioner on the morning of August 25, 2016. (PFOF ¶ 19.)  Although Ms. Fiebrink's CIWA score was "0", her reported recent ingestion of heroin required Ms. Bruno to contact Mr. Decker for medical orders. (PFOF ¶ 20.) Based on the information provided by Ms. Bruno, Mr. Decker ordered CIWA monitoring twice daily. (PFOF ¶ 21) In his treatment plan, Mr. Decker also noted "no taper meds at this time".

(Id.) Ms. Fiebrink was classified as eligible for general population and assigned Cell number 23 in Pod 6d. (PFOF ¶ 22)

On August 25, 2016, at 10:59am, Britney Kirk, LPN ("Ms. Kirk") attempted a detox check of Ms. Fiebrink. (PFOF ¶ 23.) Ms. Fiebrink refused to be seen by Ms. Kirk. (PFOF ¶ 24.) On August 26, 2016 at 1:49pm, Veronica Wallace, LPN ("Ms. Wallace") attempted a detoxification check with Ms. Fiebrink. (PFOF ¶25) Ms. Fiebrink refused to be seen by Ms. Wallace. (PFOF ¶ 26.) Fiebrink refused to answer questions asked by Ms. Wallace and refused to let Ms. Wallace take her vitals. (PFOF ¶ 27.) Ms. Wallace observed that Ms. Fiebrink was able to walk out of her cell by herself and walk back in by herself and Ms. Wallace observed no signs that Ms. Fiebrink was detoxing and that she offered no complaints. (PFOF ¶ 28, 29.) Based on her observations, Ms. Wallace felt that Ms. Fiebrink was "okay". (PFOF ¶ 30.)  On August 27, 2016, between 8:00am and 8:30am, Eva Cage, LPN ("Ms. Cage") attempted a detoxification check with Ms. Fiebrink. (PFOF ¶ 31.) Ms. Fiebrink refused to be seen by Ms. Cage. (PFOF ¶ 32.)

Latisha Aikens ("Ms. Aikens") was the correctional officer assigned to monitor Pod 6D on the night of August 27/28, 2016. (PFOF ¶ 33.) Ms. Aikens recalled the night of August 27/28, 2016 as being quiet and uneventful.  (PFOF ¶ 34.) Ms. Aikens' only observation of Ms. Fiebrink on the night of August 27/28, 2016 was that Ms. Fiebrink was asleep during her shift. (PFOF ¶ 35.)  The Activity Log for Pod 6D supports Ms. Aikens' testimony as it documents no instances of Ms. Fiebrink yelling, screaming or crying out for medical attention between 2:20pm August 27, 2016 and 7:24am on August 28, 2016. (PFOF ¶ 36.) On August 28, 2016 at 7:24am, Ms. Fiebrink was found unresponsive in her cell and was later pronounced dead at 7:38am. (PFOF ¶ 37.)

On August 28, 2015, an investigation into Ms. Fiebrink's death was initiated by Detective George Anagnostopoulos. (PFOF ¶ 38.) Det. Anagnostopoulos' investigation documented that each cell in the Milwaukee County Jail is connected by intercom to the Floor Control, which is a central area, continually staffed, between all four pods on the 6th Floor and that the office at Floor Control is able to communicate with all cells on the floor. (PFOF ¶ 39, 40.) Further, in the case of an emergency, inmates may use the intercom system to call the correctional officer at Floor Control. (PFOF ¶ 41.) Det. Anagnostopoulos' investigation revealed that during the period between 8:00am August 27, 2016 and 8:00am on August 28, 2016 there were no intercom communications in Pod 6D. (PFOF ¶ 42.)

On August 29, 2016, an autopsy was performed on Ms. Fiebrink. (PFOF ¶ 43.) The autopsy found a 75% stenosis of the left anterior descending coronary artery and a 75% stenosis of the right coronary artery. (PFOF ¶ 44.) The autopsy also showed that Ms. Fiebrink had an enlarged heart and that Ms. Fiebrink's vitreous electrolytes were at normal levels. (PFOF ¶ 45, 46.) The death certificate listed the cause of Ms. Fiebrink's death as atherosclerotic cardiovascular disease. (PFOF ¶ 47.)

Dr. Horton is a physician licensed to practice medicine in the State of Wisconsin since 2010. (PFOF ¶ 48.) Dr. Horton was employed by Armor Correctional Medical Services, Inc. (hereinafter, "Armor"), as the Medical Director at the Milwaukee County Jail from November 2014 through December 2018. (PFOF ¶ 49.) Her primary duty was to oversee health services at the Milwaukee County Jail and the House of Corrections. (PFOF ¶ 50.) She was not responsible for supervising or providing training to nursing staff employed by Armor and only directly supervised the nurse practitioners and physicians. (PFOF ¶ 51, 52.) Dr. Horton only became involved in creating treatment plans if she was approached by a medical provider. (PFOF ¶ 53.)

6

With regard to Ms. Fiebrink, Dr. Horton did not speak with Brandon Decker about his proposed treatment plan for Ms. Fiebrink prior to her death. (PFOF ¶ 54.) In fact, Dr. Horton was unaware that Ms. Fiebrink was in the Milwaukee County Jail between August 25, 2016 and August 28, 2016. (PFOF ¶ 55.) Dr. Horton provided no direct medical care to Ms. Fiebrink during the time period between August 24, 2016 and August 28, 2016. (PFOF ¶ 56.) Finally, Dr. Horton was not asked by anyone to review Ms. Fiebrink's medical records generated during the time period between August 24, 2016 and August 28, 2016 until after Ms. Fiebrink's death. (PFOF ¶ 57.)

