# UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF KRISTINA ANN FIEBRINK,
by Special Administrator Nathaniel Cade, Jr.; THE
ESTATE OF ANGELICA M. FIEBRINK; JOSE D.
MARTINEZ, JR.; and ROBERT MARTINEZ,

       Plaintiffs,

v.                                      Case No.:  18-CV-832

ARMOR CORRECTION HEALTH SERVICE, INC.;
DR. KAREN RONQUILLO-HORTON; BROOKE
SHAIKH APNP; VERONICA WALLACE, LPN;
BRITENY R. KIRK, LPN; EVA CAGE, LPN;
BRANDON DECKER APNP; MILWAUKEE
COUNTY, a municipal corporation; DAVID
A. CLARKE, JR.; RICHARD R. SCHMIDT;
NANCY EVANS, KEVIN NYKLEWICZ;
LATISHA AIKENS; BRIAN PIASECKI;
JENNIFER MATTHEWS; LATRAIL COLE;
LATOYA RENFRO; JOHN DOES 1-10; JOHN
DOES 11-20; EVANSTON INSURANCE COMPANY;
WISCONSIN HEALTH CARE LIABILITY INSURANCE
PLAN; and WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

       Defendants.

---

## DEFENDANTS MILWAUKEE COUNTY, WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION, DAVID A. CLARKE, JR., RICHARD R. SCHMIDT, NANCY EVANS, KEVIN NYKLEWICZ, LATISHA AIKENS, BRIAN PIASECKI, JENNIFER MATTHEWS, LATRAIL COLE, AND LATOYA RENFRO'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

---

Defendants, Milwaukee County, Wisconsin County Mutual Insurance Corporation, David A. Clarke, Jr., Richard R. Schmidt, Nancy Evans, Kevin Nyklewicz, Latisha Aikens, Brian Piasecki, Jennifer Matthews, Latrail Cole, and Latoya Renfro (collectively "County Defendants," unless otherwise noted), by their attorneys, Crivello Carlson, S.C., respectfully submit this Brief in Support of their Motion for Summary Judgment.

## BACKGROUND

In 2016, Milwaukee County contracted with Armor Correctional Health Service, Inc. ("Armor") to provide healthcare to inmates in the Milwaukee County Jail ("Jail"). (County Defs.' Proposed Findings of Fact ¶ 1.)[1] As part of that contract, Armor agreed to provide necessary nurses and other medical professionals for the delivery of reasonably necessary medical services to inmates at the Jail. (*Id.* ¶ 2.) Armor further agreed to "provide preliminary screening and assessing of an individual's medical condition at the time the individual is being presented for booking into the [Jail], even prior to the completion of the booking process, to determine whether the individual's physical condition is reasonably able to be accommodated within the [Jail]." (*Id.* ¶ 3.) Once an inmate entered the Jail, Armor agreed to "provide or arrange for on a regular basis, all professional medical, dental, mental health, and related health care and administrative services for each Inmate, including . . . booking/intake health screenings, . . . nursing care, . . . continuing care of identified health problems, detoxification," among other services. (*Id.* ¶ 4.)

---

[1] Hereinafter cited as "PFOF."

On August 24, 2016, the Milwaukee Police Department arrested Kristina Ann Fiebrink pursuant to a valid arrest warrant dated June 22, 2016. (PFOF ¶ 6.) Further, an Order to Detain from the State of Wisconsin Department of Corrections directed the Jail to detain Fiebrink based on the warrant because of an outstanding probation violation. (*Id.* ¶ 7.)

Fiebrink was booked into the Jail after her arrest and an Armor-provided nurse, Mai Bruno, performed Fiebrink's intake health screening early in the morning on August 25, 2016. (*Id.* ¶ 8.) During the intake screening, Nurse Bruno documented in Fiebrink's medical chart that Fiebrink had ingested heroin within 24 hours of her arrest and that she had a history of heroin use. (*Id.* ¶ 9.) To establish Fiebrink's treatment plan, Nurse Bruno conferred by phone with an Armor-employed nurse practitioner who ordered Armor's nursing staff to monitor Fiebrink two times per day, called "CIWA checks," referring to the Clinical Institute of Withdrawal Assessment. (*Id.* ¶ 10.)

CIWA checks were face-to-face meetings between nurses and inmates, and generally involved nursing staff asking the identified inmate a series of questions and taking vital signs. (*Id.* ¶¶ 11, 13.) Based on the inmate's answers to the questions and the symptoms presented, the nursing staff would give the inmate a "score," with any further medical actions to be taken by Armor-employed personnel depending on the score and the severity of the symptoms presented. (*Id.* ¶ 12.)

Correctional staff at the Jail did not have access to inmates' medical charts, which was necessary for adherence, at the direction of Armor, to the "minimum

necessary rule" under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"). (PFOF ¶ 17.) For example, medical information disclosed during inmates' intake health screenings—including prior heroin use—was not disclosed to correctional staff. (*Id.* ¶¶ 18–19.)

On August 28, 2016, shortly after 7:00 a.m., Fiebrink was found unresponsive—and later declared dead—in her cell in housing unit 6D on the sixth floor of the Jail, where she had been assigned. (*Id.* ¶¶ 15, 20.) Based on the autopsy, an Assistant Medical Examiner ("AME") for Milwaukee County determined that the cause of Fiebrink's death was astherosclerotic cardiovascular disease, and the manner of death was natural. (*Id.* ¶ 22.) The AME determined that Fiebrink's astherosclerotic cardiovascular disease was not exacerbated, accelerated, or aggravated by opioid withdrawal. (*Id.* ¶ 23.) For instance, the AME determined to a reasonable degree of medical certainty that Fiebrink was not dehydrated at the time of her death, and dehydration was not a cause of or contributor to her death. (*Id.* ¶ 24.)

