# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

THE ESTATE OF KRISTINA ANN FIEBRINK,
by Special Administrator Nathaniel Case, Jr.,
THE ESTATE OF ANGELICA M. FIEBRINK,
JOSE D. MARTINEZ JR., and
ROBERT MARTINEZ,

        Plaintiffs,

                                 **Case No. 18-CV-832-JPS**

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
DR. KAREN RONQUILLO-HORTON,
BROOKE SHAIKH APNP,
VERONICA WALLACE LPN,
BRITENY R. KIRK LPN,
EVA CAGE, KPN,
BRANDON DECKER APNP,
MILWAUKEE COUNTY,
DAVID A. CLARKE JR.,
RICHARD R. SCHMIDT,
LATISHA AIKENS,
BRIAN PIASECKI,
JENNIFER MATTHEWS,
LATRAIL COLE,
LATOYA RENFRO,
JOHN DOES 1-10,
JOHN DOES 11-20,
EVANSTON INSURANCE COMPANY, and
WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION,

        Defendants.

## DEFENDANTS ARMOR CORRECTIONAL HEALTH SERVICES, INC., NURSE PRACTITIONER BROOKE SHAIKH AND NURSE PRACTITIONER BRANDON DECKER'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# I.  INTRODUCTION

Defendants Armor Correctional Health Services, Inc. ("Armor"), Nurse Practitioner Brooke Shaikh ("NP Shaikh") and Nurse Practitioner Brandon Decker ("NP Decker") (collectively, "Defendants") are entitled to summary judgment on each of Plaintiffs' claims. During her four (4) day stay at Milwaukee County Jail ("MCJ") decedent Kristina Ann Fiebrink ("Ms. Fiebrink") received medically-appropriate care based upon constitutional standards and Wisconsin common law. Ms. Fiebrink's death was not caused by any act or omission of Defendants. Rather, she had severe, undetected heart disease which caused her death.  Further, to the extent the Plaintiffs can show that Ms. Fiebrink experienced withdrawal symptoms from her heroin usage, the hard truth is that she failed to cooperate with Armor medical staff in their efforts to monitor her condition. Moreover, she never informed Armor medical personnel of any symptoms she might have been experiencing and never asked them for treatment or medication. Hence, as a matter of law, Ms. Fiebrink's own, superseding actions serve as a bar for any recovery by Plaintiffs in this case. Additionally, even if Plaintiffs could demonstrate a triable issue as to a constitutional violation by NP Decker or NP Shaikh, both are entitled to qualified immunity. And finally, Plaintiffs' *Monell* claims against Armor fail because they can point to no policy or custom on Armor's part that violated Ms. Fiebrink's rights or caused her harm. Because no reasonable jury could find in Plaintiffs' favor as to any claim, this Court should enter summary judgment in Defendants' favor and dismiss this action.

# II.  BRIEF FACTUAL SUMMARY

Since May 11, 2013, Armor has provided health care services to inmates at MCJ. (Defendants' Proposed Findings of Fact hereinafter ("Def.'s PFOF") **Def.'s PFOF 1**). On August 24, 2016, Ms. Fiebrink was arrested. A Patient-Intake Health Screening Form (PT-051) ("Receiving Screening") was completed by RN Mai Bruno on August 25, 2016, at 12:00 a.m..

2

(**Def.'s PFOF 10**). The Receiving Screening states that Ms. Fiebrink last used heroin by nasal route (snorting) on August 24, 2016, and that Ms. Fiebrink had used various amounts of heroin over the past few years. (**Def.'s PFOF 11**). Ms. Fiebrink denied suffering from any heart issues during her Receiving Screening. (**Def.'s PFOF 12**). Ms. Fiebrink's Patient Intake Health Screening form also scheduled Ms. Fiebrink for a Level 2 Evaluation for opioid withdrawal. (**Def.'s PFOF 13**). A Level 2 Health Evaluation is an in-depth face-to-face physical evaluation and analysis of medical history and physical evaluation carried out by a Health Care Provider ("HCP") within 72 hours of the inmate's admission. (**Def.'s PFOF 14**).

In accordance with "Health Screener's Observation No. 18(i)" on the Receiving Screening Form, Armor's CIWA/COWS Withdrawal Screening Flowsheet (PT-018) ("Withdrawal Screening Flowsheet") was then initiated and completed by RN Bruno at 12:05 a.m. (**Def.'s PFOF 17**). RN Bruno is trained and experienced in identifying the signs and symptoms of drug withdrawal. (**Def's PFOF 18**) Ms. Fiebrink's score on the Withdrawal Screening Flowsheet was zero, which indicates that Ms. Fiebrink had no symptoms of withdrawal at the time of the assessment. (**Def.'s PFOF 21**).

NP Decker was the HCP on call on August 25, 2016. (**Def.'s PFOF 26**). On August 25, 2016, at approximately 5:15 a.m., NP Decker developed a withdrawal assessment plan for Ms. Fiebrink. Based on Ms. Fiebrink's zero score on the CIWA withdrawal scale, her withdrawal assessment plan called for withdrawal checks twice a day by medical staff for five-six days and no taper medications. (**Def.'s PFOF 31**). NP Decker placed Ms. Fiebrink on close observation because he was concerned about her possible drug withdrawal and because he wanted to prevent more serious conditions manifesting from drug withdrawal. (**Def.'s PFOF 32**). Ms. Fiebrink was

3

not prescribed withdrawal taper medications because she was not having any withdrawal symptoms. (**Def.'s PFOF 33**).

On August 25, 2016, at approximately 10:00 a.m., Ms. Fiebrink refused a withdrawal check with Armor LPN Briteny Kirk. (**Def.'s PFOF 54**). A patient has the right to refuse treatment. (**Def.'s PFOF 55**). Milwaukee County Jail Correctional Officer Stokes told LPN Kirk that Ms. Fiebrink refused to participate in detoxification care. (**Def.'s PFOF 56**). If a patient refuses treatment under the detoxification protocol, a refusal slip should be signed by either the patient or, if the patient refuses to sign, by the guard. (**Def.'s PFOF 57**). Both Milwaukee County Jail Correctional Officer Stokes and LPN Kirk signed the Refusal of Treatment Form on August 25, 2016. (**Def.'s PFOF 58**).

On August 26, 2016, LPN Veronica Wallace attempted to perform CIWA monitoring on Ms. Fiebrink as ordered by NP Decker. (**Def.'s PFOF 59**). Ms. Fiebrink refused LPN Wallace's monitoring. (**Def.'s PFOF 60**). However, based upon LPN Wallace's observations, Ms. Fiebrink was alert and not exhibiting any signs of distress. (**Def's PFOF 61**).

Ms. Fiebrink did not have the Level 2 HCP visit which was initially scheduled Friday, August 26, 2016, because she was in court (CIU). That Level 2 appointment was rescheduled for Monday, August 29, 2016. (**Def.'s PFOF 65**). Additionally, Ms. Fiebrink was again offered detoxification/withdrawal monitoring on August 27, 2016, this time, by LPN Eva Cage. (**Def.'s PFOF 62**). She once again, refused (**Def.'s PFOF 62, 63**).

