UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

The Estate of KRISTINA ANN FIEBRINK, by
Special Administrator NATHANIEL CADE JR.; The
Estate of ANGELICA M. FIEBRINK, JOSE D.
MARTINEZ, JR., and ROBERT MARTINEZ,

        Plaintiff,

v.

ARMOR CORRECTIONAL HEALTH SERVICE,
INC.; AND DR. KAREN RONQUILLO-HORTON;
BROOKE SHAIKH, APNP; VERONICA
WALLACE, LPN; BRITENY R. KIRK, LPN; EVA
CAGE, LPN; BRANDON DECKER, APNP; AND
MILWAUKEE COUNTY, A MUNICIPAL
CORPORATION; AND DAVID A. CLARKE, JR.;
RICHARD R. SCHMIDT; LATISHA AIKENS;
BRIAN PIASECKI; JENNIFER MATTHEWS;
LATRAIL COLE; LATOYA RENFRO;
AND JOHN DOES 1-10; JOHN DOES 11-20;
AND EVANSTON INSURANCE COMPANY; AND
WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

        Defendants.

Case No. 18 CV 000832

---

### DEFENDANTS' BRITENY R. KIRK, LPN'S AND EVA CAGE, LPN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. 56 AND CIVIL L.R. 56

---

Defendants, BRITENY R. KIRK, L.P.N. and EVA CAGE, L.P.N., by their attorneys, CASSIDAY SCHADE LLP, and, for their Memorandum of Law in Support of Their Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, and, Civil L.R. 56, states as follows:

This Honorable Court should grant these Defendants' Motion For Summary Judgment since there are no genuine issues of material fact with respect to the actions of these Defendants, NURSE KIRK and NURSE CAGE. The evidence in this case establishes that these NURSES' actions did not constitute deliberate indifference toward Inmate Fiebrink's health. Moreover, the Plaintiff has no expert nursing or physician opinion that establishes any constitutional or statutory claim of

1

deliberate indifference, or, of any Wisconsin state law negligence claim as to the specific conduct of either NURSE KIRK or NURSE CAGE, or, that any of their specific actions caused Inmate Fiebrink's injuries, including her death.

## *JURISDICTION AND VENUE*

This Court has jurisdiction pursuant to 42 U.S.C. §1983 and 28 U.S.C. §§1331, 1343(a)(3), 1342(a)(4), and 1367(a). Venue is appropriate pursuant to 28 U.S.C. §1391, as all of the events identified in the Plaintiff's Amended Complaint occurred at the Milwaukee County Justice Facility, hereinafter ("Milwaukee County Jail") located in the Eastern District of Wisconsin.

## *BACKGROUND*

In August 2016, both NURSE KIRK and NURSE CAGE were agency nurses that worked for GLC Staffing Agency. (Reid Dec., Ex. B, Kirk Dep. p. 10; Ex. C, Cage Dep. p. 10; SOMF ¶3). At all times relevant to the Plaintiff's Amended Complaint, NURSE KIRK and NURSE CAGE worked at the Milwaukee County Justice Facility ("Milwaukee County Jail") for Armor Correctional Health Services, Inc., ("Armor"), pursuant to an agreement between GLC Staffing Agency and Armor. (Reid Dec. Ex. B, Kirk Dep. p. 9, 10; Reid Dec., Ex. C, Cage Dep. p. 10; SOMF ¶3). Prior to working with the inmates at Milwaukee County Jail, Armor provided NURSE KIRK and NURSE CAGE with orientation and on-the-job training, by having them shadow other Nurses. (Reid Dec., Ex. B, Kirk Dep. p. 12; Ex. C, Cage Dep. p. 12; SOMF ¶4).

At the beginning of each shift at the Milwaukee County Jail, an Armor Nursing Supervisor would give each nurse her assignment, such as being assigned a specific unit or pod, and tasks to be performed that day. (Reid Dec., Ex. B, Kirk, p. 13; SOMF ¶5). Both NURSE KIRK and NURSE CAGE worked first shift, the day shift. (Reid Dec., Ex. B, Kirk Dep. p. 22, 25; Ex. C, Cage Dep. p. 28; SOMF ¶6).

Armor provided the training and instruction to both NURSE KIRK and NURSE CAGE how to interact with and examine inmates that were on a Detoxification ("Detox") protocol. (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; Ex. C, Cage Dep. p. 17, 46; SOMF ¶6). Both NURSE KIRK and NURSE CAGE explained this process. (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; Ex. C, Cage Dep. p. 17, 46; SOMF ¶6).

As part of their assigned tasks, nurses would be asked to perform Detox checks on certain inmates located in a specific "Pod" on a specific floor of the jail. (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; SOMF ¶7). The nurses would walk with their cart of supplies, instruments, and, medications, through the Pod, to a "day area". (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; SOMF ¶7). The nurses were assigned a prison guard, who would accompany the nurse while on the unit or pod. (Ex. B, Kirk Dep. 17, 18; SOMF ¶7). The Nurse would stay in the "day area" next to the Correctional Officer's desk with their cart and the inmates would be called to come out of their cells to meet with the Nurse with her cart in the day area next to the Correctional Officer's desk. (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; SOMF ¶8). The inmates would receive their Detox Checks there in that day area from the Nurse. (Reid Dec., Ex. B, Kirk Dep. p. 17-18; Ex. C, Cage Dep. 17, 18; SOMF ¶8).

