UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF KRISTINA ANN
FIEBRINK, by Special Administrator
Nathaniel Cade, Jr.; THE ESTATE OF
ANGELICA M. FIEBRINK; JOSE D.
MARTINEZ, JR.; and ROBERT MARTINEZ,       Case No. 2:18-cv-00832-JPS

                Plaintiffs,

    v.

ARMOR CORRECTIONAL HEALTH
SERVICES, INC., et al.,

                Defendants.

---

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS MILWAUKEE COUNTY,
WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION, LATISHA AIKENS,
AND LATRAIL COLE'S MOITON FOR SUMMARY JUDGMENT

---

NOW COMES, Plaintiffs The Estate of Kristina Ann Fiebrink and Robert Martinez, by their attorneys, Gingras Cates & Wachs LLP, and Plaintiffs Fiebrink, the Estate of Angelica M. Fiebrink and Jose D. Martinez, Jr., by their attorneys, Judge Lang & Katers, LLC and Gende Law Office SC, and submit this brief in opposition to Defendants Milwaukee County, Wisconsin County Mutual Insurance Corporation, Latisha Aikens, and Latrail Cole's ("Milwaukee County Defendants")[1] Motion for Summary Judgment.

## I.    INTRODUCTION

This case involves Milwaukee County ("MC"), Armor Correctional Health Services, Inc. ("Armor"), and the individually named Defendants' violation of the Plaintiffs' constitutional

---

[1] All parties have agreed and stipulated to dismiss David A. Clarke, Jr., Richard R. Schmidt, Nancy Evans, Kevin Nyklewicz, Brian Piasecki, Jennifer Matthews, and Latoya Renfro who all originally joined the summary judgment motion. (D. 193). Inclusion of these defendants in this motion is now moot and Plaintiffs' response will not address arguments related to these individuals.

rights. Kristina Ann Fiebrink ("Fiebrink") died on the floor of her cell, suffered cruel and unusual punishment while in the Defendants' care and custody. The Defendants were responsible for the health, welfare and safety Fiebrink, but deliberately ignored her cries for help and obvious serious medical condition. Fiebrink was provided no medical care, was ignored despite her cries for help and ultimately left to die in a cell alone racked with withdrawals from her well-known opiate addition.

Fiebrink was found dead in a cell in POD 6D at the Milwaukee County Jail ("jail") on August 28, 2016 at approximately 7:00am. (Plaintiffs' Proposed Findings of Fact in Support of their Opposition to Milwaukee County Summary Judgment, ("PPFOF-MC") ¶ 31, 33). During the early morning hours another inmate, Phebe Williams ("Williams"), heard Fiebrink screaming for help and saw the emergency light on above Fiebrink's cell. (PPFOF-MC ¶¶50-51). Williams, who had gone into labor, was also screaming for help and turned on the emergency light above her cell. (PPFOF-MC ¶52). Instead of offering any assistance whatsoever, they were told to "shut the fuck up" by a correctional officer. (PPFOF-MC ¶71).

Latisha Aikens ("Aikens") was a correctional officer employed by Milwaukee County working the third shift on POD 6D on August 27 and 28. (PPFOF-MC ¶34). Aikens was supposed to perform wellness checks every 30 minutes. (PPFOF-MC ¶35, 38). She did not. (PPFOF-MC ¶53-63). Aikens' did not receive any training on identifying withdrawal or how to perform wellness checks on inmates since the academy. (PPFOF-MC ¶42).

Latrail Cole ("Cole") is a correctional officer working POD 6D on August 27 and 28. (PPFOF-MC ¶24-25, 31-32). Cole regularly saw patients suffering from withdrawal. When Cole saw someone suffering from withdrawal, "I don't do anything." Cole knew that Fiebrink was suffering from withdrawal symptoms on August 27 but did nothing. Cole knew that Fiebrink

defecated on herself and that it was a sign of distress. (PPFOF-MC ¶28). Cole did not contact medical staff for Fiebrink. *Id*. According to Cole, "I just didn't do a wellness check" on Fiebrink. Cole did not receive any training on withdrawal. (PPFOF-MC ¶31).

## II. STATEMENT OF ADDITIONAL FACTS.

Plaintiffs respectfully refer this Court to the Plaintiffs' Proposed Findings of Fact in Response to Milwaukee County's Motion for Summary Judgment (PPFOF-MC) and Plaintiffs' Responses to Milwaukee County's Proposed Findings of Fact filed herewith and incorporated herein by reference.

## III. STANDARD OF REVIEW.

Summary judgment is only proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court's role when deciding a motion for summary judgment is not to evaluate evidence or determine the truth of the matter at issue, but only to determine whether there is genuine issue of fact. *Moore v. Ford Motor Co.*, 901 F.Supp. 1293, 1296 (N.D.Ill. 1995). Evidence presented by the responding party supported by affidavits or other evidentiary material is to be taken as true. *Uskaw v. Blemker*, 548 F. 2d 673 (7th Cir. 1976). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. CO. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the factfinder could reasonably find in the nonmovant's favor, then summary judgment is improper. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1968).

Trial courts are continually cautioned that summary judgment should be denied if, viewing the evidence in a light most favorable to the party against whom the motion is directed, there is

Case 2:18-cv-00832-AJS   Filed 04/02/19   Page 3 of 31   Document 239

any doubt that a genuine issue of material facts exists. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2727 (1983). Further, even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255.

As set forth below and detailed in Plaintiffs' (PPFOF-MC), as well as Plaintiffs' Responses to Milwaukee County's Proposed Findings of Fact, there is overwhelming evidence from which a reasonable trier of fact could conclude that the remaining Milwaukee County Defendants violated Fiebrink's constitutional and civil rights – especially when all reasonable inferences are construed in the favor of the nonmoving party.

## IV. ARGUMENT

### A. THE MILWAUKEE COUNTY DEFENDANTS VIOLATED FIEBRINK'S CONSTITUTIONAL RIGHTS PROTECTED BY 42 U.S.C. § 1983.

#### 1) Plaintiff's Constitutional claims should be analyzed under the Fourteenth Amendment's objectively unreasonable standard.

The Fourteenth Amendment's objectively unreasonable standard should be applied to Plaintiffs' Constitutional claims under 42 U.S.C. § 1983. *Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018) (the objectively reasonable standard under the Fourteenth Amendment applied to a pretrial detainee's claims for inadequate medical care). A detainee held on suspicion of a probation violation prior to receiving an adjudication determination is entitled to the same constitutional due process protections afforded a traditional pretrial detainee. Fiebrink's care and treatment, while detained on a probation hold prior to a final determination of that alleged violation, should be analyzed under the Fourteenth Amendment.

