# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| THE ESTATE OF KRISTINA ANN FIEBRINK by Special Administrator Nathaniel Cade, Jr., THE ESTATE OF ANGELICA M. FIEBRINK, JOSE D. MARTINEZ, JR., and ROBERT MARTINEZ, | Case No. 18-CV-832-JPS |
| Plaintiffs, | **ORDER** |
| v. |  |
| ARMOR CORRECTIONAL HEALTH SERVICES, INC., VERONICA WALLACE, BRITENY R. KIRK, EVA CAGE, BRANDON DECKER, MILWAUKEE COUNTY, LATISHA AIKENS, LATRAIL COLE, WISCONSIN COUNTY MUTUAL INSURANCE CORPORATION, and JOHN DOES 1-20, |  |
| Defendants. |  |

This action arises from the death of Kristina Fiebrink ("Fiebrink") on August 28, 2016 at the Milwaukee County Justice Facility ("MCJF"). On October 16, 2018, Plaintiffs filed an amended complaint alleging civil rights violations and wrongful death claims on behalf of Fiebrink as a result of inadequate health care at MCJF. (Docket #57). Specifically, the claims include a Section 1983 claim based on an Eighth Amendment violation of Fiebrink's right to medical care against all defendants; a *Monell* claim against Milwaukee County and Armor Correctional Health Services, Inc. ("Armor"); a loss of companionship claim against all defendants based on

the Section 1983 claim; a state law negligence claim against all defendants; and a state law loss of companionship claim against all defendants based on the negligence claim. *Id.* at 23–32. On October 30, 2018, Armor filed a motion to dismiss Counts One and Two of the Plaintiffs' amended complaint. (Docket #74). On March 8, 2019, Milwaukee County, Latisha Aikens ("Aikens"), Latrail Cole ("Cole"), and Wisconsin County Mutual Insurance Corporation (collectively "County Defendants"); Armor and Brandon Decker ("Decker") (collectively "Armor Defendants"); Eva Cage ("Cage") and Briteny Kirk ("Kirk"); and Veronica Wallace ("Wallace") filed motions for summary judgment. (Docket #193, #210, #219, and #223). The motion to dismiss will be addressed first, and granted in part, for the reasons stated below. The motions for summary judgment will also be granted in part, for the reasons stated below.[1]

## 1.      ARMOR'S MOTION TO DISMISS

Armor filed a motion to dismiss Counts One and Two of Plaintiffs' amended complaint. With regard to Count One, Armor argues that it cannot be liable for constitutional violations under a *respondeat superior* theory. With regard to Count Two, Armor contends that the *Monell* claims are overly broad, lack allegations of a widespread policy that caused similar incidents, and lack allegations that the policy was the moving force behind Fiebrink's injuries. For the reasons explained below, Armor's motion to dismiss will be granted in part and denied in part. Because some of the *Monell* claims brought under Count Two are dismissed from the entire

---

[1]Defendants Cage and Kirk have submitted an unopposed motion to withdraw attorney, which will be granted. (Docket #228).

Additionally, the parties' unopposed motions to restrict sensitive documents (Docket #241 and #257) will be granted.

action as improperly pled, they are necessarily dismissed as to Milwaukee County as well.

### 1.1 Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of complaints which fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a viable claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (quotation omitted).

In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81. However, a complaint that offers "'labels and conclusions'" or "'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The Court must identify allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.

### 1.2 Analysis

#### 1.2.1 *Respondeat Superior*

In Count One of the amended complaint, Plaintiffs assert what is, essentially, a *respondeat superior* claim against Armor, alleging that it is responsible for the inadequate health care that its employees provided by virtue of the fact that it is their employer. (Docket #57 at 23).

The Supreme Court held in *Monell v. Department of Social Services*, 436 U.S. 658, 693 (1978), that a local governmental body cannot have vicarious liability for the constitutional violations of its employees. Instead, it can only be liable under Section 1983 if the government's policy or custom caused the violation. *Id.* at 694. All Circuits to consider the issue have extended that reasoning to private corporations sued under Section 1983. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Iskander v. Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). The Seventh Circuit recently declined to overrule *Iskander*'s holding that "private corporations, when deemed to be state actors in suits under 42 U.S.C. § 1983, must be treated the same as municipal corporations. This means that they are not subject to vicarious liability." *Gaston v. Ghosh*, 920 F.3d 493, 494 (7th Cir. 2019). Accordingly, Count One is dismissed as to Armor.

### 1.2.2  *Monell* Claims

### 1.2.2.1  Allegations

Plaintiffs make the following allegations regarding the constitutional adequacy of Fiebrink's care. First, they allege that MCJF had "an alleged policy and procedure requiring an inmate to receive a medical screening within 72-hours of admission," and that Fiebrink did not receive such a screening, in violation of that policy. (Docket #57 at 2). They allege that MCJF employees knew that Fiebrink was suffering from "life threatening withdrawal symptoms," but intentionally "failed to administer withdrawal medications, employ the preventative detox protocol, or provide any treatment." *Id.* at 3. Plaintiffs further allege that Fiebrink should have received a medical assessment and a physical exam upon admission. Plaintiffs aver, however, that in light of Milwaukee County's "de facto

policy and procedure" of "avoiding performance of a medical exam," Fiebrink was ignored. *Id.* at 15–16.

Plaintiffs also contend that MCJF was perpetually understaffed, which resulted in substandard medical care due to "delays in access to care and deterioration in quality of care for detainees." *Id.* at 17. MCJF ignored recommendations to provide adequate staffing, thereby condoning and approving of a de facto policy of inadequate medical care. As a result of this understaffing, Plaintiffs allege that a "de facto policy of allowing [untrained] correctional staff to make medical determinations about the health and well-being of detainees" arose. *Id.* at 18.