One of the allegations against Dr. Horton involves her role in implementing policies at the MCJ. Kayla McCullough ("Ms. McCullough"), who was employed by Armor as the Health Services Administrator at the MCJ provided testimony in her deposition that outlined Armor's process for developing policies and procedures. (PFOF ¶ 58.) Ms. McCullough testified that all Armor policies and procedures are developed by Armor's Chief Medical Officer or other chiefs at the corporate office. (PFOF ¶ 59.) The policies are then rolled out to all Armor locations. (PFOF ¶ 60.) Although the policies themselves are developed at the corporate level, site medical directors and health services administrators are able to revise policies to accommodate site-specific needs. (PFOF ¶ 61.)

The primary focus of the plaintiffs' case is on Armor's policy regarding intoxication and withdrawal. The provision of medical care for individuals experiencing intoxication and/or withdrawal were primarily governed by Armor's Intoxication and Withdrawal policy designated J-G-07 which was in force at the time of Ms. Fiebrink's death. (PFOF ¶ 62.) Ms. McCullough testified that she did not approve any procedural changes to the Intoxication and Withdrawal policy that was in force in 2016. (PFOF ¶ 63.)

## SUMMARY JUDGMENT STANDARD

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file. *Id*. at 324. When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "depositions, answers to interrogatories, and admissions on file" designate "specific facts showing that there is a genuine issue for trial". *Id*. A mere "scintilla of evidence" will not preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The Seventh Circuit has often referred to summary judgment as the "put up or shut up" moment in litigation. *Goodman v. NSA, Inc.*, 621 F. 3d 651, 654 (7th Cir. 2010). Not all disputes of fact preclude summary judgment. Instead, "the requirement is that there be no genuine issue of material fact". *Anderson*, supra, at 248. A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Id*. A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A motion for summary judgment may not be defeated by evidence that is "merely colorable" or "is not sufficiently probative". *M&M Medical Supplies and Services, Inc. v. Pleasant Valley Hospital, Inc.*, 981 F. 2d 160, 163 (4th Cir. 1993). Thus, a nonmoving party cannot "create a genuine dispute of fact through mere speculation." *Emmett v. Johnson*, 532 F. 3d 291, 297 (4th Cir. 2008).

The plaintiffs have filed the above action against a number of defendants, including Dr. Karen Ronquillo-Horton ("Dr. Horton"). Dr. Horton was the Medical Director of Armor Correctional Health Service, Inc., with responsibility for providing healthcare services to inmates of the Milwaukee County Jail. The complaint alleges that, while plaintiff Kristina Ann Fiebrink was confined at the MCJ between August 24, 2016 and August 28, 2016, the defendants, including Dr. Horton, acted with deliberate indifference to Ms. Fiebrink's medical needs in violation of the Fourth, Eighth and Fourteenth Amendments. (ECF 1, ¶ 2.) The complaint asserts five causes of action, four of which are directed to Dr. Horton, including a civil rights claim pursuant to 42 U.S.C. § 1983 under *Monell v. Department of Social Services*, 435 U.S. 658 (1978) (ECF 1, ¶¶ 97-109); "federal constitutional claims" asserted by plaintiff Robert Martinez for loss of society and companionship (ECF 1, ¶¶ 110-118); negligence (ECF 1, ¶¶ 119-125); and wrongful death pursuant to Wis. Stat. § 895.03 (ECF 1, ¶¶ 126-128). Dr. Horton now moves for summary judgment on all claims asserted against her in the complaint.

## ARGUMENT

**I.   ANY INDIVIDUAL-CAPACITY CLAIMS UNDER 42 U.S.C. § 1983 AGAINST DR. HORTON MUST BE DISMISSED FOR LACK OF PERSONAL INVOLVEMENT**

Up until 2018, the claims of inadequate medical care brought by pretrial detainees were analyzed by the courts applying the deliberate indifference standard under Eighth Amendment standards which required that a defendant had a "sufficiently culpable state of mind" and asked whether the official actually believed there was a significant risk of harm. *Pittman v. Cty. Of Madison*, 746 F.3d 766, 775-76 (7th Cir. 2014). However, in *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015), the Supreme Court distinguished between pretrial detainees and convicted prisoners. Specifically, the court recognized that since a pretrial detainee has not been convicted of a crime, by definition, they cannot be punished. Therefore, the Eighth Amendment's

9

prohibition against cruel and unusual punishment is inapplicable and a pretrial detainee's claims of excessive force necessarily falls under the ambit of the Fourteenth Amendment's Due Process Clause. As a result, the deliberate indifference standard is not applicable to claims of pretrial detainees and not applicable to this case. Rather, claims of excessive force are required to be analyzed under an objective standard.

The 7th Circuit adopted the Supreme Court's reasoning and applied it to claims of inadequate medical care brought by a pretrial detainee in *Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018). The analysis consists of two steps; the first "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of plaintiff's case. *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda v. Cty. of Lake*, 900 F.3d 335). A showing of negligence or even gross negligence will not suffice. *Id*.