Plaintiffs have named as Defendants in this action Armor, several of Armor's employees and contract nurses, and nine County employees or former County employees: David A. Clarke, Jr., Richard R. Schmidt, Nancy Evans, Kevin Nyklewicz, Latisha Aikens, Brian Piasecki, Jennifer Matthews, Latrail Cole, and Latoya Renfro. (*Id.* ¶ 25.)

To begin, Plaintiffs name a number of Milwaukee County officials that had no direct contact with Fiebrink. In August 2016, David A. Clarke, Jr., was the

4

Sheriff for Milwaukee County, Richard Schmidt ran the day-to-day operations as of the Milwaukee County Sheriff's Office, Nancy Evans was the commander of the Jail, and Kevin Nyklewicz was a Deputy Inspector assigned to the Jail. (PFOF ¶¶ 26, 28, 30, 32.) Clarke, Schmidt, Evans, and Nyklewicz did not interact with Fiebrink during her detention and they learned of her death after the fact, through reports submitted to them. (*Id.* ¶¶ 27, 29, 31, 33.)

Jennifer Matthews was a correctional officer, and she did not observe or interact with Fiebrink at any time in August 2016. (*Id.* ¶¶ 34–35.) Similarly, Latoya Renfro was a correctional officer, and, although she was familiar with Fiebrink from Fiebrink's prior incarcerations in the Jail, she did not know that Fiebrink was in the Jail in August 2016 until she responded to the medical emergency call on August 28 and found Fiebrink unresponsive. (*Id.* ¶¶ 36–38.)

Latrail Cole was a correctional officer and worked first shift on August 27, 2016, in housing unit 6D. (*Id.* ¶¶ 39–40.) That morning, CO Cole asked Fiebrink if she wanted breakfast and Fiebrink refused; at her deposition, CO Cole could not recall anything of note about Fiebrink's physical appearance at that time. (*Id.* ¶ 41.) It was not unusual for inmates to refuse meals for any number of reasons. (*Id.* ¶ 42.)

Later in the morning of August 27, Fiebrink approached CO Cole and discretely told her that she needed to shower and change her clothes because, as CO Cole put it, Fiebrink "did the number two on herself," meaning that she "used the bathroom on herself." (*Id.* ¶ 43.) CO Cole did not see any fecal matter on Fiebrink,

5

nor did she see where or how Fiebrink "messed her clothes." (PFOF ¶ 44.) CO Cole observed that Fiebrink looked "tired" at the time she told CO Cole that she used the bathroom on herself, which CO Cole interpreted as tiredness "from being in jail, frustrated, probably personal problems, [or] going through something." (*Id.* ¶ 45.)

After reporting her accident to CO Cole, Fiebrink went on her own to shower, she changed into her new clothes, and then she came back to the day room to socialize with the other inmates. (*Id.* ¶ 46.) In the meantime, CO Cole directed "inmate workers" to clean Fiebrink's cell. (*Id.* ¶ 47.) CO Cole did not have occasion to observe Fiebrink's cell before it was cleaned and the inmate workers who cleaned it did not relay any information about what they saw in the cell. (*Id.* ¶ 48.) CO Cole did not know whether Fiebrink's accident was diarrhea. (*Id.* ¶ 49.)

Diarrhea can be indicative of and caused by a variety of medical conditions other than withdrawal. (*Id.* ¶ 50.) Whether symptoms of withdrawal like diarrhea or vomiting are considered "severe" depends on the amount, duration, and frequency of the diarrhea or vomiting. (*Id.* ¶ 51.) Diarrhea is one of the types of symptoms of withdrawal that CIWA monitoring is designed to detect, and there is no evidence in the record as to the amount, duration, frequency, or specific location of the bowel movement Fiebrink reported to CO Cole. (*Id.* ¶¶ 52–54.)

CO Cole was not informed at any time on August 27, 2016, that Fiebrink may have been experiencing opioid withdrawal, that she was on CIWA checks, that she had a history of opiate abuse, or that she used heroin in the 24 hours before she was detained. (*Id.* ¶ 55.) In her deposition, CO Cole could not recall whether she

6

relayed the information of Fiebrink's bathroom accident to nursing staff. (PFOF
¶ 56.) Similarly, Armor's Health Administrator and Medical Director for the Jail do
not have any information to confirm whether or not CO Cole informed nursing staff
about the bathroom accident. (*Id.* ¶ 57.) Nothing prevented Fiebrink from self-
reporting her accident to nursing staff on August 27, 2016. (*Id.* ¶ 58.)

Latisha Aikens was a correctional officer working third shift and assigned to
the sixth floor control station with her partner, Brian Piasecki. (*Id.* ¶¶ 60–61.)
Third shift began at 10:00 p.m. on August 27, 2016, and ended at 6:30 a.m. on
August 28, 2016. (*Id.* ¶ 62.) When the third-shift correctional officers arrive at
10:00 p.m., inmates are typically "locked in for the night." (*Id.* ¶ 63.) In her
deposition, CO Aikens recalled her shift as "completely quiet" "[f]rom the first round
to the last round," referring to her "bed check[ ]" inspection rounds that were
completed every 30 minutes in housing unit 6D. (*Id.* ¶¶ 64, 66.) The bed checks
involved looking into each cell to ensure inmates were in the correct locations and
were not in need of anything. (*Id.* ¶ 68.) Throughout the course of her 30-minute
checks on August 27 and August 28, CO Aikens observed Fiebrink sleeping in her
cell bed, and she did not observe any signs of sickness or other indications that
Fiebrink was experiencing withdrawal symptoms or distress. (*Id.* ¶¶ 67, 69.)