NP Shaikh did not have any face-to-face or indirect communication or assessment of Ms. Fiebrink. (**Def.'s PFOF 76**). NP Shaikh was on duty at the MCJ and noted a duplication of the order for a Level 2 appointment entered by RN Bruno. (**Def.'s PFOF 81**). On August 25, 2016, an order/appointment for a Level 2 visit was entered by RN Bruno. It appeared that RN Bruno also

4

placed an order/appointment for Ms. Fiebrink to have an Initial Health Assessment. (**Def.'s PFOF 82**). Since these are both essentially the same type of HCP visit, NP Shaikh deleted the appointment, as it was a duplicate. (**Def.'s PFOF 83**). To a reasonable degree of medical and nursing certainty, the care and treatment of Ms. Fiebrink by NP Decker and NP Shaikh was reasonable, appropriate and within the standard of care at all times, and no act or omission by the advanced practice nurses caused or contributed to Ms. Fiebrink's claimed injuries. (**Def.'s PFOF 85**). Further, neither NP Decker nor NP Shaikh ever received any information relative to Ms. Fiebrink exhibiting any signs of withdrawal prior to her death. Nor was any Armor medical personnel informed that Ms. Fiebrink had soiled her jail uniform or exhibited any other symptoms of withdrawal prior to her death. (**Def.'s PFOF 86**).

Ms. Fiebrink was last noted to be alive at 6:00 p.m. bed check on August 27, 2016. Ms. Fiebrink was declared to have died in her cell at 7:38 a.m. (**Def.'s PFOF 87, 90**). Milwaukee County Assistant Medical Examiner Dr. Jacob Smith performed an autopsy of Ms. Fiebrink on August 29, 2016 at 8:00 a.m. (**Def.'s PFOF 91**). Dr. Smith determined that Ms. Fiebrink's cause of death was atherosclerotic cardiovascular disease. (**Def.'s PFOF 94**). Further, Dr. Smith has opined that opioid withdrawal did not exacerbate, accelerate or aggravate the atherosclerotic cardiovascular disease that caused Ms. Fiebrink's death. (**Def.'s PFOF 95**).

Full factual context for matters related to this case is provided in Armor's Statement of Proposed Material Facts.

### III.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment may appropriately be entered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." *Fed. R. Civ. P. 56(c)*. The United States Supreme Court has ruled that a moving

party is entitled to judgment as a matter of law when the non-moving party fails to establish the

"existence of an element essential to [its] case, and on which [it] will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See also Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247 (1986).

## IV  <u>ARGUMENT</u>

### A.  **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS TO EACH OF PLAINTIFFS' SECTION 1983 CLAIMS IN COUNT I**

#### 1.  **Plaintiffs' Section 1983 Claims in Count I of the Amended Complaint Should be Evaluated Under the Eight Amendment Deliberate Indifference Standard**

Defendants acknowledge that the law in this Circuit is that Section 1983 medical claims by

or on behalf of *pretrial* detainees are analyzed under an objective reasonableness standard.[1] *See*

e.g. *Terry v. County of Milwaukee,* Case No. 17-CV-1112 (JPS), 2019 U.S. Dist. LEXIS 5197 (E.D.

Wis. January 11, 2019).[2] But this case is different. Ms. Fiebrink had already been convicted of a

crime at the time of her arrest (**Def's PFOF 2**). In fact, her arrest was pursuant to a probation hold

order relating to that exact conviction. (**Def's PFOF 3, 4**). Indeed, Ms. Fiebrink was not awaiting

trial in connection with the 2nd Degree Recklessly Endangering Safety crime that was the basis for

the probation hold, unlike the case with the arrestees in *Miranda* and *Terry*. Rather, she was

---

[1] Defendants filed Motions to Dismiss various claims being pursued by Plaintiffs in this lawsuit (*See* Dkt. Nos. 32 and 74). Defendants respectfully incorporate by reference the arguments set forth in those moving papers and supporting briefs into the instant Motion for Summary Judgment.

[2] Even if this Court determines that the Eighth Amendment's deliberate indifferent standard is inapplicable here, Defendants maintain that they are entitled to summary judgment on Plaintiffs' claims in Count I of the Amended Complaint under the Fourteenth Amendment's objectively unreasonable standard as well. As is the case with respect to Eighth Amendment claims, Plaintiffs pursing medical care claims under the Fourteenth Amendment must establish something greater than negligence or gross negligence. *See Miranda v. Cty of Lake,* 900 F.3d 335, 353-54 (7th Cir. 2018). Indeed, the Fourteenth Amendment standard is "akin to reckless disregard." *Id.* at 353. As set forth above, Plaintiffs cannot produce a triable issue of fact relative to Defendants' conduct with respect to Ms. Fiebrink's constitutional rights in Count I, no matter what standard this Court employs.

6

awaiting adjudication of her probation violation - - a proceeding which, in the State of Wisconsin does not involve the court system. *See Tyra v. Hayes,* Case No. 18-CV-1318 (JPS), 2018 U.S. Dist. LEXIS 216687 *2 (E.D. Wis. December 17, 2018). Hence, as someone who had already been convicted of a crime and was being held in connection with the violation of the terms of her sentence, Ms. Fiebrink's medical treatment while incarcerated is to be evaluated under Eighth Amendment Standards. *See Ortiz v. City of Chicago,* 656 F.3d 523, 530 (7th Cir. 2011), quoting *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir 2006) ("…. protections of the Fourth Amendment apply at arrest and through the Gerstein probable cause hearing, due process principles govern pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.")

      a.     **<u>Eighth Amendment Standards</u>**

In order for Plaintiffs to prevail on their Section 1983 claims against the Defendants in Count I, they must demonstrate "acts and omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Shockley v. Jones,* 823 F. 2d 1068, 1072 (7th Cir. 1987). To prove deliberate indifference to a serious medical need, the Plaintiffs must meet an objective standard and a subjective standard. *Dunigan by Nyman v. Winnebago County.,* 165 F.3d 587, 590-591 (7th Cir. 1999). Initially, the Plaintiffs must prove that Ms. Fiebrink suffered from a serious medical condition. To satisfy that element, the Plaintiffs must demonstrate that the medical condition resulted in needless pain and suffering, so as to be "'repugnant to the conscience of mankind" and "offensive to the evolving standards of decency.'" *Gutierrez v. Peters,* 111 F.3d 1364, 1371 quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Second, they must demonstrate a subjective element. *Id*. Specifically, the Plaintiffs must prove an official's deliberate indifference to that condition. *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011), citing *Estelle*, 429 U.S. at

7

104. Given that NP Shaikh and NP Decker are medical practitioners, their actions can only be found to be deliberately indifferent if they substantially deviated from accepted professional judgment to such an extent that they could not be deemed to have been relying upon medical judgment. *See Youngberg v. Romeo,* 457 U.S. 307, 314, 321 (1982); *Sain v. Wood,* 512 F.3d 886, 894-895 (7th Cir. 2008); *Jordan v. Milwaukee Cnty,* Case No. 14-CV-987, 2016 U.S. Dist. LEXIS 33251 at *30 (E.D. Wis. March 15, 2016), aff'd in part and rev'd in part, 680 Fed. Appx. 479 (7th Cir. 2017). Disagreement between a prisoner and his doctor or even between two medical professionals, about the proper course of treatment is generally insufficient, by itself, to establish an Eighth Amendment violation. *See Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006). In short, Plaintiffs must demonstrate that the medical treatment Ms. Fiebrink received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996).