If the inmate came out of her cell for her Detox check and approached the Nurse's cart in the "day area", and, consented to assessment, the Nurse would then perform the Detox check upon the inmate, which would include taking vital signs, and, asking the inmate if she were having any symptoms. (Reid Dec., Ex. C, Cage Dep. p. 17, 18; SOMF ¶9). If an inmate was to receive medications, the Nurse would administer the inmate her medications at that time. (Reid Dec., Ex. B, Kirk Dep. p. 17, 18; SOMF ¶9).

A CIWA-COWS assessment sheet would be completed if the inmate consented to the assessment. (Reid Dec., Ex. C, Cage Dep. 17, 18; SOMF ¶10). The CIWA and COWS

assessments were tools that the Nurses used to chart symptoms of withdrawals, assessing scores to any symptoms of withdraw the inmate states she is experiencing. (Reid Dec., Ex. G, Mai Bruno Dep. p. 150; SOMF ¶10.)

If an inmate refused to come out of her cell for her Detox check by the Nurse, or, came out of the cell but refused care, NURSE KIRK'S and NURSE CAGE'S training by Armor was to have the inmate sign a "Refusal of Treatment" form (hereinafter, "Refusal Form"). (Reid Dec., Ex. B, Kirk Dep. p. 39; SOMF ¶11. If the inmate refused to sign the Refusal Form, NURSES KIRK and CAGE were trained by Armor to have the Correction's Officer sign the form as a witness that the inmate refused the care, refused the Detox check (Reid Dec., Ex. B, Kirk Dep. p. 39; Ex. C, Cage Dep. p. 14, 15; SOMF ¶11).

NURSE KIRK and NURSE CAGE were not trained by Armor, nor was it Armor's policy or practice, for the Nurses to go up to an inmate's cell to observe or interact with the inmate in her own cell. (Reid Dec., Ex. B, Kirk Dep. p. 49, 50; Ex. C, Cage Dep. 69, 84, 85; SOMF ¶12). In fact, NURSE KIRK and NURSE CAGE had been trained by Armor not to go to an inmate's cell unless there was a medical emergency. (Reid Dec., Ex. B, Kirk Dep. p. 99; Ex. C, Cage Dep. p. 39, 52, 84, 85; SOMF ¶12).

## ARGUMENT

## I. SUMMARY JUDGEMNT IS WARRANTED AS THERE ARE NO GENUINE ISSUES OF MATERIAL FACT, ENTITLING JUMENT AS A MATTER OF LAW AS TO NURSE CAGE AND NURSE KIRK

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law

4

should be granted to the movant. *Celotex Corp. v* Catrett, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v Liberty Lobby, Inc.* 777 U.S. 242. 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248. The court's function in deciding a summary judgment motion is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). "A mere scintilla of evidence" in support of the non-movant's position is insufficient; a party will only be successful in opposing summary judgment "when it presents definite, competent evidence to rebut the motion." *Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 248. If there is no triable issue of fact on even one essential element of the non-movant's case, summary judgment is appropriate. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

Here, the undisputed facts show that Nurse Britney Kirk and Nurse Eva Cage are entitled to judgment as a matter of law. Therefore, for the reasons set forth below, summary judgment is appropriate as each of them on all of Plaintiffs' causes of action, which should be dismissed on the merits and with prejudice.

## II, NURSE KIRK AND NURSE CAGE ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' SECTION 1983 CLAIMS.

### A. The Evidence Establishes That Neither Nurse Kirk Nor Nurse Cage Acted Deliberately Indifferent To Fiebrink's Health

5

The Plaintiff claims that NURSE BRITNEY KIRK'S (hereinafter "NURSE KIRK") and that NURSE EVA CAGE'S (hereinafter "NURSE CAGE") treatment of Inmate Fiebrink constituted deliberate indifference pursuant to Section 1983. (See Reid Declaration, Ex. A, Plaintiff's Amended Complaint at Count I, ¶¶ 99, 100, 101; see Statement of Material Facts ("SOMF") ¶1).

In this case, Fiebrink was arrested pursuant to a valid arrest warrant based on a probation violation, having already been convicted for Second Degree Recklessly Endangering Safety, a felony. When the arrest warrant, or Order to Detain, was issued, Fiebrink was in violation of her probation for the above-described felony conviction. (Reid Declaration (hereinafter "Dec."), Ex. D, Order To Detain; SOMF ¶2). At the time of the events at issue, Fiebrink was not awaiting trial for the felony described above or for any other charge. Instead, she was awaiting adjudication of her probation violation, a proceeding which, in the State of Wisconsin, does not involve the court systems. *See Tyra v. Hayes,* Case No. 18-CV-1318 (JPS). 2018 U.S. Dist. LEXIS 216687 *2 (E.D. Wis. December 17, 2018). Therefore, through the entirety of the events at issue, from August 24th through August 28, 2016, Fiebrink was an Inmate subject to the "deliberate indifference" standard under the 8th Amendment and it is under that standard that this case should be analyzed.