Persons detained prior to probation revocation hearings are protected by the due process clause of the 14th Amendment. *Larry v. Dep't of Corr.*, No. 06-C-223-C, 2006 U.S. Dist. LEXIS

30437 *5-7 (W.D. Wis. May 12, 2006) (an individual held on a probation hold pending a probation revocation hearing had due process rights to a preliminary hearing under the Fourteenth Amendment). Fiebrink was arrested and detained without adjudication of her alleged probation violation. While a pretrial detainee and a pre-hearing probation hold detainee can be considered in form, the substance of the detention remain the same – no adjudication of the asserted violation has been finalized.   Thus, the detainee is entitled to Fourteenth Amendment protections until they have received the due process guaranteed by the Fourteenth Amendment.

### 2)    Fourteenth Amendment Objectively Unreasonable Standard.

County Defendants' deliberate inaction and/or unreasonable failure to provide Fiebrink the constitutional minimally required appropriate medical care and/or treatment is a question for a jury to determine under the objectively reasonable standard. *Miranda*, 900 F.3d 335, 354. In *Miranda*, the court concluded a jury was entitled to decide whether or not doctors' deliberate failure to act was objectively reasonable. *Id*. The medical staff in *Miranda* chose a "wait and see" monitoring plan despite having knowledge the inmate could not care for herself. *Id.*; *See Glisson*, 849 F.3d at 380, 382 (recognizing inaction as a choice).  Here, the County Defendants that remain, Cole and Aikens, equally failed to provide Fiebrink adequate access to medical care, and additionally failed to report a serious medical condition she suffered to medical providers, despite Fiebrink's known history of opiate abuse, apparent need for help and documented distress calls witnessed by another inmate.

A plaintiffs Fourteenth Amendment right to medical care is violated if: "(1) there was an objectively serious medical need; (2) the defendant made a volitional act with regard to the plaintiff's medical needs; (3) that act was objectively unreasonable under the circumstances in terms of treating or assessing the patient's serious medical needs; and (4) the defendant "acted

5

purposefully, knowingly, or perhaps even recklessly with respect to the risk of harm. *Terry v. Cty of Milwaukee,* 2019 U.S. Dist. LEXIS 5197, * 20. The Court "will be ultimately applying a recklessness test." *Id.* Each factor applies to the County Defendants, as individually Cole failed to report Fiebrink's profuse diarrhea and refusals to eat to medical, while CO Aikens failed to do any wellness checks on Fiebrink during the early morning hours between 12 a.m. through 7 a.m. on August 28, 2016, despite the fact Fiebrink was identified as a special needs patient, was on a lower tier/lower bunk restriction signifying detox inmate, and despite an independent witness seeing and hearing Fiebrink screaming for help and activating her emergency call light before her death – addressed by "shut the fuck up." (PPFO-MC ¶71).

"An objective serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that a person would receive the need for a doctor's attention." *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)(internal quotations and citations omitted). The medical condition need not be life threatening. *Id.* Here, there is no dispute that opiate withdrawal is a serious medical condition that can lead to death if left untreated. (PPFOFA ¶ 198) Which is exactly what happened here. Both Correctional Officers Cole and Aikens, as well as Armor Medical Staff assigned to ensure the health, welfare and safety of Fiebrink repeatedly failed to do their job, repeatedly ignored Fiebrink's warning signs and/or calls for help, and systematically ignored policy and procedures in place to complete wellness checks, monitor detoxification and withdrawal symptoms, pay attention to special needs patients/inmates, initiate tapering medication protocols, explain potentially adverse consequences of medical treatment refusals, and/or escalate Fiebrink's refusals and deteriorating conditions in the days and hours before her tragic death.

As this Court concluded in *Terry,* "[A] properly instructed jury could find that [the defendant] made the decision not to check on Terry in the SMU, or investigate any cries for help with purposeful, knowing, or reckless disregard of the consequences." *Terry* at 23-24 (quoting *Miranda,* 900 F3d. at 354)(internal citations omitted). In *Terry,* this Court further reasoned, "the facts …. whether she could hear Terry from her workstation at the clinic, are disputed; therefore, this an issue for the jury." *Id.* at 24. Most importantly and directly on point with the claims against a named defendant, this Court explained:

> Wenzel maintains that he had performed his rounds diligently, twice an hour, and neither saw nor heard anything troubling from Terry until 4:46 am., when the baby was already born. There is at least one report from a fellow inmate who heard some screaming that night, and there are no working security cameras to corroborate either account. This is an issue of fact for jury. A reasonable jury could find that Wenzel did not check on Terry, or that he did not check on Terry but unreasonably overlooked (or ignored) the fact that she was about to deliver a baby, and did in fact deliver, a baby in a jail cell. These facts could also support a reasonable jury conclusion that Wenzel acted purposefully, knowingly, or recklessly towards Terry.

*Id.* at 26. The *Terry* Court's well-reasoned logic applies equally to the facts of Fiebrink's untimely in-custody death.

### 3) Eighth Amendment Standard.

In the alternative, should the Court determine the Eighth Amendment standard for convicted persons applies to probation hold detainees, Fiebrink still meets the deliberate indifference standard.

A state actor acts with deliberate indifference when they know and disregard an excessive risk to the inmates' health and safety. *Farmer*, 511 U.S. at 837. A plaintiff must show the defendant acted or failed to act in a way that disregarded an excessive risk, but it is not required that the Plaintiff show that the defendant intended to or desired to cause harm. *Walker v. Bemjamin,* 293 F. 3d 1030, 1037 (7th Cir. 2002). "To be sure, the rendering of some medical care

7

does not necessarily disprove deliberate indifference; the treatment rendered may be so blatantly inappropriate that it can support an inference of intentional mistreatment." *Cesal v. Moats,* 851 F.3d 714, 723 (7th Cir. 2017). Continuing an ineffective treatment also supports a claim for deliberate indifference. *Id.* Here, Cole and Aikens either knew or should have known Fiebrink was at high risk of withdrawal complications based on her lower tier/lower bunk designation, the fact that she was a special needs inmate due to her prior and current drug abuse history, the physical signs exhibited including profuse diarrhea, refusal to eat, refusal to come out of her cell, and finally her pleas for help the night she died while activating her emergency call button – independently testified to by another inmate on the same pod as Fiebrink the night she died.