In support of their allegations that inadequate medical care was part of a wide-spread problem at MCJF, Plaintiffs describe the deaths of three inmates in 2016. Terrill Thomas died of dehydration when MCJF cut off the water supply in his cell. Laliah Swayzer, the newborn of an inmate, Shade Swayzer, died after Shade was forced to give birth alone in a solitary cell. Michael Madden died following a heart infection and seizure, before responding officers were able to secure medical attention.

From this disjointed assortment of allegations in the complaint, Plaintiffs argue, in response to the motion to dismiss, that the following de facto policies, or customs, are the bases for their *Monell* claims: MCJF's failure to (1) conduct medical intake assessments more than once per year; (2) require interval history and physical examinations when someone is jailed more than once per year; (3) require administration of medicine, or other necessary medical care, when someone is going through

withdrawal;[2] (4) provide adequate care to inmates; and (5) train staff on how to respond to inmates suffering from heroin withdrawal. (Docket #116 at 5–6). Plaintiffs allege that Milwaukee County and Armor "were the moving force behind these de facto policies because they refused to adequately train, supervise and control [or discipline] staff, both correctional and medical." (Docket #57 at 21). In turn, these de facto policies were "the moving force behind the constitutional violations" that Fiebrink suffered. *Id*. at 22. Plaintiffs contend that it would be "obvious that Armor employees and correctional officers w[ould] confront detainees that w[ould] develop symptoms from heroin withdrawal and that those detainees will be injured or killed by a policy and practice that eschews immediate medical care." (Docket #116 at 9).

### 1.2.2.2 Discussion

*Monell* allows municipalities to be held liable under Section 1983, but not on a theory of *respondeat superior*. *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985). Instead, "[m]isbehaving employees are responsible for their own conduct," and "'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007)). For municipal liability to arise under Section 1983, the constitutional violation must be brought about by (1) an express municipal

---

[2]Plaintiffs articulate their third and fourth allegations as, "Third, Armor lacks a policy requiring the administration of a preventative detoxification protocol. Fourth, Armor's policy and practice is not to provide medication or other immediate medical care when withdrawal symptoms are observed." These policies address the same issue—i.e., prompt and appropriate care for inmates with habitual heroin use—so the Court has condensed them into one policy.

policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Darchak v. City of Chicago Bd. of Ed.*, 580 F.3d 622, 629 (7th Cir. 2009).

Plaintiffs do not take issue with a specific policy; rather, they proceed under the second species of *Monell* liability. Accordingly, Plaintiffs must plead facts allowing the reasonable inference that Defendants were deliberately indifferent to these widespread practices. *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003); *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 407 (1997). Only if Defendants consciously ignored a need for action can it be said that they adopted a *de facto* "policy" of violating inmates' constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work."). This can be demonstrated "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). In other words, because Plaintiffs' *Monell* claims generally target the Defendants' lack of policies, Plaintiffs must plead facts alleging that the "gap" in Defendants' policies reflected a decision to act unconstitutionally. *Calhoun*, 408 F.3d at 380. In assessing whether the absence of a policy or protocol gives rise to a decision to violate an inmate's right to medical care, the Court will look for "evidence that there is a true municipal policy at issue, not a random event." *Calhoun*, 408 F.3d at 380. The absence of a policy could mean a

variety of things—"that the government sees no need to address the point at all, or that it believes that case-by-case decisions are best, or that it wants to accumulate some experience before selecting a regular course of action." *Id.*

In very rare instances, sometimes even a single constitutional violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 409 (citing *Harris*, 489 U.S. at 390). This extremely limited class of *Monell* liability applies only to situations where "a violation of federal rights may be a highly predictable consequence of a failure to equip [officials] with specific tools to handle recurring situations." *Id*. The Supreme Court has recently explained that in *Harris*, "[t]he Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

In addition to showing sufficient culpability on the part of the governmental entity, a *Monell* plaintiff must allege facts allowing the inference that the challenged policy, practice, or custom was the "moving force" behind her injury. *Harris*, 489 U.S. at 389. Simple but-for causation is not enough. *See Wilson v. Cook Cty.*, 742 F.3d 775, 784 (7th Cir. 2014) (citing *Brown*, 520 U.S. at 410). Instead, the challenged practice "must be closely related to the ultimate injury" that the plaintiff suffered. *Harris*, 489 U.S. at 391; *Estate of Sims ex rel. Sims v. Cty. of Barbeau*, 506 F.3d 509, 515 (7th Cir. 2009) (there must be a "direct causal link" between a custom and the alleged constitutional violations). The Seventh Circuit has said that a "moving

force" is the "catalyst" for the injury in question, not merely a "contributing factor." *Johnson v. Cook Cty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010) (training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement).

Most of Plaintiffs' *Monell* violations must be dismissed because Plaintiffs have not alleged facts that support the inference that these policies were widespread, that the policies had resulted in similar harm in the past, that Fiebrink's harm was the obvious result of these policies, or, finally, that the policies were the moving force behind Fiebrink's constitutional harm.

### 1.2.2.2.1    Medical policies

Plaintiffs argue that they allege that Armor had "a policy and practice" of conducting "clinical intake assessments by medical practitioners. . .only once per year." (Docket #116 at 5). Plaintiffs also claim that Armor "lacks a policy requiring an interval history and physical examination when someone is jailed more than once in a year." *Id.* These policies articulate the same failure to conduct an adequate and timely medical examination upon re-entry to MCJF, so they will be analyzed as one policy. Plaintiffs argue that these policies were widespread, systematic, and the moving force behind Fiebrink's constitutional harm.

Despite claiming a policy of inadequate medical examination for inmates re-entering CMJF, in their amended complaint, Plaintiffs acknowledge that Armor conducted an initial health screening of Fiebrink when she was booked. (Docket #57 at 14). They also state that it was Armor's policy to "require[] an inmate to receive a medical screening within 72-hours of admission." *Id.* at 2. Fiebrink did not receive her screening before she died, *id.*, because the screening was re-scheduled, but

a policy was nevertheless allegedly in place. The complaint, therefore, undermines the very *Monell* policies of which it tries to make claims.