The second step of the analysis asks whether the challenged conduct was objectively reasonable. This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively-without regard to any subjective belief held by the individual-whether the response was reasonable. *Id*.

In this particular case, it is Dr. Horton's position that the court should not even get to the analysis set forth above because there is no evidence that Dr. Horton participated in Kristina Fiebrink's medical care during Ms. Fiebrink's confinement in August of 2016. Dr. Horton never examined Ms. Fiebrink. Further, Mr. Decker did not, at any time before Ms. Fiebrink's death consult with Dr. Horton regarding Ms. Fiebrink's treatment plan and never reviewed Ms. Fiebrink's chart until after Ms. Fiebrink's death. She did not even know that Ms. Fiebrink was

10

even in the jail between August 24th and 28th. Therefore, there is no action on the part of Dr. Horton to even apply the objective reasonableness standard to.

The Seventh Circuit has established that an individual cannot be held liable in a §1983 action unless he or she caused or participated in the alleged constitutional deprivation. *Starzenski v. City of Elkhart*, 87 F.3d 872, 879, (7th Cir. 1996). Without a showing of direct responsibility for the improper action, liability will not lie against a supervisory official under §1983. *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986). A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary. *Id.* Individual liability for damages under § 1983 is necessarily predicated upon personal responsibility. *Id.*

The amended complaint in the instant case alleges, in relevant part:

> 2.     Fiebrink was brought to the Milwaukee County Justice Facility ("CJF") on August 24, 2016, suffering from heroin and alcohol withdrawal symptoms. Despite her acute obvious medical condition, Fiebrink was placed in the general population with no access to medical care. Despite policy and procedure requiring an inmate to receive a medical screening within 72 hours of admission, Fiebrink did not receive a medical screening; in fact, her medical screening appointment schedule for August 26, 2016, was canceled. On the night of August 27 and into the morning of August 28, 2016, Fiebrink was suffering acute symptoms related to her withdrawal, including hallucinations, vomiting and profuse diarrhea. Despite these obvious acute symptoms, and Fiebrink's verbal cries for help, which could be heard throughout Unit 6D, Fiebrink was provided no medical care and tragically died on the floor of her cell. As a result of the defendant's unlawful contact and reckless disregard and deliberate indifference, Fiebrink unnecessarily suffered and ultimately lost her life.

(ECF 1, ¶ 2.)

The amended complaint names a number of defendants, and also advances allegations against a number of these defendants which purport to identify the facts underlying the direct participation of each of these defendants in the alleged events of August 24 through August 28, 2016. (ECF 1, ¶¶ 13-17.) In contrast, with respect to Dr. Horton, the complaint makes no allegations of any personal involvement or knowledge relative to the alleged events of August 24 through August 28, 2016. (ECF 1, ¶ 12.)  Dr. Horton's deposition testimony confirmed that she

did not participate in Ms. Fiebrink's medical care and did not meet with her face-to-face between August 24 and August 28. During the discovery process in this case, there have been thousands of pages of records disclosed and over sixteen depositions completed in this case and there is not a single shred of evidence to contradict Dr. Horton's testimony and establish the necessary direct involvement by Dr. Horton in the medical care of Kristina Fiebrink.

The case of *Chizum v. Corr. Med. Servs.,* No.3:09-CV-0527, 2010 U.S. Dist. LEXIS 40583; 2010 WL 1710711 (N.D. Ind. Apr. 26, 2010) is instructive. In that case, plaintiff Max Chizum was a prisoner confined at the Miami Correctional Facility in Indiana. Chizum brought an action under 42 U.S.C. § 1983 against a number of defendants, including the correctional facility's Medical Director, Lynn Frye. Chizum alleged that he had been diagnosed with throat cancer and had been prescribed 15 mg of morphine twice daily to deal with his pain. He alleged in his complaint that the defendant healthcare providers subsequently changed his pain medication to 10 mg of methadone twice daily in order to "cut costs". The District Court for the Northern District of Indiana dismissed plaintiff's claim against the Medical Director, noting:

> In addition to Dr. Marandot and Nurse Ivers, Chizum also names the CMS and MCF Medical Director Lynn Frye as defendants. Section 1983 creates a cause of action for damages based on personal liability; a plaintiff must show the defendant's personal involvement or participation, or direct responsibility for the conditions of which he complains. . . . A person cannot be held liable for damages under § 1983 unless the person was personally involved in the alleged wrongdoing. A plaintiff must allege facts showing the defendant's participation or direct responsibility for the conditions of which he complains, . . . by demonstrating a causal link between the defendant's conduct and the plaintiff's injury. . . . The doctrine of *respondeat superior*, under which a supervisor may be held liable for an employee's actions, has no application to § 1983 actions.

*Chizum v. Corr. Med. Servs., supra*, at *10-*11.

The District Court, in *Chizum*, after establishing that § 1983 claim requires a showing of a defendant's personal involvement or participation or direct responsibility for the conditions of which the plaintiff complains, dismissed plaintiff's complaint as to Medical Director Frye:

12

That defendants Marandot and Ivers were employed by CMS, does not make that corporation liable for their alleged deliberate indifference, and the complaint does not allege that Medical Director Frye had any personal involvement in the decision not to renew Chizum's methadone prescription to expire.