CO Aikens performed and documented bed checks approximately every half
hour in housing unit 6D all throughout her shift without incident. (*Id.* ¶¶ 65, 70.)
The first time CO Aikens was informed about any type of sickness relating to
Fiebrink was after Fiebrink's death. (*Id.* ¶ 71.) CO Aikens did not have any prior

experiences with Fiebrink during Fiebrink's previous detentions at the Jail, and she did not have any face-to-face interactions with Fiebrink. (PFOF ¶ 72.)

Brian Piasecki was a correctional officer working third shift starting on August 27, 2016. (*Id.* ¶ 74.) He was assigned to the sixth floor control station with CO Aikens. (*Id.* ¶ 75.) In his deposition, CO Piasecki could not recall any events from third shift that stood out in his memory as unordinary about that night. (*Id.* ¶ 77.) CO Piasecki documented inspections approximately every half hour that were completed throughout the entire sixth floor of the Jail during third shift on August 27 and August 28. (*Id.* ¶ 78.) Those rounds were completed without incident. (*Id.*) CO Piasecki's only knowledge as to what occurred as it relates to Fiebrink's death was learning of her death when he came into work the next day. (*Id.* ¶ 76.)

As it relates to the County Defendants, Plaintiffs allege five causes of action in this case. First, they allege that all County Defendants deprived Fiebrink of her Fourth, Eighth, and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 by being deliberately indifferent to Fiebrink's serious medical needs. (Am. Compl. ¶¶ 95–103, ECF No. 57.)

Second, Plaintiffs allege that Milwaukee County, David A. Clarke, Jr., Richard R. Schmidt, Nancy Evans, and Kevin Nyklewicz are liable under 42 U.S.C. § 1983 via *Monell v. Dept. of Soc. Svcs.*, 436 U.S. 658 (1978), for failure to train and adequately supervise employees, and due to "*De facto Policies, Practices, and/or Customs In Which Milwaukee County Employees were Deliberately Indifferent to the*

8

*Constitutional Rights of Inmates and Disregarded Proper Policy and Procedure.*"
(Am. Compl. ¶¶ 104–30, ECF No. 57.)

Third, Plaintiffs allege "federal constitutional claims by Robert Martinez for loss of society and companionship." (Am. Compl. ¶¶ 131–39, ECF No. 57.) Although Plaintiffs do not specify Defendants against whom this claim is alleged, it appears they intend to allege this claim against all Defendants. Fourth, Plaintiffs allege two state-law claims against all Defendants: negligence and wrongful death under Wis. Stat. § 895.03. (Am. Compl. ¶¶ 140–49, ECF No. 57.)

## ARGUMENT

### I.  SUMMARY JUDGMENT MUST BE GRANTED IF THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND THE COUNTY DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must

9

go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id*. at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996).

Here, the undisputed facts show that the County Defendants are entitled to judgment as a matter of law. Therefore, for the reasons outlined below, summary judgment is appropriate as to all of the County Defendants on all of Plaintiffs' claims, which should be dismissed on their merits and with prejudice.

## II. JENNIFER MATTHEWS, LATOYA RENFRO, DAVID A. CLARKE, JR., RICHARD SCHMIDT, NANCY EVANS, AND KEVIN NYKLEWICZ ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 CLAIMS BECAUSE THEY LACK PERSONAL INVOLVEMENT.

The Seventh Circuit has "long held that liability under § 1983 must be predicated upon personal responsibility." *Brownlow v. Van Natta*, 2 F. App'x 516, 518–19 (7th Cir. 2001) (citing *Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996)). To that end, "the Seventh Circuit established in *Adams v. Pate*, 445 F.2d 105 (7th Cir. 1971)[,] that before liability will attach under § 1983, a plaintiff must demonstrate the defendant's **direct personal involvement** in the claimed deprivation of constitutional rights." *Franklin v. Israel*, 558 F. Supp. 712, 715 (W.D.

Case 2:18-cv-00832-AJS   Filed 03/08/19   Page 10 of 32   Document 204

Wis. 1983) (emphasis added) (citing as *see also Stringer v. Rowe*, 616 F.2d 993, 1000–01 (7th Cir. 1980)).

Jennifer Matthews, Latoya Renfro, David A. Clarke, Jr., Richard Schmidt, Nancy Evans, and Kevin Nyklewicz did not have "direct personal involvement in the claimed deprivation of [Fiebrink's] constitutional rights." *Franklin*, 558 F. Supp. at 715. Jennifer Matthews did not observe or interact with Fiebrink at any time in August 2016. (PFOF ¶¶ 35–36.) Similarly, Latoya Renfro did not know Fiebrink was in the Jail in August 2016 until she responded to the medical emergency call that went out over the radio when Fiebrink was found unresponsive on the morning of August 28. (*Id.* ¶¶ 36–38.) Accordingly, because CO Matthews and CO Renfro did not have contact with Fiebrink or know that she was in the Jail until after Fiebrink's death, they lack the direct personal involvement in the events alleged to have deprived Fiebrink of her constitutional rights and are therefore entitled to judgment as a matter of law on Plaintiffs' Section 1983 claims.

The same is true for Defendants Clarke, Schmidt, Evans, and Nyklewicz as it relates to any individual-capacity Section 1983 claims Plaintiffs allege against them. *See* (Am. Compl. ¶¶ 19–22, 33–48, ECF No. 57.) As the County Defendants discussed in their Briefs in Support of their Motion for Judgment on the Pleadings, (ECF Nos. 72, 136), Plaintiffs' allegations are insufficient to establish the personal involvement necessary to expose Defendants Clarke, Schmidt, Evans, and Nyklewicz to individual-capacity Section 1983 liability. The undisputed evidence gathered in discovery sheds further light on Plaintiffs' deficient allegations.

Specifically, Clarke, Schmidt, Evans, and Nyklewicz did not have contact with Fiebrink and did not know about the circumstances surrounding her death until after the fact. (PFOF ¶¶ 27, 29, 31, 33.) Accordingly, because David A. Clarke, Jr., Richard Schmidt, Nancy Evans, and Kevin Nyklewicz were not personally involved in the events alleged to have deprived Fiebrink of her constitutional rights, they are entitled to judgment as a matter of law on Plaintiffs' Section 1983 claims.