**b.    <u>NP Shaikh had no Substantive Involvement in Ms. Fiebrink's Care</u>**

It is undisputed that NP Shaikh never treated Ms. Fiebrink and, in fact, has no recollection of ever even meeting her. (**Def's PFOF 76**). Her sole involvement in Ms. Fiebrink's course of treatment was the deletion of a duplicate appointment which appeared in Armor's electronic medical records system. (**Def's PFOF 76-83**). Significantly, it is undisputed that, immediately after that action, Ms. Fiebrink still had a scheduled appointment - - for the same type of appointment for which she had originally been scheduled, and on the same date. (**Def's PFOF 83**). Under those circumstances, there is simply no basis to connect NP Shaikh to the alleged constitutional violations that Plaintiffs claim in this case. *See Abner v. Nangalama,* Case No. 2:11-cv-0869 KJN P, 2012 U.S. Dist. LEXIS 71340 *12 (E.D. Ca. May 22, 2012) (rescheduling of medical appointment deemed insufficient to support Section 1983 claim.) The lack of personal involvement

is important in this context, because it is black letter law that an individual cannot be held liable under Section 1983 unless he or she was personally involved in the alleged constitutional deprivation. *See Kelly v. Muni Courts of Marion County, Inc.,* 97 F.3d 902, 909 (7th Cir. 1996). Section 1983 simply does not render an employee liable for the misdeeds or failings of others.

Even if the Plaintiffs could somehow create a triable issue as to NP Shaikh's personal involvement in the alleged deprivation of constitutionally-mandated medical care to Ms. Fiebrink, their claim still fails, because NP Shaikh's actions cannot be deemed to have been objectively unreasonable or deliberately indifferent. At no point during Ms. Fiebrink's incarceration at the MCJ was NP Shaikh made aware of any particular medical problems experienced by Ms. Fiebrink. (**Def's PFOF 78**). She had no knowledge of Ms. Fiebrink's alleged bout of diarrhea or the existence of any other symptoms of heroin withdrawal. (*Id.*). For that matter, there is no evidence that NP Shaikh knew who Ms. Fiebrink was, or that she was a heroin user. (**Def's PFOF 76, 77**). Nor did NP Shaikh know that Ms. Fiebrink had been placed into a detox protocol for twice-a-day monitoring (**Def's PFOF 79**). She also was unaware that there had been any failure to complete the ordered monitoring. (*Id.*). And of course, NP Shaikh had no knowledge of Ms. Fiebrink's undiagnosed heart issues. (**Def's PFOF 80**).

Further, support for NP Shaikh's actions can be found in the expert report of Advance Practitioner Nurse Colleen Andreoni. (**Def's PFOF 85**). She reviewed NP Shaikh's actions in the context of Ms. Fiebrink's medical care and opined that NP Shaikh's actions did not, in any way, violate the operative standard of care. (**Def's PFOF 85**).

Given these undisputed facts in the record, Plaintiffs cannot possibly meet their burden of demonstrating a triable issue as to whether NP Shaikh acted in an unconstitutional manner when she deleted the duplicate assessment and did not see Ms. Fiebrink for an appointment.

9

c.  **NP Decker's Medical Judgment that Ms. Fiebrink did not Have an Immediate Need for Taper Medications was not Deliberately Indifferent or Objectively Unreasonable**

Plaintiffs' claim against NP Decker fails for two reasons. First, the undisputed evidence demonstrates that, at the time of his evaluation of Ms. Fiebrink when she was being booked into the MCJ on August 24, 2016, she did not have a serious medical need for taper medication for heroin withdrawal because she was not going through withdrawal. And second, no reasonable fact finder could conclude that the treatment plan created by NP Decker for Ms. Fiebrink represented deliberate indifference for her medical care or was objectively unreasonable. Defendants concede that upon her booking at the MCJ on August 24, 2016, Ms. Fiebrink had a known serious medical condition: she had recently consumed a significant amount of heroin. However, for purposes of evaluating a Section 1983 medical care claim, the relevant inquiry is whether, at the time of NP Decker's evaluation of Ms. Fiebrink, she had a serious medical need for the treatment. *See Williams v. Rodriguez,* 509 F.3d 392 (7th Cir. 2007). Indeed, "the failure to act despite notice of a serious medical condition is not in itself objectively unreasonable." *Gant v. City of Chi.,* Case No. 13C6231, 2017 U.S. Dist. LEXIS 20268 *7 (N.D. Ill. February 13, 2017), quoting *Williams*, 509 F.3d at 401-402. Because there is no evidence in the record to demonstrate a need for taper medications at the time of NP Decker's on-call consultation with Nurse Bruno regarding Ms. Fiebrink, Plaintiffs' Section 1983 claim against him fails.

In *Williams*, the Seventh Circuit considered whether summary judgment was appropriately granted in favor of the City of Chicago and various police officers, with respect to a number of claims, including a Section 1983 denial of medical claim. With respect to that claim, the plaintiff alleged, among other things, that the officers who arrested him failed to procure emergency treatment for his asthmatic condition. In affirming the District Court's grant of summary judgment

10

on plaintiff's Section 1983 denial of medical care claim, the Court observed that, while plaintiff had been previously diagnosed with chronic asthma and had been required to go to the emergency room on a number of different occasions, on the night of his arrest he did not display symptoms indicating a need for immediate medical attention. *Id*. at 402. Significantly, the Court reached this conclusion despite evidence in the record indicating that the plaintiff told one of the arresting officers that he couldn't breathe and that the plaintiff's relatives informed the officers of his immediate need for an inhaler due to a current asthma attack. *Id*.

In *Gant*, the Northern District of Illinois applied the holding in *Williams*, while granting summary judgment in favor of the City of Chicago and a number of police officer, in connection with a Plaintiff's Section 1983 claim for failure to provide medical care. There, the plaintiff had been stabbed in the eye and undergone surgery several days prior to his arrest. At the time of his arrest, the plaintiff had a bottle of eye drops on his person. While being booked at the police station, the plaintiff requested the eye drops and asked to see a doctor. Police personnel refused both requests. Further, a friend of the plaintiff brought another bottle of eye drops for the plaintiff, but police personnel again refused to let him have access to the eye drops. Ultimately, the plaintiff had a second, unsuccessful surgery on his eye. He effectively lost vision in the injured eye. In rejecting the plaintiff's Section 1983 claim, the Court found that the plaintiff had failed to create a triable issue as to the serious medical condition element of his Section 1983 claim *Gant,* 2017 U.S. Dist. LEXIS at \*10. The Court observed that, while the plaintiff's eye injury was a serious medical condition, he had failed to demonstrate that, during the time he was detained and interacting with the police, he had a serious medical need for the requested treatment (eye drops.) *Id.*

As in *Williams* and *Gant*, the undisputed evidence in the record establishes that Ms. Fiebrink did not have a serious medical need for the taper medications Plaintiffs claim that she

should have received. There is no evidence in the record that Ms. Fiebrink displayed any symptoms associated with heroin withdrawal while NP Decker was consulting with Nurse Bruno about her treatment plan. To the contrary, it is undisputed that Nurse Bruno had administered an evaluation tool used to assess whether inmates are going through withdrawal, and Ms. Fiebrink scored "zero" on that assessment. (**Def's PFOF 21**).