In order for Plaintiffs to prevail on their Section 1983 claims against these Defendants, they must demonstrate "acts and omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Shockley v. Jones,* 823 F.2d 106, 1072 (7th Cir. 1987). The plaintiff has the burden to demonstrate deliberate indifference to a serious medical need or condition, and the test of deliberate indifference is a significantly high burden to overcome. *See Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011); *see also Hernandez v. Tex. Dept. of Protective & Reg. Servs.*, 380 F.3d 872, 882 (5th Cir. 2004).

To prevail on their Section 1983 claims against the Defendants, the Plaintiffs must prove: (1) the existence of a serious medical need; (2) that the defendant was subjectively aware of a specific, serious medical need or risk; and (3) that the defendant demonstrated a culpable mental state by deliberately ignoring the plaintiff's alleged need or risk. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994).

The plaintiff must establish that each of the defendants actually knew (independently and subjectively) that he needed treatment for a serious medical condition or risk but nevertheless <u>purposely</u> and <u>deliberately</u> withheld such treatment. *See Sellers*, 41 F.3d at 1102 (emphasis added). In addition, "A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'" *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005).

In *Gayton v. McCoy* for example, 593 F.3d 610, 612, 2010 U.S. App. LEXIS 1937 (7th Cir. 2010), Inmate Taylor, with a history of congestive heart failure, entered the Peoria County Jail on 10/15/03 with complaints of chest pain and later, with complaints of vomiting. *Gayton,* 593 F.3d 612. As in the present case, the *Gayton* plaintiff complained that Inmate Taylor was not seen by a doctor, and, that in less than three days, she died due to nonspecific heart failure. *Gayton,* 593 F.3d 612. Over the course of those 3 days Inmate Taylor was seen by 3 Nurses, one of which was Nurse Radcliff. *Id*. The *Gayton* court found that Nurse Radcliff's actions did not establish that she was deliberately indifferent to Inmate Taylor's health, nor, could it be said that her actions were "so dangerous" that the deliberate nature of her conduct could be inferred. *Gayton,* 593 F.3d 623.

Nurse Radcliff was the first medical professional to treat Inmate Taylor upon her arrival to the Peoria County Jail (PCF). *Gayton,* 593 F.3d 622. Inmate Taylor complained of chest pains. *Id*. Nurse Radcliff responded to Inmate Taylor's complaints by putting her on the list to have her vitals

checked each morning. Nurse Radcliff had the Inmate call her brother to bring her Congestive Heart Failure medications to PCF, and, put a note on her chart to call the doctor if the medications were not delivered by the next day. _Gayton,_ 593 F.3d 622.

The _Gayton_ court found that because Nurse Radcliff took reasonable measures to ensure that Inmate Taylor would get her medications, (even though ultimately she never received her medications), and, put a note in her chart to have her seen by a doctor if the medications did not arrive, that it could "not be said that Nurse Radcliff's judgment departed so substantially from the professional norm that she acted deliberately indifferent to Taylor's health." _Gayton,_ 593 F.3d 623. Nor, could "it be said that her actions were 'so dangerous' that the deliberate nature of her conduct can be inferred." _Gayton,_ 593 F.3d 623. Therefore, summary judgment in favor of Nurse Radcliff was appropriate.

Like in _Gayton_, NURSE KIRK and NURSE CAGE also acted reasonably and did not act deliberately indifferent to Fiebrink's health. Like in _Gayton_, the evidence in this case prevents a reasonable jury from inferring that either NURSE KIRK'S or NURSE CAGE'S actions were "blatantly inappropriate" or "so dangerous" with respect to Fiebrink.

Acts that constitute deliberate indifference are more than medical malpractice. See _King v. Kramer_, 680 F.3d 1013, 1018 (7th Cir. 2012). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Also, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. _Gutierrez v. Peters_, 111 F.3d 1364, 1374 (7th Cir. 1997).

In the alternative, should the Plaintiff demonstrate that Fiebrink was a "Pre-Trial Detainee" to which the objectively unreasonableness standard applies, *see e.g. Terry v. County of Milwaukee*

*et. al.* Case No. 17-CV-1112(JPS), 2019, U,S> Dist. LEXIS 5197 (E.D. Wis, January 11, 2019) , all of the evidence and argument in the paragraphs that follow establish that none of NURSE KIRK'S or NURSE CAGE'S specific conduct at issue in this case, was "objectively unreasonable". Plaintiffs cannot produce a triable issue of fact relative to NURSE KIRK or NURSE CAGE with respect to Fiebrink's Constitutional rights, no matter what standard the Court employees.

### B. Nurse Britney Kirk did not violate the Constitution, regardless of whether the Eighth Amendment or Fourteenth Amendment controls

Fiebrink was booked into the Milwaukee County Jail on 8/24/16. (Reid Dec., Ex. B, Kirk Dep p. 32; SOMF ¶13). She was initially assessed on the early morning of 8/25/16 by Nurse Mai Bruno, who confirmed that Fiebrink was experiencing no withdrawal symptoms. (Reid Dec., Ex. G, Mai Bruno Dep. p. 150, 151; SOMF ¶13). Fiebrink's CIWA-COWS Score was "0", indicating no withdrawal symptoms present. (Reid Dec., Ex. G, Mai Bruno Dep. p. 150, 151; SOMF ¶13). At intake, Co-Defendant, Brandon Decker, A.P.N.P. placed Fiebrink on the COWS Detoxification protocol. (Reid Dec., Ex. B, Kirk Dep. p. 33; SOMF ¶14). Nurse Practitioner Decker did not prescribe Fiebrink any medications. (Reid Dec., Ex. B, Kirk Dep. 36; SOMF ¶14). Fiebrink had last used Heroin on 8/24/16. (Reid Dec., Ex. B, Kirk, p. 35; SOMF ¶14). Fiebrink's cell was located on Floor 6, area D. (Reid Dec., Ex. B, Kirk Dep. p. 32; SOMF ¶15). The 6th floor was an intake floor for women. (Reid Dec., Ex. B, Kirk Dep, p. 29; SOMF ¶15).