An officer can be provided with notice of an arrestee's medical need through words or observations of physical symptoms. *Williams*, 509 F.3d at 403. Circumstantial evidence—such as visible symptoms or other detainees' complaints--can be used to establish such knowledge. *Thomas v. Cook County Sheriff's Dep't*, 588 F.3d 445, 452-53 (7th Cir. 2009). Knowledge can be inferred from circumstantial evidence and does not rest on the plaintiff's self-reported need or lack of need for medical treatment. *Paine v. Johnson*, 689 F. Supp. 2d 1027, 1066 (N.D. Ill. 2010), (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Deliberate indifference arises when a state officer "does nothing" or "takes action that is so ineffectual under the circumstance that deliberate indifference can be inferred. *Amonoo v. Washetas*, 16-cv-125-slc, 2017 WL 5991837, *11 (W.D. Wis. Dec. 1, 2017). Here, each remaining County Defendant did nothing despite Fiebrink's words [screaming for help], deeds [activating emergency light], designation as special needs patient, and finally her symptoms of withdrawal manifested by diarrhea, refusals to eat or leave her cell.

   a. **Aikens actions violated Fiebrink's constitutional right to medical care under both the Eighth Amendment's deliberately indifferent standard and the Fourteenth Amendment's objectively unreasonable standard.**

Defendant Aikens knew of Fiebrink's medical condition and deliberately ignored that condition during Fiebrink's cries for help. At a minimum, as explained in *Terry*, there is a dispute of fact concerning whether Aikens was aware of Fiebrinks' serious medical condition considering Fiebrink's tier card indicated a lower tier/lower bunk designation routinely assigned to inmates suffering from withdrawal, ignored Fiebrink's calls for help, and failed to complete the necessary wellness checks.

Aikens was a correctional officer working third shift and assigned to the sixth-floor control station in Fiebrink's pod. (MCPFOF ¶¶ 60–61.) Third shift began at 10:00 p.m. on August 27, 2016 and ended at 6:30 a.m. on August 28, 2016. (*Id.* ¶ 62.) When the third-shift correctional officers arrive at 10:00 p.m., inmates are typically "locked in for the night." (*Id.* ¶ 63.) Aikens' primary duty on August 27, 2016 was to perform wellness check inspections. (PPFOF-MC ¶35). Aikens had three objectives or duties when completing wellness checks: 1) Maintain accountability that the inmate was in their cell (PPFOF-MC ¶41-1); 2) Respond to any inquires for help (PPFOF-MC ¶41-2); and, 3) Respond to an inmate's cell if their light is on. (PPFOF-MC ¶41-3). She performed none of those in relation to Fiebrink the night she died. Other than training at the academy, Aikens did not receive any training at the jail on how to perform wellness checks. (PPFOF-MC ¶42). Aikens was required to perform wellness checks every thirty Minutes. (PPFOF-MC ¶38) but failed to perform any wellness checks whatsoever – she just walked down the rows without even looking into the cells and none of entries in the log sheet comport with the video on the night in question. (PPFOF-MC ¶¶53-63).

Aikens clearly fabricated a record on when wellness checks were completed the night Fiebrink died, because the surveillance video documents the wellness checks recorded in the log were either inaccurate, non-existent, and/or inadequate. (PPFOF-MC ¶¶53-63). Correctional

9

officers must look in every person's cell during wellness checks to check if they were still breathing. (PPFOF-MC ¶67). The surveillance video for the hours leading up to and after Fiebrink's in-custody death reveal Aikens never stopped by Fiebrink's cell long enough to ensure she was breathing, let alone even look in through the small window of the cell door. (PPFOF-MC ¶¶53-63). Aikens does not recall viewing Fiebrink's Tier Card or pod sheet the night/morning she died, which would have revealed the lower tier/lower bunk designation routinely assigned to inmates suffering from withdrawals and put on corresponding protocols. (PPFOF-MC ¶45)(PPFOF-MC ¶43)(PPFOF-MC ¶44).

Aikens behavior is clearly distinguished from the situation where a prison official chooses one course of action over another to mitigate a risk, which does not amount to a constitutional violation. *See Fisher v. Lovejoy*, 414 F.3d 659, 662-63 (7th Cir. 2005). Rather than put herself in a position to choose one course of action over another or mitigate risks to Fiebrink, Aikens simply chose to do nothing. Aikens failed to perform her primary duty on third shift, wellness checks, as she was trained to do – to ensure prisoners are safe and breathing while they lay asleep in their cells. "A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Grieveson*, 538 F.3d at 779. Aikens made deliberate choices to not do adequate wellness checks and then created false documentation to the contrary, and not to respond to Fiebrink's screams for help and/or emergency light. Such conduct is beyond deliberate indifference to Fiebrink, instead approaching criminal negligence.

The County of course denies these material facts regarding Aikens' actions, or lack thereof, with Fiebrink and the required performance wellness checks the night she died. These are material issues of fact requiring a jury's decision, not summary dismissal as a matter of law for a bad actor.

10

Aikens states that she did not have any "face-to-face" interactions with Fiebrink and that it was a "completely quiet" night. (MCPFOF ¶¶ 64, 66, 72). This is directly contradicted by the testimony of another inmate, Phoebe Williams, who was in cell 26 with a direct sight line to Fiebrink's cell on August 27 and 28, 2016. (PPFOF-MC ¶49). Williams testified:

> The night it happened, I heard yelling and screaming… When I looked out my cell, I seen the emergency button. It's emergency button inside the cell that you press when you need emergency assistance, and the light comes on at the top of the room and it flashes yellow, and it stop flashing when the guards press the button, it stops flashing. (PPFOF-MC ¶¶49-52).

When providing all reasonable inferences to the non-moving party on summary judgment, it is clear material issues of fact in dispute require jury deliberation – not summary judgment as a matter of law to the moving party.

Further disputes surround the night of August 27th and the morning of August 28th, 2016, as to whether the emergency light was flashing above Fiebrink's cell. (PPFOF-MC ¶51). Whether the screaming and yelling from Fiebrink's cell lasted "a couple of hours." (PPFOF-MC ¶50-53). Williams testified that no correctional officers responded to Fiebrink's screams or her call light the night and morning she died. (PPFOF-MC ¶51-52). Williams also testified that she also activated her emergency call light that night/morning after he water broke, eventually giving birth at the hospital the next day. (PPFOF-MC ¶52). No correctional officers responded to Williams cell light either – other than being told to "shut the fuck up.". (PPFOF-MC ¶52). Furthermore, video surveillance contradicts Aikens' contrived Log sheet and in fact, reveals a multitude of discrepancies. (PPFOF-MC ¶53-63). This Court in *Terry* found that similar disputes as to whether or not a correctional officer completed their rounds should be decided by a jury. *Terry,* at 24.