Even if Plaintiffs had successfully alleged a cognizable policy of failing to appropriately examine newly re-admitted inmates, there are still no allegations that Armor was on notice that its health screening policies were likely to result in violations of inmates' constitutional rights. Plaintiffs do not point to a single other instance of constitutional harm arising from Armor's medical screening policies as they relate to re-entering inmates.

### 1.2.2.2.2 Detoxification policies

Plaintiffs attempt to allege *Monell* claims based on Armor's lack of a policy "requiring the administration of a preventative detoxification protocol," and the policy and practice of failing to provide "medication or other immediate medical care when withdrawal symptoms are observed." (Docket #116 at 5). These policies articulate the same failure to provide adequate care to inmates suffering from withdrawal, so they will be analyzed as one claim.

The facts of the amended complaint suggest that the decision to administer taper medication is conducted on a case-by-case basis. *See* (Docket #57 at 6–7). That complaint points to no other instances of abject denial of medications that suggest a de facto policy of withholding necessary medications from heroin users. Moreover, the amended complaint indicates that medical care was envisioned for Fiebrink as her withdrawal was monitored. *Id*. Therefore, Plaintiffs have failed to sufficiently plead the existence of a de facto policy of refusing medical attention or medication for inmates who used heroin and/or are withdrawing.

Additionally, even if they had sufficiently pled such a policy, Plaintiffs have failed to point to a single other constitutional violation arising from such a policy. Accordingly, there are no facts to suggest Armor's knowledge that such a practice commonly occurred. To the extent that Plaintiffs attempt to allege a single-incident *Monell* claim, they have not credibly alleged that "a violation of federal rights [is] a highly predictable consequence of" failing to immediately medicate an inmate who indicates heroin use or demonstrates withdrawal symptoms. *Brown*, 520 U.S. at 409. The amended complaint contains facts suggesting that Fiebrink's withdrawal was supposed to be monitored, which undermines the "high[] predictab[ility]" of the constitutional violation. *Id.* For example, that complaint indicates that taper medications were evaluated, but determined to be unnecessary at the time of admission. (Docket #57 at 6–7). Meanwhile, three nurses were ordered to conduct detox/withdrawal monitoring of Fiebrink over the course of several days. *Id.* at 6. The amended complaint, therefore, does not support the allegation that Armor had a widespread, de facto policy of withholding medical care to inmates suffering from or at risk of withdrawal.

### 1.2.2.2.3   Failing to provide adequate medical care

Plaintiffs broadly allege that Armor failed to provide adequate medical care to inmates and point to four deaths at MCJF in 2016 in an attempt to illustrate a wide-spread practice of ignoring medical needs. The deaths, discussed above, include Fiebrink's, a baby who was born in solitary confinement, a man who died in solitary confinement when his water was cut off for six days, and a man who died after suffering from a heart condition and a seizure.

In *Terry v. County of Milwaukee*, this Court declined to find a widespread municipal custom or practice of ignoring inmates' medical needs based on these same deaths. 2018 WL 2567721, at *4, *6 (E.D. Wis. June 4, 2018). The Court explained that the circumstances surrounding each death were too distinct to suggest a pattern. As here, the plaintiffs made no allegations that the same staff, medical conditions, or policies were behind the deaths. The only common fact underlying each passing was that these individuals died in MCJF custody because their medical needs were ignored—"though one instance of being ignored appears to mean something vastly different from the next." *Id.* at *7. The Court must reiterate what it held then, which is that there are insufficient factual allegations to suggest that "tolerating the problem amounted to a conscious choice." *Id.* at *8. Indeed, the "custom or policy underlying a *Monell* claim cannot be so amorphous that it effectively exposes a municipality to *respondeat superior* liability." *Id.* Because Plaintiffs have failed to state a cognizable practice, this claim must be dismissed.

### 1.2.2.2.4   Failing to train staff to respond to inmate withdrawal

Plaintiffs finally argue that Armor had a policy of failing to train employees on adequate medical care for inmates suffering from heroin withdrawal, which amounted to deliberate indifference. Defendant argues that there is no "recurring situation that presents an obvious potential for a constitutional violation," and no allegation that Armor "fail[ed] to provide further training after learning of a pattern of constitutional violations." (Docket #137 at 11–12) (citing and quoting *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003)). They further argue that there is no "obvious need" that leaves open the possibility that the "unconstitutional

consequences of failing to train could be so patently obvious that a city could be liable under Section 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64.

The Court finds that the pleadings do sufficiently allege a failure to train employees on how to respond to inmates suffering from heroin withdrawal. (Docket #57 at 18, 26). Plaintiffs allege that Fiebrink was not properly treated for her heroin withdrawal symptoms due to Armor's and Milwaukee County's failure to train employees on how to recognize and care for withdrawing inmates, and that she died as a result. *Id.* In light of the high rate of individuals who suffer from opioid addiction, as well as the sweeping media coverage of the issue, it is conceivably obvious that constitutional violations would arise from a failure to train staff on how to respond to this issue. At the motion to dismiss juncture of this analysis, Plaintiffs have adequately alleged that Armor's and Milwaukee County's failure to train was the moving force behind Fiebrink's death. This claim will be analyzed on summary judgment, *infra*.

## 2.   DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Milwaukee County, Wisconsin County Mutual Insurance Corporation, Latrail Cole, Latisha Aikens, Armor Correctional Health Services, Inc., Brandon Decker, Briteny Kirk, Eva Cage, and Veronica Wallace have submitted motions for summary judgment. For the reasons stated below, the motions submitted by the Milwaukee County Defendants, (Docket #193), the Armor Defendants, (Docket #210), and Briteny Kirk and Eva Cage (Docket #219) will be granted in part and denied in part. Veronica Wallace's motion for summary judgment, (Docket #223), will be granted in full.