*Id at \*11.*

Similar to Frye in the *Chizum* case, the Plaintiffs' Complaint contains no allegations that Dr. Horton was directly involved with the medical care of Kristina Fiebrink. Further, the plaintiffs have had more than ample time to present evidence that would establish a direct link and have failed to do so. Therefore, the absence of direct involvement alone is sufficient to grant summary judgment dismissing all individual-capacity claims against Dr. Horton.

## II. THE PLAINTIFFS' OFFICIAL-CAPACITY CLAIM ASSERTED AGAINST DR. HORTON UNDER *MONELL V. DEPARTMENT OF SOCIAL SERVICES*, 436 U.S. 658 (1978), MUST BE DISMISSED AS SUPERFLUOUS AND DUPLICATIVE OF PLAINTIFF'S *MONELL* CLAIM AGAINST MILWAUKEE COUNTY

In *Kentucky v. Graham*, 473 U.S. 159, 163, 105 S. Ct. 3099 (1985), the United States Supreme Court addressed the distinctions between personal and official capacity suits. The Supreme Court explained as follows:

Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. . . . Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Kentucky v. Graham*, *supra*, at 165-66.

In the instant complaint, Count II seeks to hold Dr. Horton responsible in her official-capacity under *Monell, supra.* (ECF 1, ¶¶ 97-109.) This claim, as asserted against Dr. Horton, however, is redundant and unnecessary.

13

Numerous district courts within the Seventh Circuit have dismissed "official capacity" claims that have been asserted against individual defendants as redundant, where the plaintiff has also named the employing municipality or corporate defendant as a party defendant. In *Garrett v. Dart*, No. 09-CV-1398, 2010 U.S. Dist. LEXIS 67965 (N.D. Ill. July 8, 2010), the plaintiff detainee claimed that various officials had violated his civil rights by allegedly delaying treatment of his abscess tooth. *See Garrett v. Dart*, Plaintiff Garrett named a number of defendants, including Cook County, Cook County Sheriff Thomas Dart, Chief Operating Officer of Cermak Health Services David Fagus, Former Chief Operating Officer of Cermak Health Services Leonard Bersky, and Executive Director of Cook County Department of Corrections, Salvador Godinez. He brought claims against each defendant in both their <u>official</u> and <u>individual</u> capacities. Martin, Godinez, Fagus and Bersky moved to dismiss the "official capacity" claims as being redundant of plaintiff's claims against the governmental entities that employed them. The U.S. District Court for the Northern District of Illinois agreed, holding:

> It is well established that a suit against an officer in his official capacity is a suit against the government entity for which the officer works. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099 . . . (1985). Plaintiff's suit against Defendants Martin, Godinez, Fagus and Bersky in their official capacities is therefore treated as a suit against Cook County and the Sheriff in his official capacity. Since plaintiff already has brought suit against Cook County and Sheriff Dart in his official capacity, the official capacity claims against Defendants Martin, Godinez, Fagus, and Bersky are dismissed as being redundant.

*Garrett v. Dart*, *supra*, at *8.

In *Sanders v. Sheehan*, No. 09C7077, 2010 U.S. Dist. LEXIS 85834 (N.D. Ill. Aug. 12, 2010), plaintiff Rafael Sanders brought a ten-count action under 42 U.S.C. § 1983 against the City of Markham, as well as a number of individual police officers, including officers Sheehan, Newman, Walker and Wilson, alleging a violation of plaintiffs' civil rights relative to his arrest. The individual defendants sought dismissal of the plaintiff's § 1983 claims against them insofar as those claims were stated against the individuals in their official capacities. The defendants

asserted that those claims were redundant of the plaintiff's *Monell* claims against the City of Markham.  The U.S. District Court for the Northern District of Illinois agreed, holding:

> In this case, Sanders's complaint sets forth a *Monell* claim . . ., dismissal of which the court previously denied . . . . Sanders's claims against the individual defendants in their official capacities are the equivalent of suit brought against the City, and must be analyzed pursuant to *Monell*.  Sanders's official capacity claims are therefore redundant of his separately stated *Monell* claim insofar as his *Monell* claim is based on the individual defendants' conduct.  Accordingly, Sanders's official capacity allegations are dismissed.

*Sanders v. Sheehan*, *supra*, at *19.

In *Davis v. Metro. Pier & Exposition Auth.*, No. 11 C 9018, 2012 U.S. Dist. LEXIS 91710 (N.D. Ill. July 3, 2012), the plaintiff brought suit against her former employer, the Metropolitan Pier & Exposition Authority, as well as two of its employees, Carlos Ponce and George Rosenbrock.  The plaintiff made a number of allegations against these entities, including constitutional rights violations under §1983.  The U.S. District Court for the Northern District of Illinois noted first that, where a plaintiff brings suits against a governmental entity, any claims against the employees of that entity in their official capacities are redundant and subject to dismissal.  *Id*. at p. 29.  The court then held:

> Davis's claims against Ponce and Rosebrock are brought against them only in their official capacities as agents of the MPEA because she does not state the capacity in which she is suing them in her Complaint and because she alleges that they acted under color of law. Thus, the claims against Ponce and Rosebrock are truly claims against the MPEA itself. Because Davis brings suit directly against the MPEA for violations of § 1981 and § 1983, the claims against Ponce and Rosebrock contained in Counts IV, V, and VI are dismissed as redundant.