## III. ALL COUNTY OFFICERS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 CLAIMS.

### A. Plaintiffs' Section 1983 medical-care claims are governed by the Eighth Amendment.

"'[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody.'" *Collins v. Al-Shami*, 851 F.3d 727, 731 (7th Cir. 2017) (quoting *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013)). "[T]he Eighth Amendment applies after a conviction . . . ." *Id.* Thus, the Eighth Amendment governs Section 1983 claims relating to conditions of confinement brought by a detainee who is held after he or she has been convicted of a crime.

Here, Fiebrink was arrested pursuant a valid arrest warrant based on a probation violation relating to a crime for which she was previously convicted. (PFOF ¶¶ 6–7.) Thus, by the time Fiebrink had any contact with the Jail or its correctional staff in August 2016, not only had a probable cause determination been made "in the form of an arrest warrant," *Lopez v. City of Chicago*, 464 F.3d 711, 718–19 (7th Cir. 2006), but Fiebrink was detained in the Jail as a convicted felon

12

awaiting the next step in an administrative procedure relating to her probation violation. Fiebrink's Section 1983 claims against the County Defendants for inadequate medical care are therefore properly analyzed under the Eighth Amendment.

The Eighth Amendment imposes a duty on officials to provide humane conditions of confinement to post-trial detainees such that they receive "adequate food, clothing, shelter, and medical care . . . ." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To that end:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official **knows of and disregards** an **excessive risk** to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.

*Id.* at 837 (emphasis added).

The law is clear that in order to establish a viable Eighth Amendment conditions-of-confinement claim, Plaintiffs must demonstrate both that Fiebrink suffered a serious deprivation and that Defendants acted with deliberate indifference. *Id.* at 834. This test consists of both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). The objective prong concerns whether the conditions exceeded contemporary bounds of decency of a mature, civilized society. *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). The subjective component is met if an official knows of and disregards an excessive risk to a detainee's health or safety. *Farmer*, 511 U.S. at 837.

13

Negligence does not satisfy the "deliberate indifference" standard, and it is not enough to show that penal officials merely failed to act reasonably. *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994). If either the objective or subjective prong is not satisfied, a plaintiff cannot establish a conditions claim. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). Further, in medical-care cases, the Seventh Circuit "will not find a jail official to have acted with deliberate indifference if she reasonably relied on the judgment of medical personnel." *Miranda v. County of Lake*, 900 F.3d 335, 343 (2018).

For example, in *Estate of Simpson v. Gorbett*, the Seventh Circuit held that, as a matter of law, county jail officers were not deliberately indifferent to an alcoholic, obese inmate's objectively serious medical needs where the inmate arrived at the jail intoxicated, was assigned to the top bunk bed in his cell, suffered convulsions related to alcohol withdrawal while sleeping, and fell from the bed, sustaining fatal injuries. 863 F.3d 740, 742–44, 747–48 (7th Cir. 2017). Addressing the plaintiff's contention that the officers were deliberately indifferent to the inmate's alcoholism, the court reasoned, "[a]bsent any indication that the defendants knew that [the inmate] was addicted to alcohol and thus was likely to suffer from serious withdrawal symptoms, [the court] may consider only whether a jury could find that the deputies rendered constitutionally defective care for his intoxication." *Id.* at 747. Because there was no evidence "that the deputies were aware of the extent of [the inmate's] drinking problem, or of the protracted risk period that follows when a heavy drinker experiences withdrawal," it was

14

"impossible to conclude that the defendants were deliberately indifferent." *Simpson*, 863 F.3d at 748.

**B.    If the Court concludes that the Eighth Amendment does not govern Plaintiffs' Section 1983 claims, then the Fourteenth Amendment applies.**

If the Eighth Amendment does not apply to Plaintiffs' Section 1983 claims, then the Fourteenth Amendment applies because Fiebrink was arrested pursuant a valid arrest warrant. *Collins*, 851 F.3d at 731 ("[T]he Due Process Clause of the Fourteenth Amendment governs after the probable-cause determination has been made . . . ."); *Lopez*, 464 F.3d at 718–19 (noting that an arrest warrant establishes probable cause).

"In the past, courts assessed pretrial detainee medical care claims under the Eighth Amendment's deliberate indifference standard . . . ." *Terry v. County of Milwaukee*, Case No. 17-CV-1112-JPS, 2019 WL 181329, at *7 (E.D. Wis. Jan. 11, 2019). However, in *Miranda*, the Seventh Circuit clarified that "a standard of objective reasonableness, and not deliberate indifference, governs claims under the Fourteenth Amendment's Due Process Clause for inadequate medical care provided to pretrial detainees." *McCann v. Ogle County, Illinois*, 909 F.3d 881, 886 (7th Cir. 2018) (citing *Miranda*, 900 F.3d at 351). Under this clarified standard:

> a pretrial detainee's Fourteenth Amendment right to medical care is violated if: (1) there was an **objectively serious medical need**; (2) the defendant made a **volitional act** with regard to the plaintiff's medical need; (3) that act was **objectively unreasonable under the circumstances** in terms of treating or assessing the patient's serious medical need; and (4) the defendant

15

> "acted **purposefully, knowingly, or perhaps even recklessly**" with respect to the risk of harm.

*Terry*, 2019 WL 181329, at *7 (emphasis added) (citing *Miranda*, 900 F.3d at 353–54).

In conducting this analysis, "[a] showing of negligence or even gross negligence will not suffice." *McCann*, 909 F.3d at 886. To that end, the analysis "requires courts to focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.* "In any application, the Court will be ultimately applying a recklessness test." *Terry*, 2019 WL 181329, at *7.