Hence, there is no factual basis in the record to support a finding that Ms. Fiebrink needed withdrawal medication at the time that NP Decker was consulting with Nurse Bruno about her. Accordingly, Plaintiffs' claim against NP Decker fails, due to their inability to satisfy the serious medical condition element of their Section 1983 cause of action.

Additionally, to the extent the Plaintiffs argue that NP Decker was deliberately indifferent to Ms. Fiebrink's serious medical need because he did not personally monitor her condition during the four (4) days she was at MCJ, Plaintiffs' allegations are entirely misplaced. Initially, as set forth above, NP Decker's involvement with Ms. Fiebrink was limited to the call he received as the on-call provider on the day Ms. Fiebrink was admitted into the MCJ. (**Def's PFOF 35**). It is undisputed that NP Decker was not asked by anyone to provide consultation or advice regarding Ms. Fiebrink's medical situation on any other occasion during her four (4) day stint at MCJ. (*Id.*). Further, the record establishes that NP Decker received no information that Ms. Fiebrink was exhibiting even a single withdrawal sign or symptom during his call with RN Bruno, or at any other time prior to Ms. Fiebrink's demise. (**Def's PFOF 36**). On the contrary, NP Decker was expressly told by RN Bruno that Ms. Fiebrink had been evaluated in accordance with the CIWA/COWS tool and had scored "zero" on that assessment. (**Def's PFOF 30**). While the evidence in the record shows that Ms. Fiebrink refused multiple assessments, as ordered, and did not see a provider within 72 hours because she had court, there is nothing to suggest -- let alone

prove -- that NP Decker bore any responsibility for those failings. Finally, there is no support for Plaintiffs' bald assertion that NP Decker had a duty to make sure that his treatment order was followed. Nothing in Armor's policies requires a provider who creates a treatment plan to ensure that others who are responsible for performing certain tasks actually do their job. (**Def's PFOF 68**). One of Defendants' expert witness, Colleen Andreoni, opined that NP Decker's reliance upon the nursing staff to execute the treatment plan that he ordered was consistent with the prevailing standard of care for Nurse Practitioners like him. (**Def's PFOF 67**). In short, the record firmly establishes that NP Decker's limited involvement in Ms. Fiebrink's medical care was in no way deliberately indifferent to her medical needs or objectively unreasonable.

### d. <u>Respondeat Superior Liability does not Exist for Private Corporations</u>

Plaintiffs also assert a Section 1983 claim against Armor in Count I of the Amended Complaint. Given that Armor is a corporation and can only act through its employees and agents, Plaintiffs are necessarily seeking to impose respondeat superior liability upon Armor for the alleged constitutional violations committed by its employees. However, under the established case authority, private corporations like Armor do not have respondeat superior liability under Section 1983. *See Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 795-96 (7th Cir. 2014); *Terry v. County of Milwaukee,* Case 17-CV-01112-JPS, 2018 U.S. Dist. LEXIS 93298 * 11 (E.D. Wis. June 4, 2018). Based upon the clear and unequivocal rulings of the Seventh Circuit, this Court should enter summary judgment in Armor's favor as to the Section 1983 claim in Count I of the Amended Complaint, which is based on a theory of respondeat superior.

13

**e.    Plaintiffs' Claims in Count I of the Amended Complaint also Fail on Account of a Lack of Causal Connection Between Defendants' Alleged Actions and Ms. Fiebrink's Death**

It is well-settled that, in order to prevail on a Section 1983 claim, a plaintiff must establish that the defendant's unconstitutional action was the "cause in fact" of the injury. *Muckway v. Craft,* 789 F.2d 517, 521 (7th Cir. 1986). Here, there is no evidence to support Plaintiffs' allegation that the Defendants' conduct caused Ms. Fiebrink's death. In fact, the overwhelming medical evidence in the record demonstrates that her death was caused by her latent heart disorder. (**Def's PFOF 91-98**). Indeed, it is undisputed that the Medical Examiner performed an autopsy on Ms. Fiebrink and found that she had two severely blocked heart arteries. (**Def's PFOF 94**).  Significantly, the Medical Examiner concluded that her death was due to atherosclerotic cardiovascular disease and not connected to any withdrawal issues (**Def's PFOF 98**).

Similarly, the Plaintiffs cannot satisfy their burden of demonstrating a triable issue of causation between NP Decker and NP Shaikh's alleged unconstitutional medical care and Ms. Fiebrink's alleged withdrawal symptoms. As set forth above, NP Shaikh's role in Ms. Fiebrink's care was to remove a duplicate appointment from the schedule. (**Def's PFOF 76-83**). Similarly, NP Decker's role in Ms. Fiebrink's care was to place her into the detoxification protocol and to order that she be monitored two times a day for a period of five (5) days. (**Def's PFOF 31, 35**). Those actions on the part of NP Decker and NP Shaikh cannot reasonably be deemed the cause of her alleged injuries.

Additionally, any causal link between any of Ms. Fiebrink's injuries and Defendants' actions are severed due to her own superseding actions. Specifically, it is undisputed that Armor's nurses attempted to perform the CIWA/COWS monitoring on Ms. Fiebrink pursuant to NP Decker's treatment order. (**Def's PFOF 54, 59, 62**). Yet, Ms. Fiebrink refused the monitoring.

14

(**Def's PFOF 54, 60, 63**). Further, despite her access to correctional and medical professionals at the MCJ throughout her incarceration in August of 2016, there is no evidence that Ms. Fiebrink ever asked for any medication or treatment. (**Def's PFOF 69 and 70**). Significantly, there is absolutely nothing in the record which even suggests that Ms. Fiebrink lacked the capacity to seek medical intervention for any discomfort that she may have experienced. To the contrary, Ms. Fiebrink sought medical assistance and medication to deal with physical issues that she was experiencing during her many jail stints. (**Def's PFOF 71**). Hence, any injuries that Ms. Fiebrink suffered during her four (4) day incarceration at MCJ cannot be linked to Defendants' actions and, for this sole reason, forecloses each of her Section 1983 claims against Defendants in Count I of the Amended Complaint. *See Galen v. County of Los Angles,* 477 F.3d 652, 663 (9th Cir. 2007) (district court correctly applied superseding cause doctrine to bar Plaintiff's Section 1983 claim); *Taylor v. Wausau Underwriters Ins., Co.,* 423 F.Supp. 2d 882, 900 (E.D. Wis. 2006) (suicide of inmate constitutes superseding cause that relieves prison or jail guard of liability for his death.)[3]