On the morning of 8/25/16, Fiebrink was on the list of inmates that NURSE KIRK was assigned to perform Detox checks on. (Reid Dec., Ex. B, Kirk Dep. p. 17, 33; SOMF ¶16). NURSE KIRK had received prior training from Armor on how to perform the Detox Assessment. (Reid Dec., Ex. B, Kirk Dep. p. 36; SOMF ¶16). NURSE KIRK had only started working at the Jail a couple weeks before 8/25/16. (Reid Dec., Ex. B, Kirk Dep. p. 10; SOMF ¶16). On NURSE KIRK'S 8/25/16 Task Sheet with respect to Fiebrink, it noted that Fiebrink had not been prescribed

any Detox medications. (Reid Dec., Ex. B, Kirk Dep. p. 36; SOMF ¶17). NURSE KIRK explained that the absence of need for any medications administration indicated that Fiebrink was not having any withdrawal symptoms upon being booked hours before, on 8/24/16. (Reid Dec., Ex. B, Kirk Dep. p. 37, 38; SOMF ¶17).

At about 10:00 a.m. on 8/25/16, NURSE KIRK was in Pod area 6D with her cart working on her inmate Detox checks. (Reid Dec., Ex. B, Kirk Dep. p. 48; SOMF ¶18). NURSE KIRK asked Officer Stokes to go to Fiebrink's cell to check to see if Fiebrink wanted her Detox Check. (Reid Dec., Ex. B, Kirk Dep. p. 48; SOMF ¶18).

Officer Stokes went to Fiebrink's cell and asked her if she wanted her Detox Check. (Reid Dec., Ex. B, Kirk Dep. p. 51; SOMF ¶19). Fiebrink stated to Officer Stokes that she did not want her Detox Check. (Reid Dec., Ex. B, Kirk Dep. p. 51; SOMF ¶19). Officer Stokes advised NURSE KIRK that Fiebrink did not want her Detox Check. (Reid Dec., Ex. B, Kirk Dep. p. 51; SOMF ¶20). Fiebrink refused to come out of her cell and go to where NURSE KIRK was in the "day area", in order for her to receive her Detox check. (Reid Dec., Ex. B, Kirk Dep. p. 44; SOMF ¶21). NURSE KIRK attempted to provide the Detox Check to Fiebrink and Fiebrink refused it. (Reid Dec., Ex. B, Kirk Dep. p. 44; SOMF ¶21). Based upon her testimony, NURSE KIRK did not have the opportunity to physically observe Fiebrink since Fiebrink refused her Detox check. (Reid Dec., Ex. B, Kirk Dep. p. 44; SOMF ¶22). The inmate did have a right to refuse treatment. (Reid Dec., Ex. C, Cage Dep. p. 66; SOMF ¶22). Pursuant to her training by Armor, NURSE KIRK was not permitted to go to Fiebrink's cell. (Reid Dec., Ex. B, Kirk Dep. p. 49, 50, 99; SOMF ¶22).

NURSE KIRK then prepared a "Refusal of Treatment" Form. (hereinafter Refusal Form"). (Reid Dec., Ex. B, Kirk Dep. p. 41; SOMF ¶23). NURSE KIRK wanted to document that Fiebrink refused her Detox Check. (Reid Dec., Ex. B, Kirk Dep. p. 41; SOMF ¶23). NURSE KIRK signed

the Refusal Form, and, Officer Stokes signed the Refusal Form. (Reid Dec., Ex. B, Kirk Dep. p. 41; SOMF ¶24). Fiebrink refused to sign the Refusal Form. (Reid Dec., Ex. B, Kirk Dep. p. 53, 54; SOMF ¶24). NURSE KIRK properly completed the Refusal Form, and, properly placed it in the correct bin where all the Refusal Forms were placed. (Reid Dec., Ex. B, Kirk Dep. p. 58; SOMF ¶24).

Accordingly, like in *Gayton*, it cannot be said that NURSE KIRK'S judgment departed so substantially from the professional norm that she acted deliberately indifferent to Fiebrink's health. Nor can it be said that NURSE KIRK'S actions were "so dangerous that the deliberate nature of her conduct can be inferred." *Gayton*, 593 F.3d. at 623. As of the morning of 8/25/16, Fiebrink had only been booked hours before NURSE KIRK was to perform her Detox Check on or about 10:00 a.m. Fiebrink had not displayed withdrawal symptoms upon being booked, her CIWA-COWS Score was "0", indicating no withdrawal symptoms present, and, she was not placed on any Detox medications. It was NURSE KIRK's understanding that as of the morning of 8/25/16, that Fiebrink was not having any withdrawal symptoms. Fiebrink was offered her Detox Check by NURSE KIRK pursuant to her training by Armor, and, Fiebrink refused it, as is her right. With respect to her actions as to Fiebrink, NURSE KIRK did what she was trained to do and followed the appropriate policies and protocols. (Reid Dec., Ex. B, Kirk Dep. p. 58; SOMF ¶26). There is also no evidence whatsoever in the record that Fiebrink's condition had changed at all from her assessment by Nurse Bruno just a few hours before.