There are key disputes of material fact whether Fiebrink was screaming the night and morning she died, turned her cell light on to indicate an emergency, had an interaction with Aikens

the night/morning she died, or if Aikens made any wellness checks on Fiebrink. All reasonable inferences must be made in favor of the non-moving party who has shown clear disputes of material fact to be determined by a jury. Even without the dispute, Aikens unquestionably failed to perform routine wellness checks on Fiebrink in direct opposition to her serious medical needs. Such blatant inaction meets the deliberate indifferent standard under the Eighth Amendment.

b. **Cole's actions violated Fiebrink's constitutional right to medical care under both the Eighth Amendment's deliberately indifferent standard and the Fourteenth Amendment's objectively unreasonable standard.**

On the morning of August 28, 2016, prior to Fiebrink being found cold to the touch and dead, Cole allegedly did rounds, but zero wellness checks. Cole could not explain her failure to complete the wellness check, "I just didn't do a wellness check." (PPFOF-MC ¶31). The purpose of wellness checks and the requirement that officers get some response or movement is "to make sure they are still breathing." (PPFOF-MC ¶29). One of the primary roles of a correctional officer is to ensure the health, welfare and safety of inmates under their supervision and control. (PPFOF ¶13) When Cole did rounds on August 28, 2016, at 6:15 a.m. and 6:45 a.m. she made no attempt to verify that Fiebrink was breathing, whether she was alive or dead, or whether she was suffering from withdrawals. (PPFOF-MC ¶31-32). When Cole entered Fiebrink's cell at about 7:00 a.m. on August 28, 2016, Fiebrink was cold to the touch, but Cole failed to provide Fiebrink any first aid. (PPFOF-MC ¶33). Cole understood that Fiebrink was assigned to a lower tier bunk because she was detoxing and was aware that Fiebrink was suffering. (PPFOF-MC ¶26-27). When Fiebrink reported to Cole on August 27, 2018, that she had defecated on herself, Cole considered that out of the ordinary and knew that something was wrong. (PPFOF-MC ¶28). Yet, Cole failed to inform medical staff of this potentially serious medical condition, even though Cole knew that

Fiebrink defecated on herself and likely experiencing withdrawal symptoms. (PPFOF-MC ¶26-28).

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Prison officials act with deliberate indifference when they act "intentionally or in a criminally reckless manner." *Tesch v. County of Green Lake*, 157 F.3d 465, 474 (7th Cir. 1998). Cole knew that an adult inmate defecating on herself was serious and knew Fiebrink was heroin addict likely suffering from withdrawals. (PPFOF-MC ¶¶ 26-28). Yet Cole failed to alert medical about this issue or doing anything for that matter other than issuing a set of clean clothing. (PPFOF-MC ¶¶ 26-28). As a result, Fiebrink's withdrawal symptoms remained untreated. *See Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) ("A delay in the provision of medical treatment for painful conditions--even non-life-threatening conditions--can support a deliberate-indifference claim so long as the medical condition is 'sufficiently serious or painful.' "). Cole was aware of Fiebrink's serious medical condition and yet failed to notify medical. (PPFOF-MC ¶¶ 26-28). There were no medical staff for Cole to defer treatment to because Cole never notified them. *Id*. This failure to take any action at all when Cole knew that Fiebrink may be withdrawing from opiate addiction and in such poor physical condition that she had defecated on herself was a clear disregard for Fiebrink's health and safety.

          **4)**       **The County Defendants' failure to provide timely medical care caused Fiebrink harm.**

"Proximate cause is a question to be decided by a jury and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment granted on this issue of causation." *Gayton,* 593 F.3d at 624. Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is

13

Case 2:18-cv-00832-AJS   Filed 04/02/19   Page 13 of 31   Document 239

challenged, the causation inquiry is quite broad: "the constitutional violation in question here is the failure to provide adequate medical care in response to a serious medical condition, not 'causing her death.'" *Id*. at 619; *see also Egebergh v. Nicholson,* 272 F.3d 925, 928 (7th Cir. 2001) (reversing summary judgment because a jury could infer that depriving arrestee of one insulin shot exposed him to substantial danger). A jury can infer based on medical records and witness testimony that a defendant caused harm. *Ortiz*, 656 F.3d at 534-35.

Plaintiff's Expert Witness Dr. Richard B. Lewan opined:

Once confined, despite other inmates reporting Kristina was in distress and crying out for help and prior obvious signs of physical distress, ***correctional staff failed to inform medical staff and medical staff ignored and failed to provide any care whatsoever.*** Let alone any lifesaving medical treatment for a high-risk ("special needs") condition. (Internal citations omitted)(emphasis added). (PPFOF-MC ¶69)

Dr. Lewan further stated Fiebrink's death was "easily avoidable" but the blatant disregard for her serious condition by correctional staff directly attributed to her death. (PPFOF-MC ¶70) After Fiebrink's death, Aikens was later informed by a supervisor that Fiebrink was suffering from withdrawal and died from those withdrawals. (PPFOF-MC ¶68). A jury can clearly find that Aikens and Cole's failure to respond or notify medical staff when Fiebrink was, screaming in her cell, turned on her cell light, or had defecated on herself was a proximate cause of the ultimate harm Fiebrink suffered.

## B. THE INDIVIDUAL COUNTY DEFENDANTS, AIKENS AND COLE, ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The determination of whether public officials are entitled to qualified immunity is an objective one. *Triad Associates, Inc. v. Robinson,* 10 F.3d 492, 496 (7th Cir.1993). When "considering the qualified immunity issue on a motion for summary judgment, a district court should consider all of the undisputed evidence in the record, read in the light most favorable to the non-movant." *Green v. Carlson*, 826 F.2d 647, 650 (7th Cir. 1987). "[T]he defendants cannot

14

prevail if [Plaintiff] can present a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity." *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992). Amply demonstrated already are numerous disputed issues of material fact on this issue. Additionally, courts can, and frequently do, deny qualified immunity claims on summary judgment based on the existence of material fact. See, e.g., *Clash v. Beatty*, 77 F.3d 1045 (7th Cir. 1996)(holding that factual dispute precluded summary judgment on qualified immunity issue); *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 929 (E.D. Wis. 1999). The County Defendants push for qualified immunity as a matter law falls far short.

The court may grant qualified immunity when 'the undisputed facts, so read, show that the defendant's conduct, as a matter of law, violated no clearly established legal norms' but if there 'are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendant's conduct did violate clearly established norms, the case must proceed to trial.' *Green v. Carlson*, 826 F.2d 647, 651-52 (7th Cir. 1987). Such is not the case here based on the abundance of factual disputes related to Cole and Aiken's conduct regarding an inmate who died under their supervision and control.