### 2.1    Legal Standard

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The Court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the [C]ourt that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

### 2.2    Relevant Facts

On August 24, 2016, Fiebrink was arrested by the Milwaukee Police Department and detained on an outstanding probation violation. During her arrest, she sustained an injury to her foot and was transported to St. Francis Hospital for evaluation. She received a foot x-ray and an EKG, both of which came back as normal. Fiebrink was transported to MCJF, where a pre-booking screening was completed by an Armor nurse. After booking, another nurse, Mai Bruno ("Bruno"), performed an intake health screening

on Fiebrink in the early morning of August 25, 2016. Fiebrink told Bruno that she was a habitual heroin user. Bruno indicated on the health screening form that Fiebrink was a daily heroin user and had last used heroin the previous day. Bruno also noted that Fiebrink had had difficulty with drug withdrawal in the past. At the time she was booked, Fiebrink did not have any symptoms of withdrawal, and registered a "zero" on a withdrawal symptom scale of 0-10. Nevertheless, Bruno completed a withdrawal screening flowsheet form and a mental health intake screening form, and reported Fiebrink's heroin use to a clinician, Brandon Decker. Decker formulated a withdrawal assessment plan that did not include detoxification medications. The parties agree that this failure to provide detoxification medication violated protocols. (Docket #245 at 3). Decker did, however, prescribe regular withdrawal checks, which consist of a nurse practitioner taking the patient's vital signs and asking various questions about withdrawal symptoms. Aside from this, Decker was not involved in Fiebrink's care, nor did he receive any other updates about her. At no point during these various health evaluations did Fiebrink disclose any heart issues.

At the time Fiebrink was admitted, it was Armor's policy to conduct withdrawal monitoring checks twice per day on inmates who indicated heroin use. Detoxification was to be done under the supervision of a physician. Armor also had a list of possible medications that could be administered to individuals going through the detoxification process.

Fiebrink was put into jail's general population, but placed on a lower bunk, which sometimes indicates that an inmate has special needs. Bruno scheduled a "Level 2" medical appointment with a clinician for opiate

withdrawal on August 26. This appointment was subsequently rescheduled for a later date.

On August 25, the day Fiebrink was admitted MCJF, Nurse Kirk went to the sixth-floor common area in order to conduct withdrawal checks. During these withdrawal checks, inmates are supposed to come out of their cells and undergo a brief examination. If inmates refuse treatment, Armor's policy requires the nurse to inform the patient of the risks of refusing consent, and have the patient sign a refusal of treatment form. If the patient refuses to sign the form, then the correctional officer on duty must sign. Armor trains its nurses never to go into the inmate's cells, so if an inmate refuses to come out of his or her cell, the corrections officer will serve as a go-between for the inmate and the nurse.

On August 25, Fiebrink refused the withdrawal check conducted by Kirk. (Docket #235 at 11). This was the only attempted withdrawal check that anybody conducted that day. Kirk filled out a refusal form but did not explain the risks of refusing treatment to Fiebrink. Kirk never saw Fiebrink, and communicated with her through a guard. The correctional officer on duty signed the refusal form in lieu of Fiebrink.

On August 26, Fiebrink refused a withdrawal check from Nurse Wallace. This was the only attempted withdrawal check of the day. Wallace did not fill out a refusal form, but she did explain the risks of refusing treatment to Fiebrink and made a note that Fiebrink refused treatment on Fiebrink's electronic medical records, so that future nurses would see it.

On August 27, Fiebrink refused a withdrawal check from Nurse Cage. This was the only attempted withdrawal check of the day. Cage filled out a refusal form but did not explain the risks of refusing treatment to Fiebrink. Cage did not see Fiebrink or speak directly to her, but

communicated through the security guard. Fiebrink was last noted to be alive at 6:00 p.m. on August 27, 2016.

Correctional Officer Cole was on duty during Fiebrink's time at MCJF. She knew that Fiebrink was assigned to a lower tier and a lower bunk, but the parties dispute whether Cole understood that Fiebrink was assigned to this type of bunk because she was going through withdrawal. Generally speaking, correctional staff were not apprised of inmates' health information, including prior heroin use. (Docket #234 at 5). On August 27, Cole witnessed Fiebrink refuse breakfast, which was fairly common among inmates. Later that day, Fiebrink defecated on herself. In response to the defecation, Cole ensured that Fiebrink's cell was cleaned, and noted that Fiebrink showered herself without incident. Following the defecation, Fiebrink socialized with other detainees in the day room. There is no evidence that the diarrhea, or any other symptoms, persisted or worsened. The parties dispute whether, from these incidents, Cole knew that Fiebrink was suffering from severe withdrawal. Cole was not formally trained to recognize heroin withdrawal symptoms.

Correctional Officer Aikens was assigned to the night shift on Fiebrink's floor the night she died. Aikens was tasked with making sure that inmates were in their cells and, if necessary, responding to calls for help. Aikens knew that an inmate who was assigned a lower tier/lower bunk was likely to have special needs. Aikens did not have any interactions with Fiebrink prior to Fiebrink's death. Aikens performed regular bed checks at Fiebrink's cell at around 10:30 p.m. and 11:13 p.m. on August 27, 2016, and then again at approximately 12:05 a.m., 12:50 a.m., and 1:42 a.m. on August 28, 2016. Defendants provided evidence that Aikens conducted additional bed checks at approximately 1:25 a.m., 2:15 a.m., 3:02 a.m., 3:30

a.m., 5:15 a.m., 5:50 a.m. When conducting these bed checks, officers were to look at the rise and fall of the inmates' chests, if possible, to ensure that they were breathing. Many of Aikens's rounds were quickly completed, and there is an issue of fact as to whether she performed these rounds thoroughly.

There is a "call-light" outside each cell, which inmates are able to activate when they are in distress. There is an issue of fact as to whether Fiebrink called for help in the night and activated her call-light. Plaintiffs have provided a witness who remembers hearing Fiebrink call for help and seeing Fiebrink's call-light activate; Defendants have provided evidence seeking to undermine this witness's account. Aikens testifies that neither she, nor her partner on duty, recall anything out-of-the-ordinary from that night. (Docket #234 at 15).