*Davis v. Metro. Pier & Exposition Auth.*, *supra*, at *30.

In *Hostetler v. City of Southport*, No.1:17-cv-01564-TWP-TAB, 2018 U.S. Dist. LEXIS 50658 (S.D. Ind. Mar. 27, 2018), plaintiff filed an action asserting a violation of his Fourth Amendment rights under 42 U.S.C. § 1983 due to false arrest and illegal search.  Amongst the defendants named was Chief of Police Thomas L. Vaughn, in addition to the City of Southport.

15

The U.S. District Court for the Southern District of Indiana agreed with Chief Vaughn's argument that plaintiff's official capacity claim against him should be dismissed:

> Turning to the official capacity claim against Chief Vaughn, "[u]nder 42 U.S.C. § 1983, official capacity suits represent 'only another way of pleading an action against an entity of which an officer is an agent.' "*Monell*, 436 U.S. at 690 n.55. Any official capacity claims are really claims against the government entity." . . . Defendants contend that Marc's claim against Chief Vaughn, in his official capacity, must be dismissed because it is in effect, an action against the city itself. The Court agrees. Vaughn's official capacity claim is duplicative of the claim against Southport, and Marc has not responded to Defendants' contention. . . . Accordingly, Chief Vaughn is dismissed in his official capacity.

*Hostetler v. City of Southport*, *supra*, at *8-*9.

*Young v. Peoria Cty.*, No. 1:16-cv-01367-JBM, 2017 U.S. Dist. LEXIS 206160 (C.D. Ill. Dec. 15, 2017) involved an action arising out of the suicide committed by an inmate of the Peoria County Jail. Plaintiffs filed suit under 42 U.S.C. § 1983 against various entities and individuals, including Peoria County, Peoria County Sheriff Michael McCoy, and a number of police officers, including officer Morgan Hanse, officer Alex Michel, Officer Michael Smith, and Officer Stan Kester. The U.S. District Court for the Central District of Illinois dismissed the "official capacity" *Monell* claims brought against the individual officers:

> Initially, the Court notes that Plaintiff has incorrectly brought official-capacity *Monell* claims against Officers Hanse, Kester, Smith, and Michel and Superintendent Asbell. A suit against an officer in his official capacity "generally represent[s] only another way of pleading an action against [the] entity of which [the] officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 . . . (1985). All of the named officers and Superintendent Asbell report to, and are hired by, the Sheriff. As such, only Sheriff McCoy is a proper defendant for Plaintiff's *Monell* claims against the Sheriff's Department. . . . Plaintiff's *Monell* claims against Officers Kester, Michel, Smith and Hanse and Superintendent Asbell are DISMISSED.

*Young v. Peoria Cty.*, *supra*, at *18-*19.

The Amended Complaint also includes Dr. Horton in its *Monell* allegations, along with Milwaukee County, Sheriff David Clarke, Richard Schmidt and Dr. Horton's employer, Armor. A *Monell* claim under these circumstances is essentially a claim asserted against Dr. Horton in her

"official capacity".  As an "official capacity" claim, Fiebrink's *Monell* claims against Dr. Horton are just another way of asserting claims against Armor and Milwaukee County.  Because the plaintiff asserts *Monell* claims against both Milwaukee County and Dr. Horton's employer, Armor, in the Complaint, plaintiffs' *Monell* claims against Dr. Horton are duplicative of the plaintiffs' claims asserted against the Milwaukee County and Dr. Horton's employer, Armor.  Based upon the authorities noted above, summary judgment should be granted as the *Monell* claims are duplicative of plaintiffs' *Monell* claims against Milwaukee County and Armor.

## III.   ROBERT MARTINEZ LACKS STANDING TO BRING A CLAIM FOR THE LOSS OF HIS MOTHER'S SOCIETY AND COMPANIONSHIP

In Count III of the complaint, Robert Martinez makes a "federal constitutional claim" for loss of society and companionship. (ECF 1, ¶¶ 110-118.) For all of the reasons set forth, *supra*, this "federal claim' fails to state a claim against Dr. Horton.

The claim of Robert Martinez fails on an additional and independent basis, however. Mr. Martinez lacks standing to assert a claim for a violation of his familial relationship with his mother under the United States Constitution.

Mr. Martinez (DOB October 6, 1998), was one month shy of turning 18 years of age on the date of his mother death on August 28, 2016. (ECF 1, ¶ 10.) The only claim that Martinez asserts in Count III of the complaint is a claim for loss of society and companionship. In *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), the Seventh Circuit was compelled to revisit its earlier decision in *Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), in which the Seventh Circuit had held that a parent's constitutional liberty interest in his relationship with his adult son was violated when his son was killed by police. In *Russ v. Watts*, the Seventh Circuit reversed course, and overturned *Bell* insofar as it recognized the constitutional right to recover for the loss of companionship of an adult relative when that relationship is terminated as an incidental result of state action. The

Seventh Circuit felt compelled to revisit its previous holding in *Bell* primarily because the Seventh Circuit sister courts had subsequently addressed the same issue on a number of occasions, and each had reached a conclusion inconsistent with *Bell*:

> Since Bell, several of our sister circuits have considered whether the Constitution protects a parent's relationship with his adult children in the context of state action which has the incidental affect of severing that relationship. No other court of which we are aware has allowed a parent to recover for the loss of his relationship with his child in these circumstances. Most courts that have considered the issue have expressly declined to find a violation of the familial liberty interest where the state action at issue was not aimed specifically at interfering with the relationship.