For instance, in *McCann*, the Seventh Circuit upheld summary judgment in favor of a sheriff and a captain for a county correctional center where a pretrial detainee, McCann, died from a contracted physician's over-prescription of methadone ten days after he was initially detained. 909 F.3d at 884–88. McCann booked into the correctional facility with severe burn wounds and a list of prescription medications, which included a prescription for methadone. *Id.* at 884. Correctional staff was thus aware that McCann was being treated for severe burn wounds with prescription medications, and some correctional officers observed him appearing "sluggish" during his ninth evening in the facility. *See id.* In affirming summary judgment for the correctional defendants, the Seventh Circuit reasoned that they were not "responsible for providing medical care to McCann," as they "reasonably relied" on the contracted physician's course of care. *Id.* at 887–88

16

(citing *Miranda*, 900 F.3d at 343; *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)).  The court further concluded that the officers "themselves took no steps to contribute to or detract from the treatment McCann received," and thus were not objectively unreasonable towards McCann's serious medical needs.  *McCann*, 909 F.3d at 887–88.

### C.    The County Officers did not violate the Constitution, regardless of whether the Eighth Amendment or Fourteenth Amendment governs.

Just as the correctional officers in *Simpson* and *McCann*, the County's officers all reasonably executed their duties in contact with or proximity to Fiebrink on August 27 and 28, 2016, all without being informed of Fiebrink's past medical or drug-use histories.  For instance, when Fiebrink approached CO Cole about her bathroom accident, CO Cole ensured that Fiebrink got clean clothes, a shower, and a clean cell.  (PFOF ¶¶ 43, 46–47.)  When CO Cole saw Fiebrink looking better and socializing with other inmates after getting new clothes and a shower, (*id.* ¶ 46), a reasonable officer in CO Cole's position could very well assume that Fiebrink's stomach was temporarily upset and that her isolated bathroom accident was not related to drug use about which she had no information.  Indeed, the evidence in the record is insufficient to show—even with the benefit of hindsight—that Fiebrink's bathroom accident was in fact related to or symptomatic of opioid withdrawal.  *See* (*id.* ¶¶ 53–54.)

The same is true of Fiebrink's morning meal refusal, as CO Cole had no reason to believe—and there is no evidence—that Fiebrink refused a meal because

she was experiencing withdrawal. (PFOF ¶¶ 41–42.) Thus, the sum of CO Cole's interactions with Fiebrink would not have led a reasonable officer in her position to believe that Fiebrink was experiencing a medical emergency, and the undisputed evidence shows CO Cole was attentive to Fiebrink's reported concerns, not deliberately indifferent. Indeed, CO Cole's actions can hardly be said to amount to negligence or gross negligence—both of which fall short of the requirements under the Eighth and Fourteenth Amendments. Accordingly, Latrail Cole is entitled to judgment as a matter of law as to Plaintiffs' Section 1983 medical-care claims.

Like CO Cole, the undisputed evidence shows that CO Aikens and CO Piasecki performed their duties with diligence and without incident on August 27 and 28, 2016. CO Aikens conducted cell checks every half-hour and every time she checked Fiebrink's room, Fiebrink appeared to be asleep. (*Id.* ¶¶ 64–65, 67, 69–70.) CO Aikens was not informed by anyone that Fiebrink was experiencing a medical emergency—or opioid withdrawal—and nothing about what she observed in Fiebrink's cell indicated differently. (*Id.* ¶¶ 64–65, 67, 69–73.) CO Piasecki did not conduct rounds in Pod 6D, but documented when bed checks were completed on the sixth floor. (*Id.* ¶ 78.) He did not witness anything out of the ordinary as he worked at the sixth floor control desk, and nothing suggested Fiebrink was experiencing a medical emergency. (*Id.* ¶ 77.)

Simply put, the undisputed evidence in the record shows that CO Aikens and CO Piasecki performed their jobs as they were supposed to, and Fiebrink died of natural causes related to a heart condition. The officers' actions in light of these

18

circumstances were objectively reasonable and certainly do not rise to the level of deliberate indifference. Even to the extent their actions could be construed as negligent, the law requires more to withstand summary judgment. Accordingly, the County officers are entitled to judgment as a matter of law on Plaintiffs' Section 1983 medical-care claims.

## IV. THE INDIVIDUAL COUNTY DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 CLAIMS BASED ON QUALIFIED IMMUNITY.

Governmental officials performing discretionary functions are shielded from liability so far as their conduct does not violate any clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). Officials are entitled to immunity if, when they acted, they "reasonably could have believed that [their] action[s] did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), *cert. den'd*, 522 U.S. 1117 (1998). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There is generally a two-part test in determining whether qualified immunity should be granted to a governmental actor: (1) whether the plaintiff has established a deprivation of a constitutional right; and, if so, (2) whether the right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The question of whether immunity attaches is a question of law. *Elder v.*

19

*Holloway*, 510 U.S. 510, 516 (1994). If qualified immunity applies to an officer's conduct, "the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

In considering the two-step procedure for addressing the defense of qualified immunity as articulated in *Wilson,* district courts are invited to proceed directly to the second prong; namely, whether the constitutional right was clearly established in a particularized sense, even if there is a material issue of fact that would prevent summary judgment on the underlying question of whether there was indeed a constitutional deprivation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When the defense of qualified immunity is raised, the plaintiff bears the burden of proving the existence of a clearly established right. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). Further, the plaintiff bears the burden of showing that the alleged violation was clearly established "before the defendants acted or failed to act." *Rice v. Burk*, 999 F.2d 1172, 1174 (7th Cir. 1993). The plaintiff must demonstrate the existence of a clearly established right by identifying a closely analogous case that had decided that the conduct was forbidden. *Forman v. Richard Police Department*, 104 F.3d 950, 958 (7th Cir. 1997). In determining whether the right alleged to have been violated was "clearly established," a constitutional right must have been identified in a particularized sense with regard to the circumstances of the alleged violation. *Warlick v. Cross*, 969 F.2d 303, 309 (7th Cir. 1992).