Based upon the questions posed to him at his deposition, NP Decker anticipates that the Plaintiffs may seek to exploit the fact that neither he nor RN Bruno reviewed Ms. Fiebrink's medical records from her prior jail stays. Indeed, Plaintiffs' medical expert references that fact in his report. But neither Plaintiffs nor their expert explain why that is of any significance in this case. At no point was NP Decker made aware that Ms. Fiebrink was exhibiting withdrawal symptoms during his phone assessment or thereafter, prior to her death. (**Def's PFOF 30, 36**). The fact that

---

[3] Defendants also anticipate that Plaintiffs may seek to offer a number of Defendants' post-death investigation materials (and testimony relating to these materials) in an effort to create a triable issue as to their claims. But those materials (Corrective Action Plans; Mortality Reviews and Death Summary Reports) are inadmissible under Fed. R. Evid. 407 as improper evidence of remedial efforts. *See Ford v. Schmidt,* 577 F.2d 408, 411 (7th Cir. 1978), *Smith v. Family Video Movie Club, Inc.,* Case No. 11 C 1773, 2017 U.S. Dist. LEXIS 19725 at * 8-9 (N.D. Ill. February 13, 2017). Alternatively, this Court should bar admission of that material because it is protected by the self-examination privilege. See *Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir. 1985); *Tice v. American Airlines, Inc.,* 192 F.R.D. 270, 272 (N.D. Ill. 2000); *Robinson v. Troyan,* Case No. CV 07-4846, 2011 U.S. Dist. LEXIS 128945 at *10-12 (E.D.N.Y. November 8, 2011); *Morgan v. Union Pacific,* 182 F.R.D. 261, 264 (N.D. Ill. 1998).

Case 2:18-cv-00832-AJS   Filed 03/08/19   Page 15 of 30   Document 211

another provider had prescribed medication during Ms. Fiebrink's prior jail stay did not require NP Decker to prescribe medications for symptoms she was not displaying. Hence, the failure to review medical records argument is a red herring, and an inappropriate attempt to second-guess NP Decker's reasonable medical judgment. Courts have repeatedly held that Section 1983 plaintiffs cannot meet their burden of demonstrating constitutionally-deficient medical care merely by questioning a practitioner's medical judgment. *See e.g. Collignon v. Milwaukee County,* 163 F.3d 982, 990 (7th Cir. 1998) (disagreement about which professionally-acceptable treatment plan for mentally ill inmate should have been pursued is insufficient to make out substantive due process violation claim.)

Likewise, to the extent that the Plaintiffs attempt to argue that there is evidence that Defendants' conduct violated certain policies of Armor or MCJ, that argument is wholly unpersuasive. For it has long been held that a defendant's failure to follow internal rules, policies or protocols is not enough to prove unconstitutional conduct. *See e.g., Fuller v. Dillon,* 236 F.3d 876, 880 (7th Cir. 2001).

In sum, because the Plaintiffs cannot demonstrate a triable issue as to any aspect of their Section 1983 claims in Count I, this Court should enter summary judgment in Defendants' favor on all of those claims.

### B.  NP DECKER AND NP SHAIKH ARE ENTITLED TO QUALIFIED IMMUNITY

Private individuals employed to complete the work of the government are eligible to invoke the qualified immunity defense alongside full-time government employees. *Filarsky v. Delia,* 132 S. Ct. 1657, 1665-66. (2012). Here, even if Plaintiffs could show a constitutional violation by NP Decker or NP Shaikh, they cannot demonstrate that they violated a right that was clearly established as of August, 2016. Indeed, there was no clearly established right to be prescribed

16

medication when there were no clear indications that medication was warranted. Nor was there a clearly established right to have a specific individual serve as an inmate's designated provider. And, there definitely was no clearly established constitutional right on the part of an inmate to have a health assessment on a particular day. Further, even if Plaintiffs could prove that NP Decker or NP Shaikh violated a clearly established right in connection with Ms. Fiebrink's death, reasonable medical practitioners could certainly disagree as to whether their actions violated that right. *See Maltby v. Winston,* 36 F.3d 548, 557 (7th Cir. 1994). Accordingly, NP Decker and NP Shaikh are entitled to qualified immunity even if this Court were to find that they violated Ms. Fiebrink's rights.

### C. SUMMARY JUDGMENT IS ALSO APPROPRIATE ON PLAINTIFFS' *MONELL* CLAIMS

#### 1. The Plaintiffs' Inability to Create a Triable Issue as to Deliberate Indifference Renders Their Claims Ripe For Summary Judgment

It is well-established that a Section 1983 plaintiff cannot succeed on a *Monell* claim without demonstrating an underlying constitutional violation. *See Collins v. City of Harker Heights,* 503 U.S. 155, 123 (1992). Hence, that would require the Plaintiffs to initially demonstrate that Armor medical personnel were deliberately indifferent in the medical care provided to Ms. Fiebrink. Deliberate indifference is a high standard of fault, which essentially requires that an actor have disregarded a known or obvious consequence of his or her action. *See Board of Comm'rs of Bryan v. Cty. Brown,* 520 U.S. 397, 410 (1997). It requires a showing of blatantly inappropriate conduct which is for more egregious then negligence. *Williams v. Saffold*, Case No. 15 C 3465, 2018 U.S. Dist. LEXIS 27157 at *8-9 (N.D. Ill. February 21, 2018). As discussed in detail above, the facts do not support a finding of deliberate indifference on Defendants' part, and hence the Plaintiffs' *Monell* claims thus fail on that basis alone.

17

**2.      None of the Plaintiffs' *Monell* Theories Raise Issues for Trial and Should be Disposed of on Summary Judgment**

As set forth above, an entity like Defendant Armor cannot be held liable under Section 1983 solely because it employs an individual who violates a plaintiff's rights. *See Monnell v. Dep't of Soc. Svcs.,* 436 U.S. 658 (1978). Rather, to impose liability on Defendant Armor under Section 1983, the Plaintiffs must show: (1) an express official policy adopted and promulgated by Armor's policymakers; (2) a widespread practice that, although not authorized by Armor's express, official policy is so permanent and well settled that it constitutes a policy; (3) a constitutional injury caused by a person with final policymaking authority. *See Teesdale v. City of Chicago,* 690 F.3d 829, 834 (7th Cir. 2012). Armor can only be found liable under *Monell* if its policies were the "moving force" behind the deprivation of Ms. Fiebrink's constitutional rights. Simple "but-for" causation is not enough. *Terry*, quoting *Wilson v. Cook Cnty.,* 742 F.3d 775, 784 (7th Cir. 2014); *Estate of Sims v. County of Bureau,* 506 F.3d 509, 514 (7th Cir. 2007). As a private corporation that has contracted with Milwaukee County to provide inmate health services, Armor is treated like a governmental unit for Section 1983 purposes. *See Shields,* 746 F.3d at 789.

In their opposition to Defendant Armor's Motion to Dismiss the Amended Complaint, the Plaintiffs allege six (6) separate *Monell* violations. Not a single one of Plaintiffs' claimed *Monell* violations has any merit and should be summarily rejected here on summary judgment.