At the time of NURSE KIRK'S attempted Detox Check of Fiebrink, NURSE KIRK clearly did not know of, nor, did she disregard, any excessive risk to Fiebrink's health or safety. Nor, can it be inferred from NURSE KIRK'S actions that any inference could be drawn that any substantial risk of serious harm existed as to Fiebrink. It was NURSE KIRK'S understanding that since

Fiebrink was not put on any Detox medications upon being booked on 8/24/16, and with the CIWA-COWS Score of "0" in the early morning hours of 8/25/16, that Fiebrink was not experiencing any withdrawal symptoms later in the morning of 8/25/16. There is no evidence that Fiebrink experienced any withdraw symptoms at all on 8/25/16 or on the following day, 8/26/16. Thus, as to NURSE KIRK, there did not exist any serious medical need as to Fiebrink that NURSE KIRK allegedly ignored, was deliberately indifferent to, or was objectively unreasonable. Accordingly, the evidence in this case prevents a reasonable jury from inferring that any of NURSE KIRK'S actions constituted deliberate indifference. In addition, none of NURSE KIRK'S actions with respect to Fiebrink can be said to be "objectively unreasonable". Thus, this Honorable Court should enter summary judgment in favor of NURSE KIRK.

### C. Nurse Eva Cage did not violate the Constitution, regardless of whether the Either Amendment or Fourteenth Amendment controls

On the morning of 8/27/16, NURSE CAGE was assigned to 6D to perform Detox checks on the female inmates there, including Fiebrink. (Reid Dec., Ex. C, Cage Dep. p. 37, 38; SOMF ¶27). NURSE CAGE was working the first shift that day. (Reid Dec., Ex. C, Cage Dep. p. 28; SOMF ¶27).

On the morning of 8/27/16, when NURSE CAGE finished seeing the other inmates that were on her list, NURSE CAGE noticed that Fiebrink did not come out of her cell for her Detox monitoring. (Reid Dec., Ex. C, Cage Dep. p. 29, 30; SOMF ¶29). NURSE CAGE asked the female Officer that was present to go to Fiebrink's cell to see if Fiebrink was coming out so that she could have her assessment. (Reid Dec., Ex. C, Cage Dep. p. 29, 30; SOMF ¶30). The Officer walked over to Fiebrink's cell. The Officer opened the door. The Officer talked to Fiebrink. Then, the Officer closed the door, went over to NURSE CAGE, and said that Fiebrink did not want to come out of her cell. (Reid Dec., Ex. C, Cage Dep. p. 29, 30; SOMF ¶31). Like NURSE KIRK, NURSE CAGE had

been trained by Armor not to approach or to go in the inmates' cells, due to safety and security reasons. (Reid Dec., Ex. C, Cage Dep., p. 84, 85; SOMF ¶32).

NURSE CAGE then filled out a "Refusal of Treatment" Form (hereinafter "Refusal Form") in its entirety, indicating that Fiebrink refused to come out of her cell. (Reid Dec., Ex. C, Cage Dep. p. 34, 83; SOMF ¶33). NURSE CAGE had the attending Officer sign the Refusal Form as well. (Reid Dec., Ex. C, Cage Dep. p. 83; SOMF ¶33). That day, 8/27/16, NURSE CAGE left the Jail at about noon because she had her own medical issue, and, she had advised her Supervisor at Armor of the same. (Reid Dec., Ex. C, Cage Dep. p. 28, 29; SOMF ¶34).

Neither NURSE KIRK, nor NURSE CAGE, had been assigned to provide any assessment of Fiebrink on the night shift of 8/25/16, on the day shift of 8/26/16, on the night shift of 8/26/16, on the night shift of 8/27/16, or, on the morning of 8/28/16. (SOMF ¶35). Fiebrink passed away on the morning of 8/28/16. (Reid Dec., Ex. C, Cage Dep. p. 32; SOMF ¶36).

Accordingly, like Nurse Radcliff in *Gayton*, it cannot be said that NURSE CAGE'S judgment departed so substantially from the professional norm that she acted deliberately indifferent to Fiebrink's health. Nor, can it be said that NURSE CAGE'S actions were "so dangerous that the deliberate nature of her conduct can be inferred." *Gayton*, 593 F.3d at 623. As of the morning of 8/27/16, Fiebrink was offered her Detox Check by NURSE CAGE pursuant to her training by Armor, and, Fiebrink refused it. Like NURSE KIRK, NURSE CAGE did what she was trained to do and followed the appropriate protocol. Like NURSE KIRK, NURSE CAGE had also been trained by Armor not to approach or to go in the inmates' cells. (Reid Dec., Ex. C, Cage Dep. p. 84, 85; SOMF ¶32).