Once a defendant has pleaded a defense of qualified immunity courts engage in a two-step analysis: (1) does the alleged conduct set out a constitutional violation and (2) were the constitutional standards clearly established at the time in question? *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994). It is well settled that providing no medical care in the face of a serious health risk constitutes deliberate indifference. *See Walker v. Benjamin,* 293 F.3d 1030, 1037 (7th Cir.2002). Police must provide care for the serious medical conditions of persons in custody. *See Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, at the time Fiebrink

was in the County's custody, it was clearly established that a government entity has an obligation to provide medical care to those in its custody, including detainees who suffer from opiate withdrawals. *See Ortiz v. Chicago*, 656 F.3d 523 (7th Cir.2011) (discussing this duty and why it applies even if the custody is expected to be short); *See also Cobige v. Chicago*, 651 F.3d 780 (7th Cir.2011).

The law is clearly established that once a state takes a person into its custody, it assumes an obligation to provide for his or her basic needs including 'food, clothing, shelter, medical care, and reasonable safety… The Constitution imposes this obligation upon the state by virtue of the "special relationship" that the state has with persons in its custody. *Hodges v. McBurnie*, No. 09-CV-7869, 2011 WL 3796727, at 5 (N.D. Ill. Aug. 25, 2011.)(internal citations omitted). In *Hodges*, the court also noted that the Defendants were aware of their duty to provide medical attention to detainees in need and therefore, denied the Defendants' motion for summary judgment on qualified immunity grounds. *Id.* The Milwaukee County Defendants in *Perry v. Wenzel,* took a similar approach as the Defendants here and requested the Court narrowly construe the constitutional rights at issue. The Seventh Circuit flatly rejected that approach, "The defendants urge us to narrowly define Perry's right. But in doing so, they are essentially urging us to conclude that because there is no case with the exact same fact pattern, qualified immunity applies. That is not what the qualified immunity standard requires us to do. Rather, we find that in September 2010, it was clearly established that the Fourth Amendment governed claims by detainees who had yet to receive a probable cause determination." *Perry v. Wenzel,* There can be no question that Fiebrink's rights to adequate constitutional medical care was established in 2016, whether under the Fourteenth or Eight Amendment.

The exact same situation exists here. Cole and Aikens knew they had a duty to provide medical attention to Fiebrink. When there are issues of disputed fact upon which the question of immunity turns, or if it is clear that the defendants' conduct violated clearly established norms, this court may not grant summary judgment in favor of the Defendants. *See Clash*, 77 F.3d at 1048; *Green*, 826 F.2d at 652; *Johnson*, 41 F.Supp.2d at 930.

Summary Judgment must be denied because viewing the evidence in a light most favorable to the Plaintiff reveals that a reasonable jury could conclude that Aikens and Cole's failures to seek any medical care for Fiebrink or ignored her serious medical condition was objectively unreasonable and/or deliberately indifferent. Plaintiff has sufficiently presented facts that would defeat any claim of qualified immunity, consistent with *Hall*. For these reasons, Plaintiffs respectfully request that this court deny the County Defendants' motion for summary judgment on qualified immunity grounds.

### C. MONELL LIABILITY

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court allowed governmental entities to be held liable under § 1983. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *City of Okla. City v. Tuttle*, 471 U.S. 808, 810 (1985). One of the ways municipal liability can attach is through a constitutional violation brought about by a widespread, though unwritten, custom or practice. *Darchak v. City of Chicago Board of Education*, 580 F.3d 622, 629 (2009).

When Defendants consciously ignore a need for action, it can be said that they adopted a *de facto* policy of violating a person's constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). A conscious ignoring of a need for action can arise from a failure to provide adequate training in light of an

17

obvious danger of constitutional violations in the absence of training. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006,1029-30 (7th Cir. 2006). This liability can attach even in instances where no previous injuries occurred as a result of the indifference of the municipal policy-maker. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).

> a. **Milwaukee County failed to train correctional officers on caring for inmates who are at risk of and experiencing withdrawal. Milwaukee County also declined training on recognizing the signs and symptoms of withdrawal offered by Armor.**

The Milwaukee County Sheriff is legally responsible for the medical care and treatment of detainees and inmates at the Milwaukee County Jail. Wis. Stat. § 302.336(2); Wis. Admin. Code § DOC 350.14(1). Milwaukee County's contract with Armor did not change that legal obligation. (PPFOF-MC ¶65.)

It is well established that people entering jail at significant risk of withdrawal are entitled to adequate medical treatment. *Davis v. Carter*, 452 F.3d 686, 696 (7th Cir. 2006) ("The plaintiff has also presented enough evidence to create triable issues of fact regarding whether certain individual defendants were deliberately indifferent by failing to ensure [the decedent] received timely methadone treatment."); see also *Foelker v. Outagamie County*, 394 F.3d 510, 513-14 (7th Cir. 2005) (concluding that heroin withdrawal is a serious medical need). One in five individuals (19%) serving sentences in jail reported regularly using heroin or opioids.[2] These individuals will experience withdrawal syndrome because of the abrupt substance discontinuation and will need immediate medical attention while detained.[3] Withdrawal from heroin is known to occur between

---

[2] Bronson, J., Stoop, J., Zimmer, S., & Berzofsky, M. (2017). *Drug use, dependence, and abuse among state prisoners and jail inmates, 2007-2009* (NCJ 250546). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. (available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5966 (visited Nov. 19, 2018)).

[3] American Society of Addiction Medicine. (2014). *The ASAM standards of care for the addiction specialist physician.* Chevy Chase, MD. (available at https://www.asam.org/docs/default-source/publications/standards-of-care-final-design-document.pdf (visited Nov. 19, 2018)).

12 and 36 hours of the last use.[4]  Withdrawal syndrome is the onset of predictable symptoms following the abrupt discontinuance of heroin or opioids.[5]  Severe complications include vomiting, dehydration, and diarrhea.[6]  Several advisory organizations provide guidelines or standards on the provision of care for individuals who are going through withdrawal syndrome while in correctional custody, including the Federal Bureau of Prisons, the World Health Organization, and the National Commission on Correctional Healthcare.[7]  There is consensus that medical supervision of withdrawal is necessary and that withdrawal management alone is not sufficient.

Nancy Evans ("Evans") was the jail commander and ran the day-to-day operations and administration of the jail as the commander.  (PPFOF-MC ¶72).  At the time of her appointment, Evans had no training on the operations or administration of jails.  (PPFOF-MC ¶73).  After her appointment, Evans received no training on the operations or administration of jails. (PPFOF-MC ¶74).

Evans knew that correctional officers would see patients suffering from withdrawal daily. (PPFOF-MC ¶75).  Cole and other correctional officers have testified that they received no training on withdrawal.  (PPFOF-MC ¶76).  Evans testified that she did not have any withdrawal training

---

[4] Kosten TR, O'Connor PG. Management of drug and alcohol withdrawal. *N. Engl. J. Med.* May 1, 2003; 348(18):1786-1795.