When Cole entered Fiebrink's cell around 7:24 a.m. on August 28 to bring her to a medical assessment, Fiebrink was cold to the touch. She was pronounced dead shortly thereafter. The parties dispute the cause of death—Defendants' autopsy points to cardiovascular disease, while Plaintiffs' expert opines that the cause of death was due to withdrawal-related complications. *See* (Docket #221-6 at 10–16).

### 2.3    Analysis

#### 2.3.1    Estate of Fiebrink's Section 1983 Claim for Violation of her Eighth Amendment Rights

As a threshold matter, the parties dispute whether the Eighth or Fourteenth Amendment applies to Fiebrink's Section 1983 claim. The due process protections of the Fourteenth Amendment "govern [a] pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."

*Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). Fiebrink was arrested and detained at MCJF pursuant to a warrant issued as a result of an outstanding probation violation. The case law in this circuit is clear that the Eighth Amendment applies "following conviction." *Id.* Since probation is a term of punishment imposed in lieu of confinement following conviction, the Eighth Amendment applies.

The Eighth Amendment's "deliberate indifference" standard requires that (1) Fiebrink suffered from an objectively serious medical condition; (2) the government official subjectively knew of the condition and was deliberately indifferent in treating it; and (3) this indifference caused Fiebrink's injury. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

The parties do not dispute that heroin withdrawal constitutes a serious medical condition. *See Davis v. Carter*, 452 F.3d 686, 692–93 (7th Cir. 2006) (assuming, without deciding, that heroin withdrawal is a sufficiently serious medical condition that would give rise to a violation of the Eighth Amendment). The issue here is whether the parties acted with deliberate indifference towards Fiebrink's medical need.

The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Gayton*, 593 F.3d at 620. Even if an official is aware of the risk to the inmate's health, he is not liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). Establishing deliberate indifference is a heavy burden; the Seventh Circuit has emphasized that deliberate indifference "comprehends

more than mere negligence but less than the purposeful or knowing infliction of harm." *Estate of Novack*, 226 F.3d at 529; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Indeed, the Court of Appeals has characterized the required showing "as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). The operative inquiry is not whether the inmate believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). The individual defendants' deliberate indifference will be analyzed below.

### 2.3.1.1        Nurse Brandon Decker

Plaintiffs have failed to establish a genuine issue of material fact as to whether Decker knew that Fiebrink was in need of withdrawal medication when she was booked into MCJF. Decker was informed that Fiebrink was a regular heroin user with a history of difficult withdrawal. However, he also knew that she did not exhibit a single withdrawal symptom upon entry to MCJF. Accordingly, Decker developed a monitoring plan that entailed withdrawal checks for Fiebrink—including one later in the day that she was admitted—and a medical appointment within 72-hours. There is no evidence that Decker ignored the risks of future heroin withdrawal. To the contrary, he addressed it with a plan tailored to her symptoms at the time of admittance (which were non-existent) and which could accommodate any future symptoms of withdrawal as they arose. There is no evidence that Decker had any responsibility past this initial consultation, nor was his opinion requested

at a later hour. While Decker may have been negligent in failing to order taper medications, there is no evidence of deliberate indifference.

### 2.3.1.2　　　　Nurse Briteny Kirk

There is no evidence that Kirk knew that Fiebrink was undergoing withdrawal symptoms when she entered the day room to conduct a withdrawal check. On August 25, Fiebrink declined the withdrawal check, as was her right to do, and the correctional officer who relayed the communications to Kirk gave no indication that Fiebrink was in distress. Additionally, Fiebrink had not been assigned any taper medication at that point, so Kirk had no basis to believe that Fiebrink was in need of medical attention. Although Kirk should have informed Fiebrink of the risks of refusing medical attention and conducted another withdrawal check later in the day, "her failure to do so was not a deliberate indifference to a serious medical condition," but may have been merely negligent in light of the fact that Fiebrink gave no indication of suffering from serious withdrawal symptoms. *Gayton*, 593 F.3d at 623. Because Kirk was not subjectively aware that Fiebrink was suffering from severe withdrawal symptoms, there is no deliberate indifference.

### 2.3.1.3　　　　Nurse Veronica Wallace

Like Kirk, Wallace had no subjective knowledge that Fiebrink was suffering from serious heroin withdrawal on August 26. Fiebrink was not prescribed taper medications, and she refused a withdrawal check, as was her right. Wallace saw Fiebrink and explained to her the risks of refusing medical treatment. There is no evidence that Fiebrink was exhibiting withdrawal symptoms that would have put Wallace on notice of her condition. Although Wallace should have filled out a refusal form and conducted another withdrawal check that day, "her failure to do so was not

a deliberate indifference to a serious medical condition," but may have been merely negligent in light of the fact that she did not know that Fiebrink was suffering from serious withdrawal symptoms. *Gayton*, 593 F.3d at 623. Because Wallace was not subjectively aware that Fiebrink was suffering from severe withdrawal symptoms, there is no deliberate indifference.

### 2.3.1.4          Nurse Eva Cage

Like Kirk and Wallace, Cage had no subjective knowledge that Fiebrink was suffering from serious heroin withdrawal. When Cage attempted to conduct the withdrawal check on August 27, Fiebrink still had not been prescribed taper medications, and she had refused two withdrawal checks. Cage was not informed that Fiebrink had defecated on herself or refused breakfast. Thus, there is no evidence that Cage knew that Fiebrink was suffering from withdrawal symptoms, let alone serious ones. Fiebrink declined the withdrawal check, as was her right to do, and the correctional officer who communicated between them gave no indication that Fiebrink was in distress. Although Cage should have warned Fiebrink about the risks of refusing medical care, "her failure to do so was not a deliberate indifference to a serious medical condition," but may have been merely negligent in light of the fact that she did not know that Fiebrink was suffering from serious withdrawal. *Gayton*, 593 F.3d at 623. Because Cage was not subjectively aware that Fiebrink was suffering from severe withdrawal symptoms, there is no deliberate indifference.