*Russ v. Watts, supra*, at 787.

In concluding that there is no constitutional right to recover for a loss of society and companionship when the state action at issue is not aimed specifically at interfering with the familial relationship, the Seventh Circuit, in *Russ*, observed:

> Courts have also been reluctant to extend the constitutional protections afforded the parent-child relationship to cases involving adult children. . . .
>
> * * *
>
> That *Bell* stands alone causes us to reconsider its holding. We now see that our conclusion that Dolphus Bell's parental liberty interest was violated by the killing of his son was not well grounded in the Constitution or Supreme Court case law. The Supreme Court has recognized violations of the due process liberty interest in the parent-child relationship only where the state took action specifically aimed at interfering with that relationship. . . .
>
> * * *
>
> . . . Under any standard, finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court. . . .

*Russ v. Watts, supra*, at 788-90.

The reasoning underlying the Seventh Circuit's holding in *Russ v. Watts* was clear:

> Affording plaintiffs a constitutional due process right to recover against the state in these circumstances would create the risk of constitutionalizing all torts against individuals who happen to have families.

18

*Id*. at 790.

While the Seventh Circuit in *Russ* noted in passing that "minor children's need for the guidance and support of their parents warrants 'sharply different constitutional treatment, '" *Id*., that concern is absent in the instant case as Mr. Martinez was essentially an adult at the time of his mother's death.

Moreover, subsequent to the *Russ* decision, some courts have challenged the very concept that a substantive claim for interference with familial relationships exists under Section 1983, even in the case of minor children. For example, *Estate of Perry v. Boone Cty. Sheriff*, No. 1:05-cv-1153-LJM-WTL, 2008 U.S. Dist. LEXIS 19358, 2008 WL 694696 (S.D. Ind. Mar. 12, 2008), involved an in-custody jail death attributed to alcohol withdrawal, dehydration, and acute renal failure. Plaintiffs filed suit under 42 U.S.C. § 1983 raising a number of claims, including a claim asserted by the minor children of the deceased inmate that the sheriff and the jail physician had allegedly deprived him of "a liberty interest in continued familial relationships" with their deceased father. The defendants argued that the interference with familial relationships claim was foreclosed by the Seventh Circuit's decision in *Russ v. Watts*, which provided that no such claim is available in cases involving adult children. In contrast, the minor plaintiffs argued that the *Russ* court left the door open for minor children to assert such a claim because it explicitly recognized that the needs of minor children "warrant sharply different constitutional treatment."

The district court, in *Estate of Perry v. Boone County Sheriff*, *supra*, acknowledged the Seventh Circuit's holding in *Russ* when it dismissed the claim asserted by the minor plaintiffs:

> As the *Russ* court recognized, finding a constitutional violation based on official actions that were not aimed at the familial relationship inappropriately stretches due process "far beyond the guiding principles set forth by the Supreme Court."

\* \* \*

19

Here, Plaintiffs have not presented any evidence, much less even alleged, that the actions of the Defendants were specifically directed at disrupting the familial relationship. Accordingly, the Court GRANTS both of the requests for summary judgment on this claim and DISMISSES the same with prejudice.

*Estate of Perry v. Boone Cty. Sheriff, supra*, at *31-*32.

In the instant case, Mr. Martinez asserts a claim for loss of society and companionship, a claim which is consistent with the claim for loss of familial relationship that was asserted by the minor plaintiffs in *Estate of Perry v. Boone County Sheriff, supra*. However, there have been no allegations and, more importantly, no evidence presented that would establish that the actions of Dr. Horton or any of the other defendants were specifically directed at disrupting the familial relationship between Mr. Martinez and his mother, Kristina Fiebrink. As the Seventh Circuit recognized, in *Russ v. Watts, supra*:

> Under any standard, finding a constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court.

*Russ v. Watts, supra*, at 789-90.

The court should grant summary judgment to Dr. Horton on Robert Martinez's claim for loss of society and companionship under Count III of the complaint on the independent grounds that no substantive claim for interference with familial relationship exists under Section 1983, and that he lacks standing to bring such a claim.

Dr. Horton also reasserts her argument as set forth under Section I as a further basis for summary judgment on Mr. Martinez's claims.

## IV. THE PLAINTIFF HAS FAILED TO ESTABLISH THAT ANY OF THE ALLEGED ACTS OR OMISSIONS OF THE DEFENDANTS CAUSED THE DEATH OF KRISTINA FIEBRINK

In addition to the constitutional claims asserted by the plaintiffs, they have also pleaded claims sounding in negligence and wrongful death which are state law claims for which the

20

controlling authority is Wisconsin law. As both causes of action are based on claims of negligent medical care or improper medical care, they ought to be analyzed through the lens of medical negligence cases in Wisconsin.

**A. There is no evidence to establish that Dr. Horton was negligent with regard to the medical treatment received by Kristina Fiebrink.**

In order to hold a defendant liable in a medical malpractice claim the burden is upon the plaintiff to show that the physician failed in the requisite degree of care and skill. *Nowatske v. Osterloh*, 198 Wis. 2d 419, 543 N.W.2d 265 (1996). That degree of care and skill can only be proved by the testimony of experts. *Froh v. Milwaukee Med. Clinic, S.C.* 85 Wis. 2d 308, 317, 270 N.W.2d 83 (Ct. App. 1978).