Here, while "*Miranda* does not change the qualified immunity standard," it did create a "clarified" Section 1983 "doctrine" that had not previously been applicable to medical-care cases. *Terry*, 2019 WL 181329, at *5–6, *10. More importantly, however, based on the admissible factual record that Plaintiffs can establish, the County Defendants did not violate clearly established law.

As set forth above, there were only three County Defendants who were on shift and who either had contact with Fiebrink or were on her floor prior to her death: Latrail Cole, Latisha Aikens, and Brian Piasecki. (PFOF ¶¶ 40, 61, 66, 75.) Latrail Cole interacted with Fiebrink once, and, after Fiebrink informed her that she had a bathroom accident, CO Cole saw to it that Fiebrink received new clothes, a shower, and a clean cell. (*Id.* ¶¶ 43, 46–47.) CO Cole was not told that Fiebrink may have been experiencing opioid withdrawal symptoms and, because diarrhea can be indicative of any number of medical conditions, including a simple upset stomach, (*id.* ¶¶ 50, 55), it was not unreasonable for CO Cole to respond to Fiebrink's single bathroom accident in the manner that she did. Indeed, CO Cole's observation that Fiebrink looked better and was socializing with other inmates after she cleaned up further confirms the reasonableness of her acts. *See* (*id.* ¶ 46.) At a bare minimum, CO Cole's actions do not represent knowing violations of the law or such plain incompetence that deprives her of qualified immunity. *See Malley*, 475 U.S. at 341. Accordingly, Latrail Cole is entitled to qualified immunity.

Similarly, CO Aikens and CO Piasecki conducted and documented bed checks every thirty minutes throughout their shift on August 27 and 28, 2016. (PFOF

¶¶ 70, 78.)  Neither of them saw or heard anything out of the ordinary during their rounds—they did not notice anything unusual about Fiebrink and they did not receive any complaints from Fiebrink or any other inmates.  (PFOF ¶¶ 64–65, 67, 69, 77.)  CO Aikens and CO Piasecki were not informed that Fiebrink may have been experiencing withdrawal from opioids, (*id.* ¶¶ 71, 79), further establishing that their actions—completing diligent bed checks and inspections throughout their shifts—were reasonable and not plainly incompetent or knowingly unlawful.  *See Malley*, 475 U.S. at 341.  Accordingly, Latisha Aikens and Brian Piasecki are entitled to qualified immunity.

Further, there are six County Defendants who did not have any contact or physical proximity to Fiebrink during her detention at the Jail in August 2016: Jennifer Matthews, Latoya Renfro, David A. Clarke, Jr., Richard Schmidt, Nancy Evans, and Kevin Nyklewicz.  (*Id.* ¶¶ 27, 29, 31, 33.)  These Defendants could not have known that Fiebrink may have been experiencing a medical condition, like withdrawal, during her detention.  Nothing in the record shows that these Defendants even had an opportunity to act unreasonably towards Fiebrink, let alone knowingly violate the law or exhibit plain incompetence as it relates to Fiebrink's medical needs.  *See Malley*, 475 U.S. at 341.  Accordingly, Jennifer Matthews, Latoya Renfro, David A. Clarke, Jr., Richard Schmidt, Nancy Evans, and Kevin Nyklewicz are entitled to qualified immunity.

Further, all of the County Defendants were entitled to rely on the County's medical services provider, Armor, to ensure that all inmates were monitored and

medicated as the healthcare professionals saw fit. *Miranda*, 900 F.3d at 343–44. In fact, "the law 'encourages non-medical security and administrative personnel . . . to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so . . . .'" *McCann*, 909 F.3d at 888 (quoting *Berry*, 604 F.3d at 440). The County Defendants' lack of access to medical records about Fiebrink's alleged condition, (*id.* ¶ 17), further justifies their reliance on Armor's nurses to monitor inmates like Fiebrink, based on their individual medical needs. Accordingly, the County Defendants are entitled to qualified immunity as to Plaintiffs' Section 1983 medical-care claims.

## V. MILWAUKEE COUNTY, DAVID A. CLARKE, JR., RICHARD SCHMIDT, NANCY EVANS, AND KEVIN NYKLEWICZ ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' MUNICIPAL-LIABILITY AND OFFICIAL-CAPACITY SECTION 1983 CLAIMS.

"An official capacity claim is tantamount to a claim against the government entity itself." *Gusman v. Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007); *Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 191 (7th Cir. 2013). A plaintiff who seeks to impose municipal liability under Section 1983 must prove that an "official municipal policy" caused the complained-of injury. *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). To do so:

> a plaintiff must prove (1) the alleged deprivations were conducted pursuant to an **express policy, statement, ordinance, or regulation** that, when enforced, **caused** the constitutional deprivation; (2) the conduct was one of a **series of incidents amounting to an unconstitutional practice** so **permanent**, well-settled, and known to [the municipality] as to constitute a "custom or usage" **with force of law**; or (3) the conduct

23

> was caused by a **decision** of a **municipal policymaker**
> with final policymaking authority in the area in question.

*Abraham v. Piechowski*, 13 F. Supp. 2d 870, 880 (E.D. Wis. 1998) (emphasis added);

*Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Plaintiffs "must demonstrate that

the 'deliberate action attributable to [Milwaukee County] itself is the "moving

force'" behind the deprivation of [Fiebrink's] constitutional rights." *Johnson v. Cook*

*County*, 526 F. App'x 692, 695 (7th Cir. 2013) (quoting *Bd. of Comm'rs of Bryan*

*Cnty. v. Brown*, 520 U.S. 397, 399 (1997) (citing *Monell*, 436 U.S. at 694)). "The

required level of factual specificity rises with the complexity of the claim," and

courts must disregard mere recitations of "legal conclusions or elements of the cause

of action . . . ." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011)

A municipality can be found liable under Section 1983 only if the

governmental body itself "subjects" a person to a deprivation of constitutional rights

or "causes" a person "to be subjected" to such deprivation. *Monell*, 436 U.S. at 692.