**a.      Armor's Alleged Policy and Practice of Only Conducting Clinical Intake Assessments by Medical Practitioners Once a Year**

To establish a municipal policy or custom, the Plaintiffs must allege a specific pattern or series of incidents that support the general allegation of a custom or policy. "*Henry v. Farmer City State Bank,* 808 F.2d 1228, 1237 (7th Cir. 1986). A single incident, generally does not provide an

18

adequate basis for inferring a policy or custom. *See Daniel v. Cook County,* 833 F.3d 728, 734 (7th Cir. 2016). It is not enough to demonstrate that Armor "could or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cty.,* 463 F.3d 773, 790 (7th Cir. 2006). Instead, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.*

Armor does not have a policy or practice which provides that inmates like Ms. Fiebrink are only allowed to receive assessments by medical practitioners once a year. In fact, it is undisputed that Ms. Fiebrink had received an assessment by a medical provider during her last jail stay on March 2, 2016. (**Def's PFOF 72**). Yet, despite the fact that less than a year had passed when she was booked into MCJ on August 24, 2016, Ms. Fiebrink was given a Level 2 designation and scheduled for an assessment by a medical provider within three (3) days. (**Def's PFOF 31**). While that initial scheduled appointment was rescheduled, the fact that it was set in the first place wholly undermines the Plaintiffs' claim that Armor's policies and practices do not provide for such assessments more than once a year. Further, there is absolutely no evidence that Ms. Fiebrink's medical provider assessment was cancelled due to Armor's alleged policy or practice. Rather, the evidence in the record is that Ms. Fiebrink's appointment was rescheduled on account of the fact that she was at a court appearance on the date and time of her scheduled appointment. (**Def's PFOF 65**).

Plaintiffs' *Monell* claim also falters because there is no evidence in the record that Armor had reason to know of this supposed policy practice or that adherence to the policy or practice would likely result in inmates suffering constitutional deprivations. In fact, the undisputed evidence is that far in advance of Ms. Fiebrink's admission to MCJ in August, 2016, Armor had

adopted a recommended leveling system for individuals being booked into MCJ. (**Def's PFOF 15**). Very simply, there is absolutely nothing in the record which would put Armor on notice that someone like Ms. Fiebrink would suffer constitutionally-deficient medical care on account of having one medical provider assessment during the course of a year. *See Chatham v. Davis,* 839 F.3d 679, 685 (7th Cir. 2016) (observing that *Monell* claims generally require evidence that the alleged unconstitutional practice or custom injured multiple parties).

Lastly, there is no evidence in the record that could support a finding that adherence to the alleged one-year policy or practice caused Ms. Fiebrink's death or other injuries. Throughout her stay, in accordance with Armor's policies, Ms. Fiebrink had the ability to request medical treatment by a provider or to ask for medication to treat withdrawal symptoms. (**Def's PFOF 69-70**). There is no evidence that she lacked the capacity to pursue these things or that she sought to access them but was denied. To the contrary, the undisputed evidence in the record is that Armor nursing staff attempted to carry out the CIWA monitoring order by NP Decker but were turned away by her. (**Def's PFOF 54, 59, 60, 62-63**). Any claim that the alleged one-year medical provider assessment policy bears a causal link to Ms. Fiebrink's demise or other alleged health issues is purely speculative. Accordingly, this *Monell* claim should be dismissed on summary judgment.

### b. Armor's Lack of Policy Mandating an Internal History and Physical Examination When Someone is Jailed More than a Year

There is absolutely no evidence that Armor's alleged lack of an internal history and physical examination policy represents a decision by Armor to violate the constitutional medical care rights for inmates like Ms. Fiebrink. Significantly, Plaintiffs offer no evidence of another inmate at MCJ predating Ms. Fiebrink who was adversely affected by the lack of an internal history and physical examination policy. Moreover, the Plaintiffs utterly ignore the undisputed

20

evidence in the record that Ms. Fiebrink was ordered to be monitored twice a day for any withdrawal symptoms. (**Def's PFOF 31**). Further, it is undisputed that Armor had many polices in effect at MCJ that would result in inmates receiving immediate medical attention if there were significant changes in their condition. (**Def's PFOF 73**). And finally, in advancing this *Monell* claim, the Plaintiffs utterly ignore the undisputed evidence in the record that Ms. Fiebrink was ordered to be monitored twice a day for any withdrawal symptoms. (**Def's PFOF 31**). Under these circumstances, the Plaintiffs cannot possibly demonstrate that the alleged absence of a policy regarding internal history and physical examinations was the "moving force" behind her injuries.

c.    **Armor's Alleged Lack of a Policy Requiring Administration of a Preventative Detoxification Protocol**

Contrary to Plaintiffs' allegation, Armor does, in fact, have policies that directly address the administration of drugs in appropriate instances to inmates who are in the process of detoxification. At the time of Ms. Fiebrink's incarceration at MCJ in August, 2016, Policy Number J-G-07 was in effect at Armor (**Def's PFOF 46**). This Policy provides, inter alia, that detoxification is done under physician supervision (*Id.*). Further, there was a detailed Policy entitled Management of Alcohol or Drug Withdrawal Risk that was in effect in August of 2016 at Armor (**Def's PFOF 47**). It included a listing of specific medications that could be administered in the withdrawal process (*Id.*). Significantly, NP Decker and NP Shaikh understood, during their employment at Armor, that the Company's policies allowed them to use their medical judgment to prescribe medications to inmates in order the address issues they encounter in the detoxification process (**Def's PFOF 48**).

Even assuming, *arguendo*, that Plaintiffs could show that Armor lacked a policy on preventative detoxification protocol during the relevant time period, they cannot raise a triable issue as to their *Monell* claim. To prove their "gap" variety *Monell* claim, the Plaintiffs are

21

essentially required to establish that Armor's lack of preventative detoxification protocol policy is tantamount to a decision by the Company to violate the rights of inmates suffering from heroin withdrawal. *See Terry*, 2019 U.S. Dist. LEXIS 5197 (E.D. Wis. January 11,2019) ("Terry has not provided evidence that the defendants' lack of late term pregnancy and labor policy is tantamount to the defendants' decision to violate the constitutional rights of women in late pregnancy.") There is absolutely no evidence of knowledge on the Company's part that the lack of such a policy posed the risk of constitutionally-deficient healthcare being provided to inmates. In fact, there is no evidence in the record of anyone else who supposedly suffered injury because of the lack of a policy on preventative detoxification protocol.

Lastly, Plaintiffs have no evidence that the alleged lack of a policy on preventative detoxification protocol was the moving force behind the injuries that Ms. Fiebrink allegedly suffered. The fact that Ms. Fiebrink was not prescribed withdrawal medication has nothing to do with a policy or lack thereof. In short, there is no causal link between Ms. Fiebrink's alleged injuries and the alleged lack of a preventative detoxification protocol.

### d. Armor's Alleged Policy and Practice of not Providing Medication or Other Medical Care when Withdrawal Symptoms are Observed

Initially, as set forth above, Armor has express policies regarding treatment (including providing medication) to inmates suffering from withdrawal. (**Def's PFOF 46-47**). These policies were in place when Ms. Fiebrink was under Armor's care in August of 2016 (***Id.***). Second, it is undisputed that medical providers at MCJ have treated many inmates suffering from drug withdrawal at MCJ. (**Def's PFOF 1**). This treatment has included providing taper medications to inmates to mitigate withdrawal symptoms (***Id.***). Indeed, it is undisputed that Ms. Fiebrink herself received withdrawal medication in connection with symptoms she had exhibited while incarcerated at MCJ. (**Def's PFOF 71**).