At the time of NURSE CAGE'S attempted Detox Check of Fiebrink, she clearly did not know of, nor, did she disregard any excessive risk to Fiebrink's health or safety. Nor, can it be

inferred from NURSE CAGE'S actions that any inference could be drawn that any substantial risk of serious harm existed as to Fiebrink. Recall that no physician or nurse practitioner had prescribed Fiebrink any Detox medications, therefore, the Nurses understood that Fiebrink was not experiencing withdrawal symptoms.

By the time of NURSE CAGE'S shift on the morning of 8/27/16, no withdrawal symptoms, or, any other medical issue with respect to Fiebrink, had been reported to the medical staff. There was one instance of diarrhea experienced by Fiebrink, which occurred after NURSE CAGE performed her rounds. Thus, as to NURSE CAGE, there did not exist any known serious medical need as to Fiebrink that NURSE CAGE allegedly ignored. Therefore, the evidence in this case prevents a reasonable jury from inferring that any of NURSE CAGE'S actions constituted deliberate indifference. In addition, none of NURSE CAGE'S actions with respect to Fiebrink can be said to be "objectively unreasonable". Accordingly, this Court should enter summary judgment in favor of NURSE CAGE.

### III. NURSE KIRK AND NURSE CAGE ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ALL OF PLAINTIFFS' CLAIMS BECAUSE PLANTIFFS' CANNOT ESTABLISH CAUSATION

In *Gayton,* the Seventh Circuit affirmed the District Court's decision that Nurse Radcliff's actions were not the proximate cause of Inmate Taylor's death. *Gayton*, 593 F.3d at 624-625. In Section 1983 cases the "plaintiff must produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged [Section 1983] due process violation." *Gayton*, 593 F.3d at 624. "Expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement," that plaintiff produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged due process violation. *Gayton*, 593 F.3d at 610. "Evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist

the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him [her]". *Gayton*, 593 F.3d at 624.

In this case, evidence of Fiebrink's diagnosis and "treatment" rendered to her by NURSE KIRK and NURSE CAGE,    standing alone, without appropriate expert testimony, is insufficient because it does not assist the jury in determining whether their specific treatment, actually exacerbated Fiebrink's condition or otherwise harmed her.  Recall that neither NURSE KIRK nor NURSE CAGE, had been assigned to provide any assessment of Fiebrink on the night shift of 8/25/16, on the day shift of 8/26/16, on the night shift of 8/26/16, after noon on 8/27/16, on the night shift of 8/27/16, or, on the morning of 8/28/16. (SOMF ¶35).

While Fiebrink passed away at about 7:38 a.m. on August 28, 2016, NURSE CAGE had left the Jail nearly 24 hours before.  NURSE KIRK had been assigned to assess Fiebrink, days before, on the morning of 8/25/16. (Reid Dec., Ex. A, Amended Complaint, ¶44, p. 15; SOMF ¶16, ¶34).

In the days that preceded, on the day shifts of 8/25/16 and 8/27/16, when NURSE KIRK and NURSE CAGE were assigned, neither NURSE KIRK nor NURSE CAGE were aware that Fiebrink had any withdrawal symptoms.  Fiebrink presented with no withdrawal symptoms, she had not been prescribed any withdrawal medications, and, no withdrawal symptoms or issues were reported to medical staff at any point in time through to NURSE CAGE'S Assessment time on 8/27/16. Fiebrink exercised her right and refused treatment and examination by either NURSE KIRK or NURSE CAGE on their respective shifts. (Reid Dec., Ex. B, Kirk Dep. p. 36, 44; Ex. C, Cage Dep. p. 34, 83; SOMF ¶17, ¶22, ¶33).

The Plaintiff recently disclosed the expert opinion of Richard Lewan, M.D., that the actions of "Armor's staff" "became the substantial factor that caused Kristina's suffering and resultant horrific and easily avoidable death." (Reid Dec., Ex. E, Lewan Report p. 3, 2nd full ¶.)  However,

Dr. Lewan's Expert Report contains no specific opinion or criticism directed to any of the specific conduct of either NURSE KIRK or NURSE CAGE. (SOMF ¶37). In fact, NURSE CAGE'S name is never mentioned in Dr. Lewan's report. NURSE KIRK'S name is only mentioned as a deposition citation to support Dr. Lewan's claim that "no physician or 'NP' scheduled to cover on August 26 and 27". (Reid Dec., Ex. E, Lewan Report p. 3, 2nd full ¶; SOMF ¶38.) Neither NURSE KIRK or NURSE CAGE is a physician or an "NP", Nurse Practitioner.

Plaintiff must "produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged [Section 1983] due process violation". _Gayton_, 593 F.3d at 624. Since Plaintiff's expert, Dr. Lewan did not set forth any specific criticism or opinion directed to any specific act or conduct of either NURSE KIRK or NURSE CAGE in his Expert Report, the Plaintiff has not put forth any expert opinion specifically establishing that either NURSE KIRK or NURSE CAGE'S specific treatment or actions had a causal connection to Fiebrink's injuries, including her death. Therefore, like in _Gayton_, this Court should find that NURSE KIRK'S and NURSE CAGE'S actions were not the cause of Fiebrink's injuries, including her death, and, grant Summary Judgment in favor of NURSE KIRK and NURSE CAGE on Plaintiff's Section 1983 claims.