[5] *Id.*

[6] American Society of Addiction Medicine. (2015). *The ASAM national practice guideline for the use of medications in the treatment of addiction involving opioid use.* Chevy Chase, MD. (available at https://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-supplement.pdf (visited Nov. 19, 2018)); U.S. National Library of Medicine. *Opiate and opioid withdrawal.* Bethesda, MD. (available at https://medlineplus.gov/ency/article/000949.htm (visited Nov. 19, 2018)).

[7] Federal Bureau of Prisons. (2014). *Detoxification of chemically dependent inmates, Federal Bureau of Prisons clinical practice guidelines.* Washington, DC. (available at https://www.bop.gov/resources/pdfs/detoxification.pdf (visited Nov. 19, 2018)); World Health Organization, Western Pacific Region. (2009). *Clinical guidelines for withdrawal management and treatment of drug dependence in closed settings.* Geneva: World Health Organization. (available at http://www.wpro.who.int/publications/docs/ClinicalGuidelines_forweb.pdf?ua=1 (visited Nov. 19, 2018)); National Commission on Correctional Health Care. (2016). *Standards for opioid treatment programs in correctional facilities.* Chicago, IL. (available at https://www.ncchc.org/opioid-treatment-programs-2 (visited Nov. 19, 2018)).

19

and that she was aware that correctional officers were similarly untrained (PPFOF-MC ¶77). Kayla McCullough (then Armor's Health Services Administrator) offered training for correctional officers on withdrawal. (PPFOF-MC ¶78. And despite the fact that Evans knew that correctional officers would see people suffering from withdrawal daily and were untrained: Evans declined Armor's offer to conduct training on withdrawal. (PPFOF-MC ¶79).

When Defendants consciously ignore a need for action, it can be said that they adopted a *de facto* policy of violating a person's constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). A conscious ignoring of a need for action can arise from a failure to provide adequate training in light of an obvious danger of constitutional violations in the absence of training. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). This liability can attach even in instances where no previous injuries occurred as a result of the indifference of the municipal policy-maker. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011).

In *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1320 (10th Cir. 2002), the Tenth Circuit concluded that a jury should decide whether it was obvious that a county was deliberately indifferent when it failed to train its jail's pre-booking officers to recognize obsessive compulsive disorder (OCD) and to handle such situations appropriately. The Tenth Circuit's ruling considered the frequency of OCD—at more than 2% of the general population—to be significant. *Id.*, at 1316. In *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 585 (3rd Cir. 2003), the Third Circuit decided that a reasonable jury could find that the failure to train employees on the administration of insulin was unconstitutional. The Third Circuit's ruling found it significant that "[n]o one could provide an inmate with medication without having first obtained an order from a doctor. There

20

was no requirement that a doctor see an inmate during the first 72 hours of incarceration. . . ." *Id.*, 584-585.

The facts here are even more compelling. Addiction to heroin and other opiates occurs more frequently than the conditions in *Olsen* and *Natale*. Decker specifically denied detoxification medication to Fiebrink per Armor's policy. (PPFOF-MC ¶1). The process of detoxification requires monitoring by a medical practitioner. Decker, rather than summoning a medical practitioner, decided to wait until one became available. And others were not trained to provide immediate medical care for her severe withdrawal symptoms.

In *Gayton*, the decedent died in custody at a jail where she was denied treatment for symptoms of heroin withdrawal, such as vomiting. 593 F.3d at 613-15. The Seventh Circuit explained, "if the plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed the inmate, there is enough causation evidence to reach trial." *Id.*, at 624-25; see also *Egebergh v. Nicholson*, 272 F.3d 925, 927-28 (7th Cir. 2001) (holding that a jury could infer deliberate indifference from missing one shot of insulin that resulted in death.).

The inadequacy of training may serve as a basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish § 1983 liability for inadequate training, all Plaintiffs' need show is (1) defendants failed to provide constitutional care, (2) the failure to provided constitutional care arose under circumstances where a usual and recurring situation with which Defendants must deal, (3) the inadequate training demonstrates a deliberate indifference, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *See Canton*, 489 U.S. at 389-91. With respect to the second and third requirements, a showing of specific incidents which establish a pattern of constitutional violations

21

is not necessary to put Armor (and Milwaukee County) on notice that it training program is inadequate. Rather, evidence of a single violation of federal rights, accompanied by a showing that Armor (and Milwaukee County) has failed to train its employees (and contracted, i.e., joint employees, nurses) to handle recurring situations, presenting an obvious potential for such a violation, is sufficient to trigger § 1983 liability. *See Bd. Of Cnty. Com'rs v. Brown*, 117 S.Ct. 1381 (1997); *Canton*, 489 U.S. at 390 n. 10.

The first requirement is satisfied because there is evidence in the record to support the claim that Fiebrink did not receive constitutionally adequate care. The second requirement is satisfied because Milwaukee County admits that it is common for correctional officers to deal with persons that are at significant risk of or experiencing withdrawal from heroin and other opiates.

The third and fourth requirements are also satisfied. The evidence supports an inference that the training demonstrates a deliberate indifference on the part of Milwaukee County toward persons with whom correctional officers come into contact and that the inadequate training was a cause of Fiebrink's suffering and death. As explained by Ronald Shansky, the Court's medical monitor,

> Per the jail log, the patient did have severe diarrhea on 8/27, but medical was never notified. This is a significant failure because medical could have responded with antidiarrheal medication as well as fluids and electrolytes to bring the patient into a healthier condition. [Correctional officers] need [] to be trained that particularly susceptible to death are patients who are in withdrawal and have significant diarrhea. Those patients need to take adequate fluids in order to restore their homeostasis. Officers need training on the relationship between withdrawal and diarrhea as well as the need to notify medical when that situation arises.

(PPFOF-MC ¶14). In addition, Richard Lewan opines that "[d]iarrhea, hallucinations and signs of dehydration went ignored with the resultant outcome of a progression . . . [s]uch severity of stress and dehydration likely with severe fluid deficits and electrolyte abnormalities cause cardiorespiratory arrest." (PPFOF-MC ¶69-70).

22

When read as a whole and viewed in the light most favorable to Plaintiffs as the party opposing summary judgment, the record supports an inference that Milwaukee County trained its officers to ignore patients at risk of withdrawal. *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), does not require a different result. In *Tuttle*, the Supreme Court held it was error to instruct a jury that it could infer from a single incident that the constitutional violation was attributable to a city policy of inadequate training or supervision. Here, Plaintiffs do not rely solely on proof of a single incident to support an inference that Fiebrink's suffering and death was caused by inadequate training and that the inadequate training was Milwaukee County's policy. Plaintiffs rely on evidence that correctional officers followed training created a culture of ignoring Fiebrink's complaints. *Tuttle* and *Canton* do not require evidence of more than one incident to establish a policy of inadequate training and that the training caused the constitutional deprivation. Those cases simply require evidence in addition to the occurrence of a single incident. Plaintiffs may properly rely on a single incident if there is other evidence of inadequate training. *See Vineyard v. County of Murray*, 990 F.2d 1207 1212-14 (11th Cir.), *cert. denied*, 510 U.S. 1024 (1993); *Russo*, 953 F.2d at 1041, 1046-48; *Bordanaro v. McLeod*, 871 F.2d 1151, 1159-63 (1st Cir.), *cert. denied*, 493 (5th Cir. 1985).