### 2.3.1.5          Correctional Officer Latrail Cole

Plaintiffs have failed to establish a genuine issue of material fact as to Cole's deliberate indifference to a serious medical need. There is no evidence that Cole had subjective knowledge of Fiebrink's severe heroin withdrawal. The parties dispute whether Cole would have understood the

significance of Fiebrink's lower bunk assignment, but this is of no consequence. Even if the Court assumed that Cole did understand, from Fiebrink's bunk assignment, that Fiebrink may have had special needs, it is undisputed that Cole did not know what those special needs were. The parties agree that refusing meals is a fairly common occurrence, so the only indication Cole may have had of a serious medical issue was the self-defecation. However, in response to Fiebrink's self-defecation, Cole ensured that Fiebrink and her cell were swiftly cleaned. Cole attested that Fiebrink used the shower by herself without incident, then socialized with other inmates in the day area. Fiebrink never told Cole that she was going through withdrawal or experiencing continuing/worsening diarrhea, nor did she appear to be in obvious anguish. There is, in short, no evidence that Cole subjectively knew that Fiebrink was suffering from severe withdrawal.

### 2.3.1.6     Correctional Officer Latisha Aikens

It is undisputed that Aikens did not know that Fiebrink was suffering from heroin withdrawal at the beginning of the night that Fiebrink died. However, Plaintiffs offer some evidence which, if believed, indicates that at some point in the early morning of August 28, Fiebrink called for help and activated the call button outside of her cell, but nobody responded. Defendants, on the other hand, have provided evidence that Aikens diligently conducted her rounds twice an hour—which included a "bed check" of Fiebrink's cell—and concluded that nothing out of the ordinary happened that night. This issue of fact is left to the jury to resolve. If Aikens ignored Fiebrink's calls for help and call light while on her rounds, then it can be inferred that she knew that Fiebrink was in distress, and ignored her, which would potentially give rise to a deliberate indifference claim.

### 2.3.1.6.1    Qualified Immunity

Qualified immunity shields officials from the civil consequences of their constitutional violations when the law did not put the officials on clear notice that their conduct would be unlawful. *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that the doctrine protects officials from civil liability when they perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "Put simply," says the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The test for qualified immunity is (1) whether the defendants' alleged actions violated the plaintiff's constitutional rights; and (2) "whether the implicated right was clearly established at the time." *Jones v. Wilhelm*, 425 F.3d 455, 461 (7th Cir. 2005). Once the defense is raised, the plaintiff bears the burden to defeat it. *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). To overcome an assertion of qualified immunity, Fiebrink must proffer facts which, if believed, would amount to a violation of her constitutional rights. *Katz*, 533 U.S. at 201. As the discussion above shows, Fiebrink has done this. Next, Fiebrink must show that the violation of her constitutional rights was "clearly established under applicable law at the time and under the circumstances that the defendant official acted." *Easterling v. Pollard*, 528 Fed. App'x 653, 656 (7th Cir. 2013).

A right is clearly established if "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Factually identical precedent is not necessary; the

guiding question is whether the official would have had "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Deliberately ignoring a request for medical assistance has long been held to be a form of cruel and unusual punishment." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Accordingly, if Aikens heard Fiebrink call for help and saw her activate the call-light outside her door, but ignored the request for medical assistance, then qualified immunity would not apply.

### 2.3.1.7    Causation

Defendants contend that Plaintiffs have not established an issue of material fact as to whether Defendants' unconstitutional conduct was the cause in fact of her injury. *Muckway v. Craft*, 789 F.2d 517, 521 (7th Cir. 1986). Causation is generally a question of fact for the jury to decide. *Shick v. Ill. Dept. of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002) ("While generally the issue of proximate cause is a jury question, in extreme circumstances ... the question of proximate cause is an issue of law properly resolved by a court."); *Gayton*, 593 F.3d at 624 (in addressing a claim for deliberate indifference to an inmate's medical needs under the Eighth Amendment, "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation."). The issue may only be resolved on summary judgment "when there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Johnson v. City of Philadelphia*, 837 F.3d 343, 352 (3d Cir. 2016). The Court is satisfied that a reasonable jury could find causation between Aikens ignoring Fiebrink's alleged calls for help and Fiebrink's death.

### 2.3.2 Estate of Fiebrink's Monell Claim[3]

At summary judgment, Plaintiffs must provide evidence that Armor and Milwaukee County failed to train their staff on how to respond to inmates suffering from heroin withdrawal, and that this policy of failing to train was the moving force behind Fiebrink's constitutional violation. *Wilson*, 742 F.3d at 784.

There is evidence that Armor's training policies were deficient and that Milwaukee County's correctional officials were not trained on how to identify and respond to inmates suffering from heroin withdrawal. However, there is no evidence that the failure to train policy was the moving force behind Fiebrink's constitutional violation. This is because Fiebrink was not exhibiting obvious signs of heroin withdrawal that would have put any observing Armor or Milwaukee County employees on notice even if they *had* been trained to identify signs of heroin withdrawal. The only evidence of any out of the ordinary behavior that Fiebrink exhibited to Cole—refusing one meal and defecating on herself once—are also symptoms of a variety of other ailments or psychological conditions. Additionally, there is no evidence that Fiebrink's symptoms progressed or were accompanied by other signs of withdrawal. Instead, the evidence shows that after the defecation occurred, Fiebrink cleaned herself up and proceeded to socialize in the day room without incident. There is no evidence that Fiebrink complained of or exhibited any other withdrawal symptoms, or that anybody observed her in obvious distress, until the night

---

[3]In their oppositions to summary judgment, Plaintiffs also advance *Monell* theories regarding a de facto policy of understaffing. *See* (Docket #240 at 4). Summary judgment is not the appropriate time to advance these arguments for the first time, so the Court will not consider them. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

that she passed away. Training could not have avoided the harm that occurred because Fiebrink did not clearly present withdrawal symptoms. Accordingly, there is no evidence that this failure to train was the moving force behind her constitutional harm. Therefore, this *Monell* claim must be dismissed.