First and foremost, it must be reiterated that it is undisputed that Dr. Horton was not in any way, involved in the treatment of Kristina Fiebrink between August 24th and August 28, 2016. She did not examine Ms. Fiebrink, she did not consult with any of the nurse practitioners or nurses that provide care to Ms. Fiebrink and she never reviewed any of Ms. Fiebrink's medical records until after Ms. Fiebrink passed. The lack of direct involvement by Dr. Horton alone should provide a sufficient basis to grant summary judgment dismissing the negligence and wrongful death claims against Dr. Horton.

However, even if the plaintiffs can get beyond the lack of Dr. Horton's direct involvement in Kristina Fiebrink's medical care, their negligence and wrongful death claims against Dr. Horton must still fail as the experts the plaintiffs' have disclosed have failed to identify a specific standard of care that Dr. Horton is alleged to have violated and how she violated that standard of care. While Wisconsin acknowledges that there are unusual circumstances where the common knowledge of lay people may be able to determine the negligence question without expert testimony, (*Christianson v. Downs*, 90 Wis. 2d 332, 279 N.W.2d 918 (1979) offers the example of where a

21

surgical instrument was left in an incision or where the wrong organ or body part was removed during surgery), this case is not one of those cases. The issues of rendering appropriate medical care in a correctional facility or the appropriate standard of care to be applied to the medical treatment of a heroin addict are clearly not within the ken of the lay person and expert testimony is absolutely required on both issues. The plaintiffs have failed to provide the expert testimony necessary to establish the appropriate standard of care and that any such standard was violated by Dr. Horton and that failure is fatal to their negligence and wrongful death claims.

**B. Kristina Fiebrink's death was caused by atherosclerotic cardiovascular disease and not by complications related to heroin withdrawal.**

Even if the plaintiffs are able to establish that something Dr. Horton did or did not do violated some standard of care, they still have to establish that such failure was a substantial cause of Kristina Fiebrink's death. Once again, the law in Wisconsin requires expert testimony to establish causation. *Treptau v. Behrens Spa, Inc.*, 247 Wis. 438, 444, 20 N.W.2d 108 (1945). While the plaintiffs have offered up Dr. Richard Lewan as their expert to opine on causation, his opinion that complications from withdrawal led to Ms. Fiebrink's death is based entirely on conjecture, supposition and omission of relevant facts. (See Dec. of Randall Guse, Exhibit 22)

The hurdle faced by the plaintiffs on the cause issue is the autopsy report issued by Jacob Smith, M.D. which cites atherosclerotic cardiovascular disease as the cause of Ms. Fiebrink's death. The autopsy found that the found a 75% stenosis of the left anterior descending coronary artery and a 75% stenosis of the right coronary artery. In addition, Ms. Fiebrink had an enlarged heart. Finally, and most damaging to the plaintiffs' case, the toxicology report found no evidence of dehydration.

In his report, Dr. Lewan states that "stress and dehydration likely with severe fluid deficits and electrolyte abnormalities caused cardiorespiratory arrest." (Guse Decl. Ex. 22 at p.3) In order to reach this conclusion, Dr. Lewan conjectures that Ms. Fiebrink was experiencing "repeated" (Id.) episodes of diarrhea, hallucinations and signs of dehydration. Further, although he admits that "there is no documentation that she had retching and vomiting", he still leaps to the conclusion that "it is more likely than not that she did as evidenced by the severity of her dehydration". (Id.) Admittedly, there is one episode of diarrhea documented by corrections staff. However, there is no evidence documenting "repeated" episodes of diarrhea, retching or vomiting or that Ms. Fiebrink was experiencing hallucinations. In fact, his conclusion that Ms. Fiebrink was severely dehydrated is refuted by the objective findings in the autopsy, conveniently ignored by Dr. Lewan, that showed Ms. Fiebrink's vitreous electrolytes to be within normal ranges. In short, Ms. Fiebrink was not dehydrated at the time of her death much less, "severely dehydrated".

In order to overcome the objective report authored by a medical examiner citing a cause of death unrelated to heroin withdrawal, the plaintiffs have disclosed a report full of supposition and woefully short on facts. Dr. Lewan's opinion regarding causation is speculative and fails to refute the autopsy report or create a genuine issue of material fact precluding summary judgment for Dr. Horton as a nonmoving party cannot "create a genuine dispute of fact through mere speculation." *Emmett v. Johnson*, 532 F. 3d 291, 297 (4th Cir. 2008). Therefore, the plaintiffs have failed to meet their burden to establish that any alleged acts or omissions by Dr. Horton was a substantial factor in Ms. Fiebrink's death.

**C. The policies and procedures the Plaintiffs claim were deficient were not developed by Dr. Horton**

The plaintiffs have alleged that policies and procedures in place at the Milwaukee County Jail at least in part, led to Ms. Fiebrink's death. They also allege that Dr. Horton, as Medical Director, bears responsibility for those policies and procedures. However, the undisputed facts demonstrate that policies and procedures were drafted by Armor's chief medical officer and then rolled out to the various Armor sites. While Dr. Horton, in conjunction with the Health Services Administrator, Kayla McCullough, had the authority to modify policies to better fit the needs of the MCJ, the primary policy at issue, Armor's Intoxication and Withdrawal policy, was not modified or changed by Dr. Horton or Ms. McCullough. Further, there is no evidence that any of the other policies referenced have been modified at the recommendation of Dr. Horton. Therefore, any allegations of negligence against Dr. Horton pertaining to the development of policies implemented at the MCJ are without merit.