Local governments are responsible only for "their own illegal acts." *Id.* at 665–83.

They cannot be held vicariously liable for the acts of their employees. *Brown*, 520

U.S. at 403.

Plaintiffs do not point to any express County or Jail policies that would have

caused Fiebrink's death. Rather, they flatly allege that "[t]he physical and mental

anguish suffered by Fiebrink in August of 2016 was part [of] a persistent and

**widespread pattern** of disregarding constitutionally mandated medical care."

(Am. Compl. ¶ 50, ECF No. 57) (emphasis added).

24

While a custom or practice "may be so persistent and widespread [such that it has] the force of law," "[t]he word 'widespread' must be taken seriously." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970). To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010).

"In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* "*Miranda* does not change the *Monell* standard, even when applied to jail inmate medical claims." *Terry*, 2019 WL 181329, at *12 n.12.

In *Calhoun v. Ramsey*, the Seventh Circuit held that the plaintiff failed to establish a *Monell* claim relating to a jail's policy against advance verification of detainees' medications, where the jail would not pre-approve the plaintiff's medications and, a few hours after entering into custody but before his medications were approved, he had to be removed and treated at a hospital. 408 F.3d 375, 377–

25

81 (7th Cir. 2005). The court reasoned that the plaintiff failed to "point to any language in the jail's policy that [wa]s constitutionally suspect," and the evidence of custom and practice was insufficient to "permit an inference that the County ha[d] chosen an impermissible way of operating." *Calhoun*, 408 F.3d at 381.

The present case requires the same result. Plaintiffs are unable to point to any specific Jail policy with "constitutionally suspect," *id.*, language as it relates to the correctional officers' interactions with Fiebrink, let alone that such policy caused the officers to deprive Fiebrink of her constitutional rights. Instead, Plaintiffs generally allege that these Defendants failed to train and adequately supervise employees, but a *Monell* claim requires more. Moreover, there is no evidence that shows that correctional officers were acting pursuant a custom or practice such that Fiebrink's death was part of a widespread pattern where the custom or practice was the driving force behind each similar incident. Rather, Plaintiffs' allegations against Clarke, Schmidt, Evans, Nyklewicz, and the County amount to veiled attempts to hold the County vicariously liable for the acts of its employees based on vague allegations of a generic institutional pattern of not following the law.

Thus, Plaintiffs' *Monell* allegations fail not only because there was no constitutional deprivation in this case as a matter of law, but because the evidence is insufficient to withstand summary judgment on a *Monell* claim. Accordingly, because Plaintiffs cannot meet their burden to prove the elements of their alleged municipal-liability claim and official-capacity claims against Milwaukee County,

26

David A. Clarke, Jr., Richard R. Schmidt, Nancy Evans, and Kevin Nyklewicz, the County Defendants are entitled to judgment as a matter of law on those claims.

## VI.  THE COUNTY DEFENDANTS ARE INMMUNE FROM PLAINTIFFS' STATE-LAW CLAIMS.

Plaintiffs' two state-law claims for negligence and wrongful death against the County Defendants, Wis. Stat. § 895.03, (Am. Compl. ¶¶ 140–49, ECF No. 57), are barred by state-law governmental immunity.  Governmental immunity under Wisconsin law is "extremely broad." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017), *cert. den'd*, 138 S. Ct. 1440, 200 L.E.2d 717 (Apr. 2, 2018).  Such immunity is committed to the Wisconsin statutes as follows:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees **nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions**.

Wis. Stat. § 893.80(4) (emphasis added); *see also Lodl v. Progressive Northern Ins. Co.*, 2002 WI 71, ¶ 20, 253 Wis. 2d 323, 646 N.W.2d 314.

Wisconsin's governmental immunity broadly "'provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties.'" *Perry*, 872 F.3d at 462 (quoting *Pries v. McMillon*, 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010)).  "Wisconsin courts have interpreted this protection as extending to all conduct involving 'the exercise of

27

discretion and judgment.'" *Thomas v. Correctional Healthcare Companies, Inc.*, 15–CV–633–JPS, 2016 WL 7046795, at *4 (E.D. Wis. Dec. 2, 2016) (quoting *Milwaukee Metro Sewerage Dist. v. City of Milwaukee*, 277 Wis. 2d 635, 672, 691 N.W.2d 658 (2005)).

"There are four exceptions to this broad doctrine: '(1) the performance of ministerial duties; (2) the performance of duties with respect to a 'known danger;' (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" *Perry*, 872 F.3d at 462 (quoting *Bicknese v. Sutula*, 260 Wis. 2d 713, 660 N.W.2d 289, 296 (2003)).

Here, all of the County Defendants are entitled to immunity under Wis. Stat. § 893.80(4), as none of the exceptions apply. First, the medical-discretion exception does not apply, as the Seventh Circuit recognized that "Wisconsin courts have been unwilling to extend the [medical discretion exception] to defendants who are not medical professionals." *Id.* Second, based on the discussions above, there is no admissible evidence in the record that the County Defendants' actions were malicious, willful, and intentional. Third, the known-danger exception is inapplicable. That exception is a "**narrow**, judicial-created exception that arises **only** when there exists a danger that is **known and compelling** enough to give rise to a ministerial duty on the part of a municipality or its officers." *Lodl*, 2002 WI 71, ¶ 4 (emphasis added). Here, the known-danger exception is inapplicable because the undisputed facts show that none of the County Defendants knew that

Fiebrink may have been at risk of withdrawal symptoms or a heart condition until after her death. (PFOF ¶¶ 27, 29, 31, 33, 35, 38, 55, 59, 67, 73, 79.)