Lastly, Plaintiffs fail to offer any evidence of other inmates who merited treatment and medication for drug withdrawal but were denied the same. Plaintiffs merely point to Ms. Fiebrink's situation as an example. And while there is no factual support for the Plaintiffs' claim, even if Ms. Fiebrink was denied medication and care for her withdrawal, that would be insufficient support for a *Monell* claim. *See Barwicks v. Dart*, Case No. 14-cv-8791, 2016 U.S. Dist. LEXIS 80958, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (at summary judgment stage, single instance of unconstitutional deprivation cannot create triable issue as to *Monell* claim.)

### e.     Armor's Alleged History of Inadequate Inmate Care at MCJ

Plaintiffs attempt to leverage certain publicized medical cases at MCJ as a basis for their broad, inadequate care-based *Monell* claim. But in doing so, they ignore this Court's holdings in *Terry,* 2018 U.S. Dist. LEXIS 93298 at *23  and *Williams v. Milwaukee Cty.,* Case No. 18-CV-1045-JPS, 2019 U.S. Dist. LEXIS 5979 (E.D. Wis., January 14, 2019). In both cases, this Court made it clear that generalized allegations of inadequate care at MCJ evidenced by disparate medical situations would not support a *Monell* claim against Armor. Like the Plaintiffs here, the plaintiff in *Terry* based her claim in large part on adverse medical incidents involving other inmates, as detailed in various records, including the reports of court-appointed monitor, Dr. Robert Shansky. *Id.* at *6. This Court found that such evidence was insufficient to state a viable *Monell* claim based upon a widespread custom or practice theory. *Id. at *18.*

Moreover, the record shows that the Armor medical personnel who were working at the MCJ while Ms. Fiebrink was there in August of 2016, had received training on Armor's policies generally and specifically with respect to treating inmates who, like her, had drug-addiction problems. (**Def's PFOF 18-19, 28-29, 75**).

23

Here, Ms. Fiebrink's case involves the treatment she received relating to her heroin usage. There is no evidence in the record as to a nexus between her medical issues and treatment and those of the other inmates the Plaintiffs mention in their Amended Complaint. Moreover, in the case of Michael Madden, his incarceration occurred after Ms. Fiebrink's death (Plaintiffs' Amended Complaint, Dkt. 57, ¶ 66). So clearly his medical case could not be part of a pattern that that put Armor on notice of a problem that ultimately caused harm to Ms. Fiebrink.

Lastly, as is the case with all the Plaintiffs' *Monell* theories, this one also fails due to a failure of evidence on the issue of causation. *See Chatham,* 839 F.3d at 685; *Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 664 (7th Cir. 2016). Because the Plaintiffs' alleged-inadequate medical care *Monell* theory is identical to the one rejected on causal grounds in *Terry*, this Court should also enter summary judgment in Armor's favor, because the evidence here does not create a triable issue of fact as to the causation element of their *Monell* claim.

    **f.**    <u>**Armor's Alleged Failure to Train**</u>

In order to hold Armor liable under a failure-to-train *Monell* theory, the Plaintiffs must first establish that the Company had notice of constitutional violations committed by its inadequately-trained employees. *See Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir. 1994). Further, a plaintiff must produce evidence which shows that his or her injuries were caused by the training failure. *See City of Canton,* 489 U.S. at 391; *Ellingson v. City of Edgerton,* Case No. 09-cv-443-wmc, 2010 U.S. Dist. LEXIS 100502 at *20 (W.D. Wis. September 23, 2010). Summary judgment should be entered against Plaintiffs with respect to their failure-to-train *Monell* claim due to a lack of evidence in the record regarding both components. Initially, there is no evidence in the record that Armor had been put on notice that its medical personnel were providing constitutionally-deficient care with respect to inmates who had consumed heroin. Plaintiffs cannot point to a single instance

24

of Armor providing deliberately indifferent care to a heroin user in connection with his or her withdrawal. Further, the evidence in the record establishes that medical personnel at MCJ understood how to treat and care for inmates suffering from heroin addiction. Ms. Fiebrink's situation is a case in point. During a number of her stays at MCJ, Ms. Fiebrink had been assessed using the CIWA tool and prescribed taper medications to address her withdrawal issues (**Def's PFOF 71**). Indeed, the record clearly demonstrates that RN Bruno understood how to conduct a CIWA assessment and when to involve a medical provider for direction in terms of managing an inmate that had recently used heroin (**Def's PFOF 18-19**). Further, the evidence shows that NP Decker had received training on Armor's policies and procedures throughout his employment there. (**Def's PFOF 28-29**).

Likewise, the Plaintiffs cannot demonstrate that the injuries allegedly sustained by Ms. Fiebrink, and her ultimate death, were proximately caused by Armor's alleged failure to train its personnel. None of the alleged failures in care cited by the Plaintiffs bear any connection to a lack of training. There is evidence in the record that medical personnel at MCJ only attempted to monitor Ms. Fiebrink once a day, instead of twice a day as ordered by NP Decker. But even if that is the case, there is no evidence in the record that this occurred because of a training deficit. Similarly, Plaintiffs make much of Armor's medical staff's alleged failure to review Ms. Fiebrink's prior medical records. Even assuming, *arguendo*, that there was a failure to review her past treatment records, there is no evidence in the record that such a review would have caused NP Decker or RN Bruno to pursue a different treatment path. Significantly, one of Defendants' expert witnesses, Colleen Andreoni has opined that there was no breach of the standard of care by virtue of NP Decker not reviewing the past records and basing his treatment decisions on Ms. Fiebrink's current condition. Finally, Plaintiffs contend that due to a lack of training, Ms. Fiebrink did not

see a medical practitioner during her stay at the MCJ in August of 2016. Yet they offer no evidence that this alleged failure had anything to do with a lack of training. There is no evidence that there was a lack of awareness by medical personnel at MCJ, as to whether inmates could be sent to medical practitioners or under what circumstances that should occur in relation to a drug-addicted inmate. In fact, Ms. Fiebrink was scheduled to see a medical provider, but that appointment was rescheduled due to her court appearance. (**Def's PFOF 65**). There is absolutely no evidence that Ms. Fiebrink was exhibiting signs of withdrawal that Armor medical personnel observed or were made aware of, and that her lack of a visit with a medical provider bears any connection to her death or injuries. Very simply, evidence of a causal link necessary for a successful *Monell* claim is entirely missing here.

In sum, the Plaintiffs' *Monell* claim lacks the necessary factual support to survive the instant Motion for Summary Judgment. Accordingly, this Court should enter judgment in Armor's favor as to Count II of the Amended Complaint.