The Plaintiff also recently disclosed the Expert Report of Timothy P. Ryan. Mr. Ryan's Expert Report is attached as Exhibit F to the Reid Declaration. In his Expert Report, Mr. Ryan set forth specific criticisms of both NURSE KIRK and NURSE CAGE. (Reid Dec., Ex. F, Ryan Expert Report, p. 7, 8, 12, 15; SOMF ¶39). Mr. Ryan specifically claimed that both failed to "conduct any visual observation of Ms. Fiebrink leaving her actual physical and medical condition unknown and uncared", such that Fiebrink "was left alone to suffer from whatever pain and discomfort her detoxification and withdrawal issues may have been at that time". (Reid Dec., Ex. F, Ryan Expert Report, p. 15 at "a."). Mr. Ryan, however, is not a Nurse, Nurse Practitioner, or a Physician, and

therefore, he lacks the requisite education, skill, and training, to assist the trier of fact to understand the evidence or to determine if the specific conduct of either NURSE KIRK or NURSE CAGE actually caused Fiebrink's injuries, including her death.

Under the *Daubert* framework, the district court is tasked with determining whether a given expert is qualified to testify in the case in question and whether his testimony is scientifically reliable. *Daubert v. Merrell Dow Pharm, Inc*., 509 U.S. 579, 592-93, 113 S. Ct., 2786 (1993). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' testimony." *Gayton*, 593 F.3d at 616.

In *Gayton* for example, the Plaintiff's expert, Dr. Weinstein, an expert in the area of prison healthcare, gave the opinion that Inmate Taylor would not have died if the prison heath care providers had given her, her cardiac medications. *Gayton*, 593 F.3d at 617. The *Gayton* court barred Dr. Weinstein from providing this opinion, finding him unqualified to give it because of his lack of specific knowledge of cardiology and pharmacology knowledge upon which to base his conclusion that Inmate Taylor's cardiac medications had a reasonable probability of saving her life if taken in the days before her death. *Gayton*, 593 F.3d at 617.

In this case, Plaintiff's proposed expert, Mr. Ryan, has a Bachelor of Science in Business Administration from the University of California, a Masters in Public Administration from California State University, completion of an Executive Leadership, Terrorism Assessment, and Forensics Program from the FBI National Academy, and, completion of the Graduate "2001 Senior Executives in Local Government" program from Harvard University. (Reid Dec., Ex. F, Ryan Expert Report, Appendix A, and, Appendix B; SOMF ¶40). An examination of Mr. Ryan's Curriculum Vitae and of his Resume, Appendix A and Appendix B of his Report, show that Mr.

Ryan has had no nursing or medical education, training, experience, or, licensure of any kind, including as a nurse, nurse practitioner, or, as a physician. (Reid Dec., Ex. F, Ryan Expert Report, Appendix A, and, Appendix B; SOMF ¶40).

As in *Gayton*, this Court should find that Plaintiff's Expert, Mr. Ryan, is unqualified under the *Daubert* framework, to provide standard of nursing or medical care, or, causation opinions in this case as against either NURSE KIRK or NURSE CAGE, since he lacks specific knowledge in either nursing or in medicine, to assist the trier of fact to understand or to determine whether NURSE KIRK'S or NURSE CAGE'S specific conduct, was below the adequate standard of care or whether their specific actions had a causal connection with the alleged statutory or constitutional violations.

**IV.    NURSE KIRK AND NURSE CAGE ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS OF NEGLIGENCE AS PLAINTIFF CANNOT SUSTAIN HER BURDEN OF PROOF**

At Count IV of the Plaintiff's Amended Complaint, the Plaintiff claims that NURSE KIRK and NURSE CAGE were negligent, under a Wisconsin state law theory, in their nursing care and treatment of Fiebrink, and, that as a result of their "negligent, careless, and reckless disregard for Fiebrink's safety", that Fiebrink suffered injuries and damages. (Reid Dec., Ex. A, Plaintiff's Amended Complaint, Count IV, ¶¶141-146).

In the Plaintiff's Negligence Count, Count IV, all of the allegations against NURSE KIRK and NURSE CAGE are with respect to their provision or non-provision of nursing care to Fiebrink. All of the allegations involve questions of nursing judgment that are to be evaluated under a professional care standard. Thus, the Plaintiff's Negligence claim against these nurses is one for medical malpractice.

In a medical malpractice case in Wisconsin, the plaintiff must establish the standard of care, establish that the defendant failed to conform to the standard of care, and, establish that the defendant's failure to conform to the standard of care, caused the plaintiff's injury. *Carney-Hayes v. Northwest Wisconsin Home Care*, 284 Wis.2d 56, 81-82, 699 N.W.2d 524, 537 (Wis. 2005). To hold a professional liable, the plaintiff has the burden, to show that the professional failed in the requisite degree of care and skill. *Froh v. Milwaukee Medical Clinic, S.C.*, 85 Wis.2d 308, 317, 270 N.W.2d 83, 87 (Wis App. 1978). Moreover, "that degree of care and skill can only be proved by the testimony of experts. Without such testimony the jury has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him". *Froh*, 270 N.W.2d at 87.