By providing direct evidence of inadequate training, as discussed above, Plaintiffs have provided sufficient evidence beyond the occurrence of a single incident to withstanding summary judgment. It is not enough for Milwaukee County to point to the existence of a policy if that policy did not properly address persons with withdrawal, and if Milwaukee County did not ensure that its officers were adequately trained to follow that policy or apply it in the type of situation that occurred here. *See Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 740 (6th Cir. 2015) (finding that summary judgment on failure-to-train claim was inappropriate in part because, although private

23

corporation contracted to provide medical care to inmates had policies and protocols, nurses had little to no training and admitted that they did not know the policies or used them at their discretion). Regardless of how thorough a policy is on a particular subject the policy is only as good as the training provided to those who are to follow and carryout the directives. More is encompassed in the notion of training that simply making employees aware of a policy. Were the law otherwise, the mere placing of an acceptable policy on the books would insulate Defendants from liability.

Nor does *Brown*, 117 S.Ct. 1382, require a different result. This case before us is within the "narrow range of circumstances" recognized by *Canton* and left intact by *Brown*, under which a single violation of federal rights may be a highly predictable consequence of a failure to train correctional officers and contract medical personnel to handle recurring situations with an obvious potential for such a violation. The likelihood that correctional officers will have to deal with persons at significant risk of or experiencing withdrawal, and the predictability that failing to conduct even a visual assessment, justifies a finding that Milwaukee County's failure to properly train its officers reflected deliberate indifference to the obvious consequence of Milwaukee County's choice. The likelihood of suffering and death also supports an inference of causation—that Milwaukee County's indifference led directly to the very consequence that was so predictable.

### D. GOVERNMENTAL IMMUNITY TO PLAINTIFFS' STATE LAW CLAIMS DOES NOT APPLY TO COUNTY DEFENDANTS

County Defendants argue that they are protected from Plaintiffs' state negligence and wrongful death claims under governmental immunity. Wis. Stat. § 893.80(4). The most generally recognized exception to this rule is that officials are liable for damages stemming from the negligent performance of a "purely ministerial duty." *Lister v. Board of Regents*, 72 Wis. 2d 282, 300-01, 240 N.W.2d 610, 621-22 (1976). A ministerial duty is one which is absolute, certain and

imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion. *Domino v. Walworth County*, 118 Wis. 2d 488, 490, 347 N.W.2d 917, 919 (Ct. App. 1984), *quoting Lister*, 72 Wis. 2d at 301, 240 N.W.2d at 622. In sum, acts which involve the exercise of judgment or discretion rather than the mere performance of a prescribed task do not come within the exception to the rule. *Lifer v. Raymond*, 80 Wis. 2d 503, 509, 259 N.W.2d 537, 540 (1977).

A governmental employee may have a ministerial duty to take some action, although how that act is performed is discretionary. *Rolland v. County of Milwaukee,* 2001 WI App 53, ¶ 12. In *Rolland*, the Plaintiff survived summary judgment when she was injured after her motorized handicapped scooter tipped over on a county bus. There was an issue of fact as to whether the bus driver secured her scooter at all. The defendant was found to have a ministerial duty to secure the scooter on the bus. *Id.* at ¶ 12. However, he had no discretion to fail to secure the scooter. Because there were facts that supported the conclusion that he did not secure the scooter at all, summary judgment was denied. *Id*.

In Wisconsin, an inmate has a claim against a prison employee who negligently fails to obtain medical attention for the inmate and that failure causes the inmate to sustain a serious illness or injury. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 375, 514 N.W.2d 48 (Ct. App. 1994).

"Proximate cause is a question to be decided by a jury and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment granted on this issue of causation." *Gayton,* 593 F.3d at 624. Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is

challenged, the causation inquiry is quite broad: "the constitutional violation in question here is the failure to provide adequate medical care in response to a serious medical condition, not 'causing her death.'" *Id.* at 619; *see also Egebergh v. Nicholson,* 272 F.3d 925, 928 (7th Cir. 2001) (reversing summary judgment because a jury could infer that depriving arrestee of one insulin shot exposed him to substantial danger). A jury can infer based on medical records and witness testimony that a defendant caused harm. *Ortiz,* 656 F.3d at 534-35.

Discretionary act immunity does not absolve Aikens or Cole from Fiebrink's state law claims. Wis. Stat., § 893.80(4) provides:

> … that no suit may be brought against a political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Wisconsin has determined that when analyzing if governmental immunity applies, "'legislative, quasi-legislative, judicial, or quasi-judicial functions' are synonymous with discretionary acts. A discretionary act is one that involves an exercise of judgment when applying rules to the facts. In contrast, ministerial acts are not covered by governmental immunity. A ministerial act involves an act that is an absolute and certain duty imposed by law, which prescribes the manner in which it is to be performed. The performance of a ministerial act does not require the use of judgment or discretion." *DeFever v. City of Waukesha*, 2007 WI App 266, ¶ 7, 306 Wis. 2d 766, 772-73, 743 N.W.2d 848, 851 (internal citations omitted.)

Not all government actions are immune from liability. "The rule of immunity is subject to exceptions, which seek to balance the rights of injured parties to seek compensation with the need for public officers and employees to perform their duties freely." *Pries v. McMillon*, 2010 WI 63, ¶ 21, 326 Wis. 2d 37, 52, 784 N.W.2d 648, 655. "There is no immunity against liability associated

26

with: 1) the performance of ministerial duties imposed by law; 2) known and compelling dangers that give rise to ministerial duties on the part of public officers or employees; 3) acts involving medical discretion; and 4) acts that are malicious, willful, and intentional. *See Willow Creek Ranch,* 2000 WI 56, ¶ 25, 235 Wis.2d 409, 611 N.W.2d 693.   At least one exception applies here, precluding summary judgment on this issue.