### 2.3.3 Robert Martinez's Wrongful Death Claim

Plaintiffs bring a federal wrongful death action based on any Section 1983 violations. The Seventh Circuit has yet to consider whether minor children have standing to bring claims under Section 1983 for loss of society or companionship of a parent. Defendants ask the Court to extend the holding of *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005), which established that parents do not have "a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action," to preclude a minor child's ability to recover for loss of companionship because the challenged state action was not committed with the intent of interfering with the familial relationship. The Court declines to do so at this juncture, although it acknowledges that this is an unsettled area of the law. *Russ*'s holding intended to cabin due process protections to mitigate "the risk of constitutionalizing all torts against individuals who happen to have families." *Id.* at 790. However, in dicta, the Seventh Circuit acknowledged that the "need for the guidance and support of. . .parents warrants sharply different constitutional treatment." *Id.* at 790. The only court to consider the issue in this district has allowed minor children's loss of companionship claims brought under Section 1983 where the state action was not committed with intent to interfere with the family relationship. *See Avery v. City of Milwaukee*, 2015 WL 13016242, at *1 (E.D. Wis. May 19, 2015); *see also Mombourquette ex rel.*

*Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 654 (W.D. Wis. 2007). Therefore, if a jury finds that Aikens violated Fiebrink's civil rights, then this Court will permit the jury to hear Robert Martinez's claim. Martinez was born on October 6, 1998 and was approximately 17 years and ten months of age when Fiebrink passed away. A jury will be able to factor his age into the damages computed for loss of society and companionship.

### 2.3.4    Negligence (Wis. Stat. § 895.03)

Plaintiffs bring a negligence claim against all defendants for their conduct in relation to Fiebrink's care in the days leading up to her death. In Wisconsin, the elements of a negligence claim are: "(1) [a] duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Antwaun A. v. Heritage Mut. Ins. Co.*, 596 N.W.2d 456, 461 (Wis. 1999). The duty in this case would be one of reasonable or ordinary care, which is defined as the care "which a person of ordinary prudence would exercise under the same or similar circumstances." *Schuldies v. Serv. Mach. Co., Inc.*, 448 F. Supp. 1196, 1199 (E.D. Wis. 1978). Notably, Wisconsin has adopted the Andrews approach to duty, *see Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 102 (Ct. App. N.Y. 1928) (Andrews, J., dissenting), holding that "[t]he duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act." *A.E. Inv. Corp. v. Link Builders, Inc.*, 214 N.W.2d 764, 766 (Wis. 1974); *Klassa v. Milwaukee Gas Light Co.*, 77 N.W.2d 397, 401 (Wis. 1956). Thus, negligence arises when "it can be said that it was foreseeable that [the defendant's] act or omission to act may cause harm to someone." *Rolph v. EBI Cos.*, 464 N.W.2d 667, 672 (Wis. 1991)

(citations and quotations omitted). Yet, while Wisconsin has adopted the view that "everyone owes a duty to the world at large, the duty owed to the world is not unlimited but rather is restricted to what is reasonable under the circumstances." *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009).

### 2.3.4.1    Immunity

State officials are immune from liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). Wisconsin courts have interpreted this protection as extending to all conduct involving "the exercise of discretion and judgment." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 673 (Wis. 2005) (quotation omitted). A "discretionary duty" requires "a public official to determine how a general policy should be carried out or how a general rule should be applied to a specific set of facts." *Patterson v. Hepp*, 2017 WL 3261715, at *12 (E.D. Wis. July 31, 2017) *aff'd*, 722 F. App'x 585 (7th Cir. 2018) (citing *Lifer v. Raymond*, 259 N.W.2d 537, 541 (Wis. 1977)). Wisconsin courts have recognized four categories of acts to which immunity does not apply: "(1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional." *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). The immunity afforded by Section 893.80(4) and the exceptions thereto represent "a judicial balance struck between 'the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress.'" *C.L. v. Olson*, 422 N.W.2d 614, 617 (Wis. 1988) (quoting *Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 240 N.W.2d 610, 621 (Wis. 1976)); *Patterson*, 2017 WL 3261715, at *11. Three exceptions to discretionary immunity potentially

apply to this case: the professional discretion exception to Armor, Decker, Cage, Kirk and Wallace; and either the ministerial duty exception or the malicious, willful, and intentional exception to the County Defendants.

### 2.3.4.1.1      Armor, Decker, Cage, Kirk, and Wallace

The "professional discretion" exception to immunity applies most often in medical contexts because "[t]he theory behind immunity for quasi-judicial decisions does not dictate an extension of the immunity to cover the medical decisions of medical personnel employed by a governmental body." *Scarpaci v. Milwaukee Cty.*, 292 N.W.2d 816, 827 (Wis. 1980); *Estate of Perry v. Wenzel*, 872 F.3d 439, 462–63 (7th Cir. 2017) (applying Wisconsin law and holding that because defendants "were exercising their medical discretion. . .governmental immunity does not act as a bar to suit."). Armor does not dispute that immunity does not protect it or its employees; therefore, the medical negligence claims against them will go forward.

### 2.3.4.1.2      County Defendants

The ministerial duty exception removes an official's immunity where the duty in question "is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister*, 240 N.W.2d at 622.[4] In contrast to ministerial tasks, discretionary acts require a public official to determine how a general policy should be carried out or how a general rule should be applied to a specific set of facts. *Lifer*, 259

---

[4]Plaintiffs also argue that the professional discretion exception applies to the County Defendants, but the correctional officers are not "medical personnel" who made medical decisions regarding Fiebrink's care. *See Scarpaci*, 292 N.W.2d at 827.

N.W.2d at 541. Even acts performed pursuant to a legal obligation may be discretionary because there may exist room for judgment. *Scott*, 663 N.W.2d at 723. A key step in inquiring whether an act is discretionary or ministerial is to identify the law creating the duty to act. "Where there is a written law or policy defining a duty, we naturally look to the language of the writing to evaluate whether the duty and its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion." *Pries v. McMillon*, 784 N.W.2d 648, 656 (Wis. 2010). The Court begins, therefore, with the alleged source of Defendants' duty.