**D. The plaintiffs have failed to establish that Dr. Horton was negligent in the supervision of her staff.**

In large part, the plaintiffs' claims focus on the alleged acts or omissions of the nursing staff employed by Armor at the MCJ. However, Dr. Horton was not responsible for the training or supervision of nursing staff at the MCJ. That responsibility fell to the Director of Nursing who did not report to Dr. Horton. As the nursing staff was not under the purview of Dr. Horton, there can be no claim of negligent supervision against Dr. Horton as it pertains to the nursing staff.

Dr. Horton did have the responsibility of training and supervising the nurse practitioners and the physicians that were on staff at the MCJ. The only individual under Dr. Horton involved in the care of Kristina Fiebrink was Mr. Decker. On August 25, 2016, Mr. Decker was the on-

24

call nurse practitioner. As the on-call nurse practitioner, Mr. Decker's role was to be available for emergencies and to consult with the nursing staff should the need arise.

Mr. Decker was contacted by Mai Bruno, R.N. after she completed the initial Mental Health Screening, Health Screening and initial CIWA screening on Ms. Fiebrink. Nurse Bruno relayed to Mr. Decker that Ms. Fiebrink had ingested a large quantity of heroin during the previous day. She also informed Mr. Decker that Ms. Fiebrink's CIWA score was "0". Based on that information, and consistent with Armor's Intoxication and Withdrawal policy and the CIWA Flowsheet, NP Decker, issued medical orders that the nursing staff conduct CIWA screening twice a day. Based on the fact that Ms. Fiebrink was not showing any signs of withdrawal, he did not order taper medications for Ms. Fiebrink.

Mr. Decker's treatment plan was entirely consistent with Armor policies in place at the time. The primary policy/procedure applicable to Ms. Fiebrink's case is Armor's Intoxication and Withdrawal policy-J-G-07-(Armor 0978-0982). Ms. McCullough testified in her deposition that she has not approved any modifications to this policy for the MCJ. Plaintiffs and plaintiffs' expert, Dr. Lewan, have argued that Armor and Dr. Horton violated this policy by failing to have a physician monitoring Kristina Fiebrink's care during August of 2016. (Guse Declaration. Exh. 22 at p.3) However, the policy, which is based on the National Commission on Correctional Health Care (NCCHC) standards, differentiates between individuals actively detoxing and individuals experiencing signs of intoxication or withdrawal. The policy only requires that *detoxification* is to be done under physician supervision (Guse Decl.Exh. 19 p.1 para. 7). The policy defines detoxification as "the process by which an individual is gradually withdrawn from a drug by the administration of decreasing doses of the drug on which the person is physiologically dependent . . . (Id. p.2) Monitoring by "qualified health care professionals" not

physicians, is required for individuals showing signs of intoxication or withdrawal (Id. p.1, para. 6). As Ms. Fiebrink exhibited no symptoms of withdrawal at the time Decker issued his medical order, his treatment plan was consistent not only with policies and procedures in place at the MCJ but with national standards in place.

The plaintiffs attempt to make the argument that Mr. Decker had an obligation to monitor Ms. Fiebrink's medical care to make sure his orders were being followed. However, once a provider enters implements a treatment plan requiring CIWA monitoring, such as in Ms. Fiebrink's case, it is the nursing staff's responsibility to carry out the monitoring tasks and nursing leadership's responsibility to make sure the nursing tasks are completed, not the providers. Thus, there would be no expectation that Mr. Decker would follow up on Ms. Fiebrink's case while she remained in the jail unless the nursing staff requested intervention by a provider.

All of Brandon Decker's actions were appropriate based on Armor policies in place at the time. Whether or not those policies were appropriate is not Dr. Horton's argument to make. However, there is no evidence that Mr. Decker did anything that was inconsistent with the training and policies implemented by Armor. Nor is there any evidence that any of the training or supervision provided by Dr. Horton was inconsistent with procedures and policies implemented by Armor.

Dr. Horton was not responsible for training or supervising nursing staff at the MCJ and there is no evidence that she was negligent in her supervision of the medical providers employed by Armor. Therefore, any claim of negligent supervision against Dr. Horton fails for lack of proof.

## CONCLUSION

For the reasons set forth above, defendant Dr. Karen Ronquillo-Horton respectfully requests that this Court grant summary judgment as to all claims asserted by the plaintiffs.

Dated this 8th day of March, 2019.

By:  **s/ Randall R. Guse**
LORI GENDELMAN
State Bar No. 1005633
RANDALL R. GUSE
State Bar No. 1024900
Attorney for Defendants Dr. Karen
Ronquillo-Horton and Wisconsin Health
Care Liability Insurance Plan
**OTJEN, GENDELMAN, ZITZER,**
**JOHNSON & WEIR, S.C.**
20935 Swenson Dr., Suite 310
Waukesha, WI 53186
P:      262-777-2221
         262-777-2215
E:      lgendelman@otjen.com
         rguse@otjen.com