Fourth, the ministerial-duty exception is inapplicable. "Just because a jury can find that certain conduct was negligent does not transform that conduct into a breach of a ministerial duty." *Kimps v. Hill*, 200 Wis. 2d 1, 11, 546 N.W.2d 151 (1996). This doctrine is technically not an "exception," but rather a judicial recognition that ministerial acts are not discretionary and thus not entitled to immunity in the first place. *Thomas*, 2016 WL 7046795, at *4–7.

Here, correctional officers' decisions of when and whether to contact medical staff, whether and how to provide inmates with basic medical attention, and whether and when a particular situation warrants declaring a medical emergency all inherently involve discretion on the part of the officer. The same is true for Jail command staff and high-ranking officials in the Milwaukee County Sheriff's Office as it relates to their choices in crafting, implementing, and updating policies and training relating to medical care for inmates. Thus, the so-called "ministerial duty exception" is inapplicable in this case. Because none of the judicially-created exceptions to Wis. Stat. § 893.80(4) governmental immunity apply in this case, the County Defendants are immune from Plaintiffs' state-law claims for negligence and wrongful death under Wis. Stat. § 895.03. Accordingly, the Court should grant summary judgment on Plaintiffs' state-law claims against the County Defendants.

## VII. THE COUNTY DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL OF PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS' CANNOT ESTABLISH CAUSATION.

"To recover damages under 42 U.S.C. § 1983 a plaintiff must prove that the defendants acted under color of state law, that their actions resulted in a deprivation of the plaintiff's constitutional rights, and that the action of the defendants **proximately caused** the constitutional violation." *Crowder v. Lash*, 687 F.2d 996, 1002 (7th Cir. 1982) (emphasis added). General principles of tort liability and common law inform the proximate cause analysis in Section 1983 cases. *Hibma v. Odegaard*, 769 F.2d 1147, 1155 (7th Cir. 1985) (citing Restatement (2d) of Torts § 431). Similarly, to establish liability on Plaintiffs' tort claims under Wisconsin law, Plaintiffs must prove proximate causation. *See Merco Distributing Corp. v. Commercial Police Alarm Co., Inc.*, 84 Wis. 2d 455, 459–60, 267 N.W.2d 652 (1978); *Menick v. City of Menasha*, 200 Wis. 2d 737, 749, 547 N.W.2d 778 (Ct. App. 1995). To be the proximate or "legal" cause of a plaintiff's harm, the actor's alleged wrongful conduct must be a "substantial factor" in bringing about the harm. Restatement (2d) of Torts § 431. A number of considerations go into a court's analysis of whether conduct is a substantial factor, including the number of other factors contributing to the harm. *Id.* § 433.

Here, Plaintiffs' federal and state law claims are premised on their allegations that Defendants' acts and non-acts caused Fiebrink's death. *See generally* (Am. Compl. ¶¶ 1–2, ECF No. 57.) However, an autopsy performed on Fiebrink's body revealed that she died of natural causes, specifically,

30

astherosclerotic cardiovascular disease. (PFOF ¶ 22.) The County Defendants did not cause Fiebrink's cardiovascular disease. Further, the Assistant Medical Examiner who performed the autopsy on Fiebrink's body has opined, to a reasonable degree of medical certainty, that opioid withdrawal—to the extent Fiebrink in fact experienced it—did not exacerbate, accelerate, or aggravate the astherosclerotic cardiovascular disease that caused her death. (PFOF ¶ 23.) For example, dehydration did not impact Fiebrink's cardiovascular disease because she was not dehydrated at the time of her death. (*Id.* ¶ 24.)

Thus, the undisputed evidence[2] in the record establishes that the cause and manner Fiebrink's in-custody death were natural and unrelated to any alleged acts or non-acts by the County Defendants. Because Plaintiffs cannot establish that the County Defendants caused Fiebrink's death, they cannot establish their federal and state-law claims as a matter of law. Accordingly, the County Defendants are entitled to summary judgment as to all of Plaintiffs' claims against them, which should be dismissed on the merits and with prejudice.

## CONCLUSION

For the foregoing reasons, the County Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety as to these moving Defendants on the merits, with prejudice, and with such costs and disbursements as the Court deems equitable.

---

[2] In the days prior to the filing of this Motion, Plaintiffs disclosed a medical expert, Dr. Richard Lewan. It is anticipated that Plaintiffs will attempt to contest the opinions of Dr. Jacob Smith through evidence eventually offered by Dr. Lewan. In the event that Plaintiffs do attempt to dispute the opinions of Dr. Smith, Defendants anticipate moving to bar or limit the admissible testimony of Dr. Lewan in a separate motion.

31

Dated this 8th day of March, 2019.

CRIVELLO CARLSON, S.C.
Attorneys for Defendants Milwaukee County, David A. Clarke, Jr., Richard R. Schmidt, Latisha Aikens, Brian Piasecki, Jennifer Matthews, Latrail Cole, Latoya Renfro, Nancy Evans, Kevin Nyklewicz, John Does 1–10, and Wisconsin County Mutual Insurance Corp.

By:     s/ Benjamin A. Sparks
        SAMUEL C. HALL, JR.
        State Bar No. 1045476
        BENJAMIN A. SPARKS
        State Bar No. 1092405
        KYLE R. MOORE
        State Bar No. 1101745

**P.O. Address**
710 N Plankinton Avenue
Suite 500
Milwaukee, WI 53203
P: 414-271-7722
E:      shall@crivellocarlson.com
        bsparks@crivellocarlson.com
        kmoore@crivellocarlson.com