### D. SUMMARY JUDGMENT SHOULD ALSO BE GRANTED ON PLAINTIFF ROBERT MARTINEZ' LOSS OF SOCIETY AND COMPANIONSHIP CLAIM

Defendants are entitled to summary judgment on Plaintiff Robert Martinez' claim of loss of his mother's society and companionship in Court III of the Amended Complaint on two grounds. First, as set forth above, there is no triable issue that any of the Defendants violated the constitutional rights of Ms. Fiebrink based upon the facts in the record. Because of this lack of an underlying constitutional violation, there is no foundational basis for Mr. Martinez' claim in the first instance. And second, even if there was a triable issue as to violation of Ms. Fiebrink's constitutional rights, Mr. Martinez' claim still fails because the facts do not support a finding that any of the Defendants violated Ms. Fiebrink's rights for the specific purpose of interfering with

her relationship with her son.  *See Russ v. Watts,* 414 F.3d 783 (7th Cir. 2015) (United States Constitution does not confer a right to recover for loss of companionship when the challenged state action is not undertaken for the specific purpose of interfering with the familial relationship). Here, it is clear that Mr. Martinez' claim is not one he is permitted to pursue under Section 1983. Moreover, there is absolutely no evidence in the record that the alleged constitutional violations were undertaken for the purpose of interfering with Mr. Martinez' relationship with his mother. In fact, the Amended Complaint contains no such allegation. Accordingly, there is no basis for his claim in this action, and the Court should enter summary judgment on it in Defendants' favor.

### E. SUMMARY JUDGMENT SHOULD ALSO BE GRANTED ON PLAINTIFFS' COMMON LAW NEGLIGENCE CLAIMS

Despite the fact that Plaintiffs did not expressly allege medical malpractice claims with respect to Nurse Practitioners Decker and Shaikh, their conduct is assessed by comparing their actions with similarly-situated individuals with comparable professional training.[4] *See Nowatske v. Osterloh, M.D.,* 198 Wis.2d 419, 433 (Wis. 1996). Hence, Plaintiffs must provide expert testimony to establish that their conduct violated the applicable standard of care. Plaintiffs' medical expert has not stated what the standard of care was for either NP Decker or NP Shaikh, or that their specific actions with respect to Ms. Fiebrink violated the operative standard of care. By contrast, one of Defendants' standard-of-care experts, Colleen Andreoni, specifically identified the applicable standard of care for NP Decker and NP Shaikh and opined that their actions did not fall below that standard with respect to Ms. Fiebrink's care. (**Def's PFOF 85**).  This failure to

---

[4] Plaintiffs once again fail to pay heed to this Court's precedent with respect to their Amended Complaint.  Instead of specifying how each named Defendant was negligent under Wisconsin law, they merely allege a host of allegedly negligent conduct without detailing which Defendant is specifically responsible for each particular offense. Hence, it is hard to imagine how employees like NP Decker and NP Sheikh could possibly be liable for "failing to develop and implement proper policies and procedures…" when there is no allegation that they were even responsible for creating policies and procedures as part of their job duties. (See **Dkt 57, ¶144.**)

present appropriate expert testimony on the part of the Plaintiffs precludes them from establishing liability against NP Decker and NP Shaikh for their purported negligence. But even if they could provide sufficient expert testimony regarding NP Decker and NP Shaikh's standard of care, summary judgment would still be warranted because, as set forth above, neither of their actions were negligent. NP Shaikh provided no care to Ms. Fiebrink and was not aware of any need to do so, while NP Decker's role in Ms. Fiebrink's care was limited to a short call during her arrival to the jail that resulted in a treatment order calling for twice a day CIWA monitoring by other medical personnel. There is no expert testimony, or other evidence in the record, that NP Decker's medical judgement to not prescribe medication to Ms. Fiebrink at intake, was improper, given the undisputed evidence that she was stable and not exhibiting any signs of withdrawal at that time. The law does not obligate medical practitioners to practice defensive medicine such as prescribing drugs for a condition that has not developed.

The record here is similarly devoid of evidence that Armor was negligent with respect to the care Ms. Fiebrink received at MCJ. Plaintiffs apparently maintain that Armor is liable for failing to train and supervise NP Decker, NP Shaikh and other employees. However, as detailed herein, Ms. Fiebrink received appropriate care during her stay at MCJ during August of 2016. She was immediately screened and assessed by a nurse upon arrival at MCJ and NP Decker designed a treatment plan. (**Def's PFOF 10, 17, 31**). And it is undisputed that, on multiple occasions, Armor medical personnel attempted to perform CIWA monitoring on her each of the days she was at the jail. (**Def's PFOF 54, 59-60, 62-63**). It is well-established under Wisconsin law that an employer cannot be held liable for negligent hiring, training or supervision if its employees did not commit negligent acts in the first place, and those are the fact here. *See John Doe 1 v. Archdiocese of*

28

*Milwaukee,* 303 Wis. 2d. 34 at ****24 (Wis. 2007); *Miller v. Wal-Mart Stores, Inc.,* 219 Wis. 2d 250, 268 (Wis. 1998).

Finally, Plaintiffs' negligence claims still fail based upon the superseding cause doctrine for any injuries that she sustained. *See University Dodge, Inc. v. Drott Tractor Co.,* 55 Wis. 2d 396, 400 (Wis. 1972); *Merz v. Old Republic Insurance Co.,* 53 Wis. 2d 47, 55-56 (Wis. 1971); *Cefalu v. Cont'l Western Ins. Co.,* 2005 WI App 187 at **780-781 (Ct. App. 2005). Here, it is undisputed that Armor personnel sought to perform CIWA monitoring on Ms. Fiebrink each day in which she was alive during her incarceration at MCJ in August of 2016. (*Id.*). Each time, she refused to be monitored. Further, Ms. Fiebrink had the ability to seek medical assistance at all times. (**Def's PFOF 69-70**). There is no evidence in the record that Ms. Fiebrink was unaware of how to access help for withdrawal symptoms. To the contrary, it is undisputed that Ms. Fiebrink had received medication during her prior stays and had sought medical attention. (**Def's PFOF 71**). Further, there is no evidence that Ms. Fiebrink lacked the capacity to decline treatment or to seek medical assistance. Hence, even if Plaintiffs could show that Ms. Fiebrink suffered withdrawal symptoms at some point and died due to them, her own failures relieve the Defendants from any liability for the harm that befell her, based upon Wisconsin law.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully submit that there is no genuine issue as to any material fact and that the uncontroverted evidence in the record entitles them to judgment as matter of law as to all claims in this case. Accordingly, Defendants respectfully request that this Court grant the instant Motion for Summary Judgment as to all of Plaintiffs' claims.

Dated at Milwaukee, Wisconsin this 8th day of March, 2019.

By: */s/ Emery K. Harlan*
Emery K. Harlan

State Bar No. 1000240
Eric L. Andrews
State Bar No. 1068550
Carlos Pastrana
State Bar No. 1088286
735 N. Water Street, Suite 610
Milwaukee, WI 53202
(414) 436-0353 Phone
(414) 436-0354 Facsimile
emery.harlan@mwhlawgroup.com
eric.andrews@mwhlawgroup.com
carlos.pastrana@mwhlawgroup.com

**COUNSEL FOR DEFENDANTS**