Whether expert testimony is required in a negligence case against a nurse, and thus whether the court should give the professional care instruction or the ordinary care instruction depends on whether the alleged negligent act involved professional nursing care or custodial care. *Payne v. Milwaukee Sanitarium Found.*, Inc., 81 Wis. 2d 264, 275-76, 260 N.W.2d 386, 392 (Wis. 1977). Professional nursing care involves "those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." *Payne*, 81 Wis.2d at 276. Expert testimony is required to establish the standard of care in these matters. *Id*. Custodial care, on the other hand, involves "subjects within the realm of the ordinary experience of mankind", and, does not require Expert testimony to establish the standard of care. *Id*.

In *Payne* for example, a patient at the Milwaukee Psychiatric Hospital lit herself on fire when she was allowed to be in a less restrictive unit of the hospital and was given access to smoking materials and matches, all pursuant to a physician's order. *Payne*, 81 Wis.2d at 275. Trial was

19

allowed to proceed against the Hospital on negligence, none of the Parties submitted any expert testimony, and, the Hospital was found negligent. *Id*. On appeal one of the issues was whether expert testimony was needed to establish whether the hospital was negligent when a hospital nurse and a hospital psychiatric aide allegedly failed to supervise the Patient more closely, and/or, to have her checked on more frequently when the Patient's physician did not order this stricter level of supervision. *Payne*, 81 Wis. 2d at 275-76.

The *Payne* court held that any claim of negligence based on the lack of supervision given, whether brought against the attending psychiatrist or the hospital and its staff, nurse or aide, required expert testimony to establish. *Payne*, 81 Wis. 2d at 276. Since the level of supervision ordered for the patient related to therapy and security, this was a matter involving special knowledge or skill or experience on a subject not within the realm of the ordinary experience of mankind, which required special learning, study, or experience. *Payne*, 81 Wis. 2d at 276.

Like in *Payne*, the conduct at issue of NURSE KIRK and NURSE CAGE, in attempting to provide Fiebrink with her Detox physical assessment, in believing that Fiebrink had no withdrawal symptoms, in the setting of jail security, with Fiebrink refusing the treatment, and, with the Nurses completing the required "Refusal of Treatment" Form due to Fiebrink's refusal, these are all issues of nursing judgment rather than issues of routine or custodial care.

Also like in *Payne*, the issues of whether or not NURSE KIRK and NURSE CAGE adequately checked on Fiebrink, in a secured jail setting, whether they adequately attempted to evaluate her pursuant to the nursing training they were given, or, whether Fiebrink's refusal of Detox assessments should have been "escalated" to the next level of nursing supervision, all implicate a standard of nursing care and judgment concerning matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of

mankind, all of which require special study or experience, and, need to be established by nursing expert testimony.

As established above, with respect to the Plaintiff's expert Dr. Lewan, his Expert Report in this matter failed to establish that either NURSE KIRK or NURSE CAGE, failed to conform to the nursing standard of care, as it contained no specific criticisms of the specific conduct of either NURSE KIRK or NURSE CAGE. (Reid Dec., Ex. E, Dr. Lewan's Expert Report; SOMF ¶37).

Also, as established above, although the Plaintiff's expert, Timothy Ryan's Expert Report did contain specific criticisms of the conduct of NURSE KIRK and NURSE CAGE with respect to standard of care and causation opinions, Mr. Ryan has had no nursing or medical education, training, background, licensure, or, experience. Mr. Ryan's own Curriculum Vitae and Resume establish that Mr. Ryan has not gone to any nursing school, has not completed any nursing school program, is not a Licensed Practical Nurse, is not a Registered Nurse, or, a Nurse Practitioner, has not gone to any medical school, competed any medical school or osteopathic medical school program, is not a medical doctor or a doctor of osteopathic medicine. (Reid Dec., Ex. F, Ryan Expert Report, Appendix A, and, Appendix B; SOMF ¶40).

In this case, since the Plaintiff has failed to disclose or to provide any nursing expert opinion that establishes the appropriate nursing standard of care, that establishes that the specific conduct of NURSE KIRK and NURSE CAGE failed to conform to that standard, and, that that specific deviation of the nursing standard of care was a substantial factor in causing Fiebrink's injuries and damages, including her death, the Plaintiff cannot establish a *prima facie* case of state law medical or nursing negligence against NURSE KIRK or NURSE CAGE. Thus, this Court should enter summary judgment in favor of NURSE KIRK and NURSE CAGE and against the Plaintiff.

WHEREFORE, the Defendants, BRITENY R. KIRK, L.P.N., and, EVA CAGE, L.P.N., respectfully request that this Honorable Court enter Summary Judgment in their favor pursuant to Federal Rule of Civil Procedure 56, and, Civil Local Rule 56, and, grant such other relief as this Honorable Court deems equitable and just.

Dated this 8th day of March, 2019.


Respectfully submitted,
CASSIDAY SCHADE LLP


By: ____/s/ *John J. Reid*____
        John J. Reid

One of the Attorneys for the Defendants, BRITENY R. KIRK, L.P.N., and, EVA CAGE, R.N.

John J. Reid
Wisconsin Bar No. 1057458
CASSIDAY SCHADE LLP
111 East Wisconsin Avenue, Suite 2100
Milwaukee, WI 53202
414-224-1086
414-224-6044 – Fax
jreid@cassiday.com
9066842

23