Whether to provide medical care, or what kind to provide, does not involve the effectuation of a government policy and therefore no immunity is attached.     The *Scarpaci* court drew a distinction between medical and governmental discretion. *See Scarpaci v. Milwaukee County,* 96 Wis.2d at 663, 686–87, 292 N.W.2d  816, 827 (1980)  "'It is only when the conduct involves the determination of fundamental governmental policy and is essential to the realization of that policy, and when it requires "the exercise of basic policy evaluation, judgment and expertise" that the immunity should have application....' " *Id.* at 687, 292 N.W.2d at 827 (quoting Restatement (Second) of Torts sec. 895B comment d (1977)). "A psychiatric examination and diagnosis does not involve the determination or effectuation of governmental policy. It therefore is not covered by governmental immunity." Gordon v. Milwaukee Cty., 125 Wis. 2d 62, 67-68, 370 N.W.2d 803, 806 (Ct. App. 1985) *abrogated by Kimps v. Hill*, 187 Wis. 2d 508, 523 N.W.2d 281 (Ct. App. 1994) (abrogated on other grounds.)  Here, Aikens and Cole's failure to take any action to address the medical needs of Fiebrink does not involve the determination or effectuation of a government policy.  Therefore, no immunity attaches.

Further, Aikens and Cole had a ministerial duty to provide Fiebrink medical assistance or at a minimum access to medical treatment.  "If liability is premised upon the negligent performance [or nonperformance] of a ministerial duty imposed by law of government policy, the immunity will not apply."  *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 26, 253 Wis. 2d 323, 338, 646

N.W.2d 314, 321. A ministerial duty is one that "is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Id*. at ¶25. "The first step in the ministerial duty analysis is to identify a source of law or policy that imposes the alleged duty." *Oden v. City of Milwaukee*, 2015 WI App 29, ¶ 13, 361 Wis. 2d 708, 719, 863 N.W.2d 619, 624 *review denied*, 2015 WI 98, ¶ 13, 365 Wis. 2d 126, 870 N.W.2d 838.

Aikens and Cole had a series of ministerial duties imposed by both federal constitutional law and Milwaukee County policy and procedure to ensure the safety and wellbeing of County inmates. (PPFOF-MC ¶65). As set forth herein, the law is clear that government officials have a duty to provide medical care to individual suffering a medical emergency in their custody.

These aforementioned duties of Aikens and Cole were "absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 25, 646 N.W.2d 314, 321. Here, report medical issues and cries for help to medical personnel. Aikens and Cole violated all of the above ministerial duties they owed to Fiebrink. They had no discretion to refuse Fiebrink medical care. Cole and Aikens' failure to provide medical care violated their ministerial duties; therefore, immunity does not apply. *Lodl v. Progressive N. Ins. Co.*, 2002 WI 71, ¶ 26, 646 N.W.2d 314, 321.

### E.  PLAINTIFFS' STATE NEGLIGENCE CLAIMS

The facts set forth herein make clear the Plaintiffs' negligence claims are appropriate. To constitute a cause of action for negligence there must be; (1) A duty to conform to a certain

28

standard of conduct to protect others against unreasonable risks; (2) a failure to conform to the required standard; (3) a causal connection between the conduct and the injury; and (4) actual loss or damage as a result of the injury. *Thomas v. Kells*, 53 Wis. 2d 141, 144, 191 N.W.2d 872, 873-74 (1971).

The County Defendants: (1) owed Fiebrink a duty to provide her medical care; (2) as set forth above neither Aikens or Cole made any attempt to provide medical care or access to medical care to Fiebrink; (3) these failures caused Fiebrink's ultimate demise, (PPFOF-MC¶ 68-70), or at a minimum additional withdrawal suffering (4) Fiebrink suffered this horrifying debacle in the last hours of her life, the amount of pain and suffering incalculable considering the Milwaukee County Defendants' utter disregard for her humanity.

Summary judgment is generally not appropriate in negligence actions. "Summary judgment for a defendant is proper under Fed.R.Civ.P. 56(c) only if the pleadings, depositions and affidavits fail to disclose a genuine issue of material fact. In deciding this question, courts are to resolve all doubts against the party seeking summary judgment. As one court has observed, [s]ince tort actions generally encompass a multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual situations, such actions are usually not appropriate for disposition by summary judgment. In negligence cases, questions concerning the reasonableness of the parties' conduct, foreseeability and proximate cause particularly lend themselves to decision by a jury. Thus, summary judgment is rarely appropriate in negligence cases." *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1316 (7th Cir. 1983) (internal citations omitted.)

"As a general rule, however, the existence of negligence is a question of fact which is to be decided by the jury. To hold that a person is not negligent as a matter of law, the court must be

able to say that no properly instructed, reasonable jury could find, based upon the facts presented, that the defendants failed to exercise ordinary care. This court has stated that summary judgment does not lend itself well to negligence questions and should be granted in actions based on negligence only in rare cases." *Ceplina v. S. Milwaukee Sch. Bd.*, 73 Wis. 2d 338, 342-43, 243 N.W.2d 183, 185 (1976).

Defendants' breach of care caused Fiebrink's death not to mention hours of pain and suffering as she lay dying on the floor slipping closer and closer to her ultimate end after Aikens ignored her cries for help. (PPFOF-MC, ¶¶ 51, 69, 70). Aikens and Cole had the resources and ability to get Fiebrink the necessary medical care that would have saved her life. (PPFOF-MC, ¶¶ 69, 70).

V. **CONCLUSION**

**WHEREFORE,** the Plaintiffs respectfully request the Defendants' motion for summary judgment be denied in all respects.

Dated this 2nd day of April 2019.

> **GINGRAS, CATES & WACHS, LLP**
> Attorneys for The Estate of Kristina A. Fiebrink
> And Robert Martinez
>
> BY: /s/ William F. Sulton
> Mark L. Thomsen
> State Bar No. 1018839
> William F. Sulton
> State Bar No. 1070600

**P.O. ADDRESS:**
3228 Turnberry Oak Dr.
Suite 210
Waukesha, WI 53188
T: (414) 935-5482
F: (414) 778-1770
Email: mthomsen@gcwlawyers.com

> **JUDGE LANG & KATERS, LLC**

30

Attorneys for Estate of Angelica M. Fiebrink, Estate of Kristina A. Fiebrink, and Jose Martinez, Jr.

BY: s/ Christopher Katers
Christopher Katers
(SBN: 1067557)

**P.O. ADDRESS:**
8112 West Bluemound Road, Suite 101
Wauwatosa, WI 53213
P: (414) 777-0778
F: (414) 777-0776
Email: ckaters@jlk-law.com

**GENDE LAW OFFICES SC**
Attorneys for Estate of Angelica M. Fiebrink, Estate of Kristina A. Fiebrink, and Jose Martinez, Jr.

BY: s/ James J. Gende II
James J. Gende II
(SBN: 1030921)

**P.O. ADDRESS:**
N28 W23000 Roundy Dr. Ste 200
Pewaukee, WI 53072
P: (262) 970-8500
F: (262) 970-7100
Email: jgende@jamesgendelaw.com