Plaintiffs contend that Aikens and Cole had "a series of ministerial duties imposed by both federal constitutional law and Milwaukee County policy and procedure to ensure the safety and wellbeing of County inmates." (Docket #239 at 28). However, they do not point to a specific writing that the Court can examine to determine whether "its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion." *Pries*, 784 N.W.2d at 656. Certainly, all people have a duty of care to one another, and custodial officials have a duty to carry out their jobs according to the constitution and the legislation of Milwaukee County, but a mandate to follow the law does not necessarily give rise to a ministerial duty. *See Swatek v. Cty. of Dane*, 531 N.W.2d 45, 59–60 (Wis. 1995) (evaluating a Wisconsin statute requiring prison officials to provide appropriate medical care to inmates and concluding that the statute imposes a discretionary duty). At summary judgment, Plaintiffs must do more than simply allege that a ministerial duty exists—they must provide evidence of the source of the ministerial duty in order for the Court to evaluate whether the exception applies. Plaintiffs have not done this;

therefore, to the extent that the County Defendants were negligent, discretionary immunity shields them from liability.

The Court notes, however, that if a jury finds Aikens to be deliberately indifferent, then the exception to governmental immunity for actions conducted with malice, intent, or purpose may apply. *See Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 984 (E.D. Wis. 2003) (leaving for the jury the question of whether a police officer, who was also sued under Section 1983, was malicious, willful, and intentional in his arrest of the plaintiff); *see also Campbell v. Brown Cty.*, 2006 WL 1207833, at *5 (E.D. Wis. May 2, 2006) (Section 1983 case in which the court left for the jury the question of whether immunity applied to a state law negligence claim). Accordingly, if the jury finds that Aikens was deliberately indifferent, then the question of whether she acted with malice, willfulness, or intent for the purpose of negating governmental immunity will also be submitted to the jury.

### 2.3.4.2      Standard of Care and Causation

A *prima facie* case of medical malpractice under Wisconsin state law requires Plaintiffs to establish the standard of care through expert testimony. *Carney-Hayes v. N.W. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005); *Payne v. Milwaukee Sanitarium Found., Inc.*, 260 N.W. 386, 390 (Wis. 1977) (recognizing a "distinction between medical care and custodial or routine hospital care."). Plaintiffs have provided one admissible expert opinion, from Timothy Ryan, that bears on the standard of medical care as to Armor, Decker, Kirk, and Cage, thereby creating a genuine issue of material fact as to whether the standard of care was breached. To the extent Defendants take issue with the reliability of this expert's qualifications and conclusions, they may elicit those weaknesses through cross-examination.

Plaintiffs' tardy submission of Dr. Richard Lewan's opinion (Docket #230) is inadmissible to establish the standard of care. *See* Fed. R. Civ. P. 37(c)(1); *Baker v. Indian Prairie Cty. Unif. Sch. Dist. No. 204*, 1999 WL 988799, at *3 (N.D. Ill. Oct. 26, 1999). Moreover, since Ryan does not opine on the standard of care administered by Wallace, Plaintiffs have failed to make out a prima facie case against her. Therefore, the negligence claims as to Wallace must be dismissed.

Armor, Decker, Kirk, and Cage also argue that Fiebrink's own refusal of treatment was a superseding cause to any purported negligence that may have contributed to Fiebrink's death. Causation is generally an issue for the jury, unless there is absolutely no issue of fact. *Shick*, 307 F.3d at 615. Here, while the Armor Defendants have provided evidence that Fiebrink's death was caused by issues unrelated to their putative negligence, Plaintiffs have also provided evidence that medical negligence may have contributed to Fiebrink's death. *See* (Docket #221-6). A reasonable jury could find a causal connection between the remaining defendants' negligence and Fiebrink's death. Therefore, the medical negligence claims against the Armor Defendants are not properly resolved on summary judgment.

3.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendant Armor Correctional Health Services, Inc.'s motion to dismiss Counts One and Two of Plaintiffs' amended complaint (Docket #74) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that the Milwaukee County Defendants' motion for summary judgment (Docket #193) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that the Armor Defendants' motion for summary judgment (Docket #210) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Defendants Eva Cage and Briteny Kirk's motion for summary judgment (Docket #219) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Defendant Veronica Wallace's motion for summary judgment (Docket #223) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Count I of the Amended Complaint, Plaintiffs' *respondeat superior* claim, be and the same is hereby **DISMISSED** against Defendant Armor Correctional Health Services, Inc.;

**IT IS FURTHER ORDERED** that Count II of the Amended Complaint, Plaintiffs' *Monell* claims against Defendants Armor Correctional Health Services, Inc. and Milwaukee County, be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Count I of the Amended Complaint, Plaintiffs' Eighth Amendment claim, be and the same is hereby **DISMISSED** as to Defendants Latrail Cole, Veronica Wallace, Brandon Decker, Eva Cage, and Briteny Kirk;

**IT IS FURTHER ORDERED** that Count III of the Amended Complaint, Plaintiffs' Section 1983 loss of consortium claim, be and the same is hereby **DISMISSED** as to Defendants Latrail Cole, Veronica Wallace, Brandon Decker, Eva Cage, and Briteny Kirk;

**IT IS FURTHER ORDERED** that Counts IV and V of the Amended Complaint, Plaintiffs' negligence and state law loss of companionship claims, be and the same are hereby **DISMISSED** as to Defendants Veronica Wallace and Latrail Cole;

**IT IS FURTHER ORDERED** that Defendants Veronica Wallace and Latrail Cole be and the same are hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that Defendants Eva Cage and Briteny Kirk's motion to withdraw as attorney (Docket #228) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion to restrict document (Docket #241) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that the Armor Defendants' motion to restrict document (Docket #257) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 3rd day of May, 2019.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge